United States Courts
Southern District of Texas
**FILED**

AUG 1 6 2010

David J. Bradley
Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

**SEALED**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex. rel.* | § | |
| DAKSHESH "KUMAR" PARIKH, M.D., | § | |
| HARISH CHANDNA, M.D., and AJAY | § | |
| GAALLA, M.D., | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | |
| | § | |
| CITIZENS MEDICAL CENTER, DAVID P. | § | |
| BROWN, and WILLIAM TODD | § | |
| CAMPBELL, JR., M.D., | § | |
| Defendants | § | |

**FILED *IN CAMERA*
UNDER SEAL
AS REQUIRED BY
31 U.S.C. § 3730(B)(2)**

CIVIL ACTION NO. **V - 1 0 - 6 4**

JURY REQUESTED

UNSealed *per Order on 2/26/13*
Public and unofficial staff access
to this instrument are
prohibited by court order.

## PLAINTIFFS' *QUI TAM* COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Plaintiffs, Dakshesh "Kumar" Parikh, M.D., Harish Chandna, M.D., and

Ajay Gaalla, M.D. (collectively "Physicians" or "Relators"), acting on behalf of and in the name

of the United States of America, and file this *Qui Tam* Complaint under the Federal False Claims

Act, 31 U.S.C. § 3729 *et seq.*, to recover damages, civil penalties, and other equitable relief from

the Defendants Citizens Medical Center ("CMC"), David Brown ("Brown"), and Dr. William

Campbell ("Campbell") (collectively "Defendants").   In support of these claims, Relators

respectfully show this Court the following:

### I.
### PARTIES AND *QUI TAM* DISCLOSURES

1.      Drs. Parikh, Chandna, and Gaalla are citizens of the United States and physicians

duly licensed to practice medicine in Texas.   Their practices are in Victoria County, Texas, and

include (at the moment) privileges at least in form to practice at CMC.

2.     CMC is a county-owned hospital operating in the State of Texas pursuant to Texas Health and Safety Code Chapter 263 and doing business in Victoria County, Texas at 2701 Hospital Drive, Victoria, Texas 77901-5749. Upon order of the Court, Citizens Medical Center may be served by serving its Administrator, David P. Brown, at 2701 Hospital Drive, Victoria, Texas 77901-5749, or any other address at which he may be found.

3.     David P. Brown is the Administrator of CMC. Upon order of the Court, Brown may be served at his place of employment, 2701 Hospital Drive, Victoria, Texas 77901-5749.

4.     William Todd Campbell, Jr., M.D. is a cardiovascular physician licensed to practice in the State of Texas. Upon order of the Court, Dr. Campbell may be served at his place of business at 2700 Citizens Plaza, Suite 300, Victoria, Texas 77901.

5.     Pursuant to 31 U.S.C. § 3730(b)(2), a copy of this complaint and written disclosure of substantially all material evidence and information the Physicians possess are being served on the United States Government ("Government") in accordance with FED. R. CIV. P. 4(d)(4). The complaint is being filed under seal and *in camera*, and shall remain under seal for at least 60 days, and will not be served on the Defendants until the Court so orders.

6.     Pursuant to 31 U.S.C. § 3730(e)(4)(B), before filing this suit, the Physicians provided the Attorney General of the United States and the United States Attorney for the Southern District of Texas, a statement of material evidence and information demonstrating the actions that serve as the basis for this action. This action is not based on any public disclosure of information within the meaning of 31 U.S.C. § 3730(e)(4)(A). The Physicians have direct and independent knowledge, within the meaning of 31 U.S.C. §3730(e)(4)(B), of the information on which the allegations in this complaint are based. To the extent any of these allegations may

have been publicly disclosed within the meaning of 31 U.S.C. § 3730, the Physicians voluntarily provided this information to the Government before filing the original complaint.

## II.
## JURISDICTION AND VENUE[1]

7.       This Court has jurisdiction over this matter under 31 U.S.C. § 3729 *et seq.* and 28 U.S.C. §§ 1331, 1345.

8.       Venue is proper in the Southern District of Texas pursuant to 31 U.S.C. § 3732(a), because it is the judicial district in which Defendants can be found, reside, transact business, and/or in which the acts giving rise to this false claims case occurred.

## III.
## BACKGROUND AND SUMMARY OF CLAIMS

9.       This is an action to recover damages and civil penalties on behalf of the United States of America arising out of false claims and records presented to the United States. This action arises under 31 U.S.C. § 3729, known as the False Claims Act ("FCA").

10.      The FCA claims in this case are based on the Defendants' illegal conspiracy to submit and actual submissions of false and fraudulent patient claims and hospital cost reports to the United States in order to obtain millions of dollars in payments for various healthcare services. These false claims and false statements are part of the Defendants' unlawful scheme to obtain business by paying kickbacks and illegal remunerations to physicians, and entering into

---

[1]       The Plaintiffs previously filed a private cause of action against the Defendants in this United States District Court on February 24, 2010. *See Chandna et al. v. Citizens Medical Center, David Brown, et al.,* 6:10-CV-00014 (S.D. Tex.) (filed February 24, 2010, and transferred from Judge Rainey to Judge Jack in the Corpus Christi Division pursuant to judicial recusal) ("Related Case"). Judge Rainey voluntarily recused himself from the Related Case based on David Brown's involvement.

David Brown is also a named defendant and key figure in this case. Plaintiffs assume recusal is likewise appropriate given Mr. Brown's involvement. Pursuant to the Southern District of Texas' Division of Work Order, Plaintiffs assert the case should properly be transferred to the Corpus Christi Division where the Related Case is currently pending. *See In re Division of Work Order for 2010* ¶ 23(A) at p. 7.

Plaintiffs' *Qui Tam* Complaint

prohibited financial relationships with physicians to induce the physicians to refer patients to Defendants' facility and its exclusive cardiac surgeon, Dr. Yusuke Yahagi ("Dr. Yahagi").

11. The False Claims Act is a civil statute that prohibits the knowing submission of false or fraudulent claims to the Government for payment. *See* 31 U.S.C. § 3729 *et seq.* A claim to the Government is rendered "false" for purposes of the False Claims Act when medical services or items are furnished in violation of the Anti-Kickback Act, notwithstanding the fact that the services or items provided may have themselves been appropriate and proper.

12. The Anti-Kickback Act, 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that payoffs to those who influence healthcare decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or harmful to a vulnerable patient population. To protect the integrity of the healthcare system, Congress enacted a *per se* prohibition against the payment of kickbacks in any form. The act prohibits anyone from making or accepting payment or any form of remuneration for referring, recommending, or arranging for federally funded medical services, including services provided under the Medicare and Medicaid programs. It prohibits anyone from knowingly or willfully soliciting or receiving any remuneration directly or indirectly, overtly or covertly, in exchange for referring an individual to a person for the furnishing (or arranging for the furnishing) of any item or service for which payment may be made in whole or in part under a federal health care program. *See* 42 U.S.C. § 1320a-7b(b). Violators of the Anti-Kickback Act may be prosecuted criminally or may be subject to civil monetary penalties and excluded from the Medicare/Medicaid programs. *Id.*; 42 U.S.C. § 1320a-7a(a)(7). Additionally, violation of the act can subject the perpetrator to civil monetary fines of $50,000.00 per violation and three times the amount of remuneration paid. *See* 42 U.S.C. §§ 1320a-7(b)(7), 1320a-7a(a)(7).

13.     For purposes of the Anti-Kickback Act, physician privileges with a hospital are a form of "remuneration." A hospital's discretionary decision-making as to physician privileges or credentialing can result in what is called "conflicts credentialing" in violation of the Anti-Kickback Act and state law. The Anti-Kickback Act covers any arrangement where <u>one</u> purpose of the remuneration was to obtain money for the referral of services or to induce further referrals.

14.     Texas Health & Safety Code § 241-1015 also prohibits hospitals from engaging in economic or conflicts credentialing of physicians. Section 241-1015 provides in pertinent part:

> A hospital ... may not refuse or fail to grant or renew staff privileges, or condition staff privileges, based in whole or in part on the fact that the physician or a partner, associate, or employee of the physician is providing medical or health care services at a different hospital or hospital system.

TEX. HEALTH & SAFETY CODE § 241-1015.

15.     Texas law prohibits the corporate practice of medicine. *See, e.g.,* TEX. OCC. CODE § 165.156 (precluding the corporate practice of medicine); *see also id.* § 164.052(a)(17) (recognizing that the practice of medicine is restricted to licensed physicians). The Texas Medical Practice Act prohibits, directly or indirectly, aiding or abetting, the practice of medicine by a person, partnership, association, or corporation, that is not licensed to practice medicine by the Texas Medical Board. *See id.* at § 164.052. This provision prohibits an entity that is not licensed to practice medicine, such as CMC, from employing a physician and collecting the fees generated by a physician. *See id.*

16.     ***Defendants' False Claims Act Violations.*** The Physicians' *qui tam* claims are based on the following allegations:

> 1.     CMC's illegal and unauthorized practice of medicine has resulted in and continues to result in fraudulent billing to federal health care programs;

employed competing cardiologists; (2) demanded that the Physicians refer to all of their surgical patients to CMC's exclusive cardiac surgeon, Dr. Yahagi (who has an unusually high mortality rate); (3) retaliated against the Physicians for reporting patient-care concerns; and (4) refused to notify the Physicians when their patients presented to CMC's emergency room, despite patient requests to call the Physicians.

20.     In 2007 and 2008, CMC began engaging in the unauthorized practice of medicine by entering into illegal employment contracts with five cardiologists.[2]   Specifically, CMC entered into Physician Employment Agreements with five cardiologists—Drs. William Campbell, Jr., Kurtis Krueger, Robert Oakley, Tywaun Tillman, and Chelif Junor (collectively "CMC Cardiologists"). *See* Exhibits "A"-"E."  Under the Physician Employment Agreements, CMC employs the CMC Cardiologists, bills and collects for all the medical services they provide, including both hospital and office-based services, pays the physicians a salary, allows the cardiologists to participate in CMC's health and dental insurance, provides limited malpractice coverage, and provides dictation services. *See id.*

21.     The Physician Employment Agreements further provide that the CMC Cardiologists and their medical practice activities are subject to the control of CMC.  The Agreements between CMC and Drs. Campbell, Krueger and Oakley state, "The relationship between [CMC] and [Dr. Campbell/Krueger/Oakley] shall be that of an employer and employee. Employee shall be in the paid service of [CMC] (a governmental unit) and, as such, [CMC] has the legal right to control the tasks performed by [the doctors] pursuant to this Agreement. Employee shall not be an independent contractor." Exhibits "A"-"C."  The Agreements between CMC and Drs. Tillman and Junor state that "the relationship between [CMC] and [Dr.

---

[2]      While there are certain limited exceptions to the prohibition on the corporate practice of medicine, CMC does not fall within any of the exceptions.

Plaintiffs' *Qui Tam* Complaint

Tillman/Junor] shall be that of an employer and employee. Employee shall be considered and treated as having an employee status." Exhibits "D"-"E." This type of employment relationship with the CMC Cardiologists is illegal because it violates the prohibition on the corporate practice of medicine. *See* TEX. OCC. CODE § 165.156 (precluding the corporate practice of medicine); *see also id.* § 164.052(a)(17) (recognizing that the practice of medicine is restricted to licensed physicians). CMC has obtained payments from Medicare and Medicaid for medical services provided under these illegal contracts.

22. CMC also illegally employs a group of emergency room physicians. The emergency room physicians are Drs. David Stone, Clyde Walrod, Dr. Penny Thamwiwat, and Chris Hall (collectively "ER Physicians"). This type of employment relationship with the ER Physicians is illegal because it violates the prohibition on the corporate practice of medicine. Upon information and belief, CMC has obtained payments from Medicare and Medicaid for medical services provided under these illegal contracts.

23. On February 17, 2010, CMC passed a resolution barring the Physicians from practicing at CMC ("Resolution"). The Resolution purports to exclude all physicians from the cardiology department who are not contractually committed to CMC to participate in the on-call emergency room coverage program and precludes such physicians from exercising their clinical privileges at CMC. Exhibit "F."[3] The stated basis for removing the Physicians' privileges is "operational problems." The stated reason is a pretense. The Physicians were removed because they did not refer patients to CMC's exclusive cardiac surgeon, Dr. Yahagi, and because CMC wanted to increase business for the CMC Cardiologists.

---

[3] The draft version of the Resolution specifically identified the Physicians by name. *See* Exhibit "G."

Plaintiffs' *Qui Tam* Complaint

24.     On the same day, February 17, 2010, David Brown (CMC's Administrator), sent a memo to all members of the CMC medical staff notifying them of CMC's decision to exclude the Physicians, which took immediate effect and set February 24, 2010 as the deadline for the Physicians to cease their cardiology practice and clinical privileges at CMC. *See* <u>Exhibit</u> "H."

25.     In complete disregard of federal and state law, CMC has removed the Physicians from its staff because they do not refer all of their surgical patients to Dr. Yahagi. Further, CMC removed the Physicians in order to steer the Physicians' patients the CMC Cardiologists. CMC also implemented a system of paying the ER Physicians a monetary incentive for referring patients to the CMC Cardiologists and CMC's Chest Pain Center.

26.     Rather than referring all of their patients to Dr. Yahagi, as CMC demanded and as the CMC's Cardiologists do, the Physicians exercised their independent medical judgment in making referrals based on the best interests of their patients. Referrals to Dr. Yahagi are often not in the best interests of the Physicians' patients since Dr. Yahagi has an unusually high mortality rate among heart surgery patients. The Defendants are upset that the Physicians are not making their decisions based on the best economic interests of CMC.

27.     Prior to the passage of the Resolution, Dr. Yahagi was so upset about the Physicians' lack of patient referrals to him that he (with the significant assistance of CMC's administrator, David Brown) wrote a letter stating that he would not provide surgical standby coverage for the Physicians, despite the requirement in the bylaws that he to do so. As Dr. Yahagi wrote to the Physicians:

> For the past many years, I have been providing standby coverage for angioplasties but have been disappointed with the inconsistency of your not referring those same patients to me when they need my services. It seems best, I think, if I no longer provide standby coverage. This decision is effective January 18, 2010.

Plaintiffs' *Qui Tam* Complaint

5892572v.2

Exhibit "I." Despite Dr. Yahagi's violation of the bylaws in refusing to provide standby, CMC failed to correct the situation until nearly a month later, when the Physicians' counsel demanded adherence to the bylaws. In the meantime, CMC permitted (and actually enabled) patients' lives to be put in danger by Dr. Yahagi in an effort to coerce the Physicians to refer patients to Dr. Yahagi or else force the Physicians out of the hospital.

28.    The CMC Cardiologists perform all of their procedures at CMC and refer all or almost all cardiac surgical cases to Dr. Yahagi (who in turn performs the procedures at CMC). Under the Resolution, the CMC Cardiologists have been granted the exclusive right to perform cardiology services at CMC. Upon information and belief, Dr. Campbell, one of CMC's employed cardiologists and a competing cardiovascular physician, has met with CMC administration and/or members of CMC's board of directors and promoted CMC's closure of the cardiology department for reasons that benefit him financially.

29.    The Defendants' true motive for removing the Physicians' privileges is best demonstrated in correspondence the Physicians received from Donald T. Day, chairman of CMC's board of directors. On December 16, 2009, Mr. Day wrote to each of the Physicians criticizing them for referring surgical patients to another facility. Mr. Day stated as follows:

> As you are aware, bypass surgery is performed at Citizens Medical Center by Dr. Yusuke Yahagi. Nevertheless, it is our understanding that rather than refer patients to Dr. Yahagi and have a bypass procedure performed at Citizens Medical Center, you refer patients to another cardiovascular surgeon for evaluation.
>
> While it is certainly your right to exercise your medical judgment as you see fit, likewise, it is the responsibility of the Board of Directors at Citizens Medical Center to exercise their judgment as to what is in the *best interest of the business of Citizens Medical Center* and its patients and Medical Staff. It is the Board's firm belief that it is in the best interest of Citizens Medical Center for patients who are capable of being treated at

> Citizens Medical Center to be treated at Citizens Medical Center and not be transferred elsewhere.
>
> In this connection, it is our understanding that, for the past several years, you have not referred cardiac surgical candidates to Dr. Yahagi but, rather, have referred those patients either out of town or to cardiovascular surgeons who do not have privileges at Citizens Medical Center.

Exhibits "J," "K," and "L" (emphasis added). Mr. Day goes on to ask numerous questions about the Physicians' referral patterns, and whether the Physicians "intend to refer future cardiac surgical patients to Dr. Yahagi." Mr. Day concludes the correspondence by stating, "[w]e are convinced that it is not in the best interest of Citizens Medical Center to have patients at our hospital who are potential cardiac surgical candidates referred to other physicians at other hospitals when Dr. Yahagi is competent to perform these procedures at Citizens Medical Center." *Id.*

30.     Most shocking is Mr. Day's conclusion that CMC wanted responses to the questions about the Physicians' referral patters to Dr. Yahagi "**so that we may take them into consideration during your reappointment process**." *Id.* (emphasis added). As CMC described the letters, they ask "very pointed questions regarding [the Physicians'] utilization of Dr. Yahagi's and the hospital's services, patient transfers, and asking whether they should reapply to the Medical Staff." These letters are so appalling that CMC's current counsel drafted a letter to the Physicians' counsel, after the filing of the Related Case, in which he futilely attempted to convey that the letters do not mean what they say. *See* Exhibit "M."

31.     The December 16, 2009 correspondence is consistent with the same type of economic pressure the Physicians have received in the past from CMC. For example, on September 18, 2007, CMC's Administrator, David Brown, wrote Dr. Chandna questioning him as to why a patient was discharged to the competing hospital, DeTar Hospital, where the patient

Plaintiffs' *Qui Tam* Complaint

underwent a successful bypass surgery. David Brown similarly initiated harassing and false inquiries about Dr. Gaalla's transfer of a patient to Houston for surgical intervention. On October 8, 2007, Dr. Parikh received similar correspondence from Brown questioning his admission of a patient to DeTar Hospital even when no such transfer from CMC had occurred.

32.    CMC was upset with the Physicians because the Physicians "rely upon Dr. Yahagi for standby cardiac interventions at Citizens Medical Center but do not refer patients to him for surgical care." In order to increase CMC's profits, the Defendants began steering the Physicians' patients to the CMC Cardiologists. To this end, even when the Physicians' patients present at CMC's emergency room and specifically request the Physicians, they are not called. David Brown instructed his employees and medical staff that, regardless of the patient's cardiologist, "[w]e will refer all such patients to our cardiology group. Pre established relationship or not." Exhibit "N." In summary, for several years, Defendants have attempted to unduly pressure the Physicians to make decisions in the best economic interests of CMC, rather than decisions based on the health care needs of their patients. When the Physicians did not succumb to the Defendants' pressure, the Defendants began steering the Physicians' patients to the CMC Cardiologists who, in turn, referred those patients to Dr. Yahagi.

33.    While CMC publically promotes itself as a non-profit hospital, its actions tell otherwise. In one case, for example, when a patient needed a coronary artery bypass operation, David Brown stepped in and insisted, "[n]ot without making financial arrangements. Deposit or something." Exhibit "O." The Defendants succeeded in their illegal efforts to remove the Physicians from the hospital, steer Plaintiffs' patients to the CMC Cardiologists, and ensure Dr. Yahagi received all patient referrals. In fact, in 2009 CMC experienced a *41% increase* in

STEMI cases[4] and a 12% increase in the number of patients treated in the Chest Pain Center over 2008. *See* Exhibit "P." Additionally, CMC's internal chart showing the number of PCI procedures performed by cardiologist establishes an increase for some of the CMC Cardiologists from 2007 through 2009, while during the same time period those procedures decreased substantially for the Physicians.

34.     Defendants' conduct in trying to force the Physicians to make decisions based on the hospital's economic interests runs directly afoul of the Anti-Kickback Statute. That statute prohibits the offering, payment, solicitation, or receipt of any remuneration in exchange for a patient referral or referral of other business for which payment may be made by a Federal health care program, including Medicare and Medicaid. Because many of the Physicians' surgeries are covered by Medicare and Medicaid, CMC has violated this statute by conditioning the grant of privileges on referrals for services or items reimbursable by the federal health care programs.

35.     The Defendants' knowing and reckless misconduct has (and continues to) cause significant damage to the Government for which recovery is warranted.

## V.
## *QUI TAM* CLAIMS

1.   **CMC's Unauthorized and Illegal Practice of Medicine and Fraudulent Billing to Federal Health Care Programs.**

36.     In 2007 and 2008, CMC entered into Physician Employment Agreements ("Agreements") with the CMC Cardiologists. *See* Exhibits "A" – "E." Under the Agreements, CMC directly employs the CMC Cardiologists, bills and collects for the services they provide, pays the CMC Cardiologists a salary, and the CMC Cardiologists and their medical practice activities are subject to CMC's control. *See id.* For example, the Agreements provide:

---

[4]     STEMI is an acronym for "ST segment elevation myocardial infarction," which is a type of major heart attack.

Plaintiffs' *Qui Tam* Complaint

> The relationship between [CMC] and [Dr. Campbell, Krueger, Oakley] shall be that of an employer and employee. Employee shall be in the paid service of [CMC] (a governmental unit) and, as such, [CMC] has the legal right to control the tasks performed by [the Doctors] pursuant to this Agreement. Employee shall not be an independent contractor.

Exhibits "A" – "C." The Agreements between CMC and Drs. Tillman and Junor provide that "the relationship between [Citizens Hospital] and [Dr. Tillman/Junor] shall be that of an employer and employee. Employee shall be considered and treated as having an employee status." Exhibits "D," "E."

37.     This type of employment relationship between CMC and the CMC Cardiologists is illegal. *See, e.g.,* TEX. OCC. CODE § 165.156 (precluding the corporate practice of medicine); *see also id.* § 164.052(a)(17) (recognizing that the practice of medicine is restricted to licensed physicians). The Texas Medical Practice Act prohibits, directly or indirectly, aiding or abetting, the practice of medicine by a person, partnership, association, or corporation, that is not licensed to practice medicine by the Texas Medical Board. *See id.* at § 164.052. This provision prohibits an entity that is not licensed to practice medicine, such as CMC, from employing a physician and collecting the fees generated by a physician. *See id.* Because the Agreements violate the Texas Medical Practice Act, the Agreements are void.

38.     CMC also illegally employs the ER Physicians. These contracts are also illegal for the reasons set forth above.

39.     CMC's unauthorized practice of medicine has resulted in fraudulent billing to federal health care programs for procedures performed on Patients (as defined below). Specifically, since 2007, CMC has billed federal health programs for services and procedures performed by the CMC Cardiologists while CMC was illegally employing the CMC Cardiologists. Upon information and belief, since 2010, CMC has billed federal health programs

for services and procedures performed by the ER Physicians while CMC was illegally employing the ER Physicians. The Physicians assert that CMC has submitted Medicare and/or Medicaid claims for the services and procedures performed by the CMC Cardiologists and ER Physicians while they were illegally employed by CMC. By way of example only (and not limitation), the Physicians assert that the following Medicare and/or Medicaid patients (the "Patients")[5] have been wrongfully steered to the CMC's Cardiologists (and in some cases Dr. Yahagi) by the ER Physicians and others in violation of the Anti-Kickback Statute and Medicare and/or Medicaid has paid claims based on Defendants' misrepresentations that the services rendered were legal:

1. Dr. Parikh's Patients:

- Patient P.H. (March 2009). Dr. Parikh's patient presented to CMC's emergency room and Dr. Parikh was not called. A stress test was performed on the patient at CMC without notifying Dr. Parikh, pursuant to the illegal referrals described herein. Medicare and Medicaid paid for this claim.

- Patient J.B. (March 2010). This patient presented to CMC's emergency room and was steered to Dr. Campbell; Patient died after surgery performed by Dr. Yahagi. Medicare paid for this claim.

- Patient M.G. (August 2007). Dr. Parikh's patient presented to CMC's emergency room and Dr. Parikh was not called. A stress test was performed on the patient at CMC without notifying Dr. Parikh, pursuant to the illegal referrals described herein. Medicare paid for this claim.

- Patient C.J. (February 2010). Dr. Parikh's patient presented to CMC's emergency room and Dr. Parikh was not called. A stress test was performed on the patient at CMC by Dr. Clyde Walrod without notifying Dr. Parikh, pursuant to the illegal referrals described herein. Medicare paid for this claim.

- Patient A.B. (April 2008). Dr. Parikh's patient presented to CMC with junctional bradycardia and Dr. Parikh was not notified, pursuant to the illegal referrals described herein. Medicare paid for this claim.

---

[5] The Patients' initials are utilized herein to protect the Patients' confidentiality. The Physicians believe CMC has obtained many more illegal payments from the Government based on the Defendants' violations of the Anti-Kickback and Stark Act, which will be revealed during the discovery phase. Thus, the definition of "Patients" is also intended to include *all* persons for whom Defendants submitted false claims for payment to the Government.

Plaintiffs' *Qui Tam* Complaint

5892572v.2

- Patient P.H. (March 2009).   Dr. Parikh's patient presented to CMC's emergency room for palpitations.  Dr. Parikh was not notified.  The patient was kept overnight and an emergency room physicians performed a stress test on the patient without notifying Dr. Parikh, pursuant to the illegal referrals described herein.  Medicare paid for this claim.

- Patient R.M. (March 2010).  Dr. Parikh's patient presented to CMC's emergency room and Dr. Parikh was not notified.   The patient was kept overnight and testing was conducted on the patient without notifying Dr. Parikh, pursuant to the illegal referrals described herein.  Medicare paid for this claim.

- Patient D.R. (January 2010).   Dr. Parikh's patient presented to CMC's emergency room and Dr. Parikh was not called.  Instead, the patient was steered to CMC's cardiologists, Dr. Krueger, for consultation, pursuant to the illegal referrals described herein.  Medicare paid for this claim.

- Patient R.C. (January 2008).   Emergency room physician, Dr. Walrod, performed a stress test on the patient without notifying Dr. Parikh, the patient's established cardiologist, pursuant to the illegal referrals described herein.  Medicare paid for this claim.

- Patient R.H. (February 2010).  Dr. Parikh's patient was admitted to CMC's emergency room and Dr. Parikh was not notified, pursuant to the illegal referrals described herein.  Medicare paid for this claim.

- Patient W.J. (July 2008).  Dr. Parikh's patient was admitted to CMC's emergency room and Dr. Parikh was not notified.  Instead, the patient was admitted to CMC's cardiologist, Dr. Tillman, pursuant to the illegal referrals described herein.  Medicare paid for this claim.

- Patient I.P. (September 2008).  Dr. Parikh's patient presented to CMC's emergency room, and CMC's emergency room physician, Dr. David Stone, performed a stress test on the patient without notifying Dr. Parikh.  The patient was then steered to CMC's cardiologist, Dr. Tillman, for consultation pursuant to the illegal referrals described herein.  Medicare paid for this claim.

- Patient N.C. (March 2008).  Dr. Yahagi steered Dr. Parikh's patient to CMC's cardiologist, Dr. Tillman, pursuant to the illegal referrals described herein.  Medicare paid for this claim.

- Patient K.H. (February 2010).  This patient was steered from Dr. Parikh to CMC's cardiologist, Dr. Campbell, pursuant to the illegal referrals described herein.  Medicare paid for this claim.

2.  Dr. Chandna's Patients:

- Patient L.S. (February 2009). Dr. Chandna's patient presented to CMC's emergency room and Dr. Chandna was not called. CMC's cardiologist, Dr. Oakley, consulted the patient, pursuant to the illegal referrals described herein. Medicare paid for this claim.

- Patient E.G. (January 2009). Dr. Chandna's patient presented to CMC's emergency room and Dr. Chandna was not called. Instead, CMC's cardiologists, Drs. Junor and Tillman, consulted the patient, pursuant to the illegal referrals described herein. Medicare paid for this claim.

- Patient J.W. (May 2010). Dr. Chandna's patient presented to CMC's emergency room and Dr. Chandna was not called. The patient underwent a stress test at CMC, pursuant to the illegal referrals described herein. Medicare paid for this claim.

- Patient L.G. (February 2010). Dr. Chandna's patient presented to CMC's emergency room and Dr. Chandna was not called. CMC's cardiologist, Dr. Krueger, consulted the patient, pursuant to the illegal referrals described herein. Medicare paid for this claim.

- Patient E.M. (August 2009). Dr. Chandna's patient presented to CMC's emergency room and Dr. Chandna was not called. The patient underwent a stress test at CMC pursuant to the illegal referrals described herein. Medicare paid for this claim.

- Patient F.D. This patient presented to CMC's emergency room and requested Dr. Chandna or Dr. Gaalla. Dr. Yahagi refused to call either doctor and consulted with CMC's cardiologist, Dr. Tillman, pursuant to the illegal referrals described herein. Medicare paid for this claim.

3.  Dr. Gaalla's Patients:

- Patient J.F. (January 2008). Dr. Gaalla's patient underwent a peripheral stent procedure by Dr. James Taylor without notifying Dr. Gaalla, pursuant to the illegal referrals described herein. Medicare paid for this claim.

- Patient L.H. (July 2008). Dr. Gaalla's patient had an echocardiogram test performed and Dr. Gaalla was not notified, pursuant to the illegal referrals described herein. Medicare paid for this claim.

- Patient I.G. (January 2010). Dr. Gaalla's patient had an echocardiogram test performed and Dr. Gaalla was not notified, pursuant to the illegal referrals described herein. Medicare paid for this claim.

- Patient P.S. (November 2009). Dr. Gaalla's patient had an echocardiogram test performed and Dr. Gaalla was not notified, pursuant to the illegal referrals described herein. Medicare paid for this claim.

- Patient E.B. (January 2009). Dr. Gaalla's patient was admitted to CMC and he was not notified, pursuant to the illegal referrals described herein. Medicare paid for this claim.

- Patient M.M. (May 2010). Dr. Gaalla's patient underwent a stress test and Dr. Gaalla was not notified, pursuant to the illegal referrals described herein. Medicare paid for this claim.

- Patient A.C. (May 2010). Dr. Gaalla's patient underwent a stress test and Dr. Gaalla was not notified, pursuant to the illegal referrals described herein. Medicare paid for this claim.

- Patient J.C. (May 2010). Medicare paid for this illegal claim.

- Patient O.M. (March 2010). Dr. Gaalla's patient had an echocardiogram test performed and Dr. Gaalla was not notified, pursuant to the illegal referrals described herein. Medicare paid for this claim.

- Patient W.W. (December 2009). Dr. Gaalla's patient underwent a procedure performed by CMC's cardiologist, Dr. Tillman, and Dr. Gaalla was not notified, pursuant to the illegal referrals described herein. Medicare paid for this claim.

- Patient L.B. (April 2010). Dr. Gaalla's patient underwent a procedure performed by CMC's cardiologist, Dr. Tillman, and Dr. Gaalla was not notified, pursuant to the illegal referrals described herein. Medicare paid for this claim.

4. Dr. Yahagi's Patients:

- Patient C.C. Dr. Chandna's patient who died after heart surgery performed by Dr. Yahagi. The surgery was performed pursuant to the illegal referrals described herein. Medicare paid for this claim.

- Patient M.T. Dr. Chandna's patient who died after heart surgery performed by Dr. Yahagi. The surgery was performed pursuant to the illegal referrals described herein. Medicaid paid for this claim.

- Patient A.M.  Dr. Chandna's patient who had an amputation after a leg bypass procedure performed by Dr. Yahagi.  The surgery was performed pursuant to the illegal referrals described herein.  Medicare and Medicaid paid for this claim.

- Patient C.B.  Dr. Chandna's patient who had an infected aorta after abdominal aortic aneurysm surgery performed by Dr. Yahagi.  The surgery was performed pursuant to the illegal referrals described herein.  Medicare paid for this claim.

- Patient C.G.  Dr. Chandna's patient who suffered a stroke during carotid surgery performed by Dr. Yahagi. The surgery was performed pursuant to the illegal referrals described herein.  Medicare and Medicaid paid for this claim.

- Patient L.M. (2007).  Dr. Parikh's patient who underwent right carotid artery surgery by Dr. Taylor.  After a recent heart attack, Dr. Taylor took patient in for surgery; Dr. Parikh was not informed; surgery resulted in patient being paralyzed and bedridden, resulting in significant increase in costs and patient suffering.  Medicare paid for this claim.

- Patient B.K. (June 2009). Dr. Parikh's patient who had left carotid artery surgery by Dr. Yahagi at CMC.  The patient had complications after surgery because he was taken to surgery without cardiology clearance. The surgery was performed pursuant to the illegal referrals described herein.  Medicare and Medicaid paid for this claim.

- Patient M.R. (July 2009).  Dr. Parikh's patient who had lung surgery by Dr. Yahagi and died three days after the surgery in the hospital.  Dr. Parikh was not called to see the patient before surgery despite requests from the patient's family. The surgery was performed pursuant to the illegal referrals described herein.  Medicare paid for this claim.

- Patient N.A. (March 2009).  Dr. Parikh's patient who had an inappropriate redo procedure of a right carotid endarterectomy surgery by Dr. Yahagi.  The surgery was performed pursuant to the illegal referrals described herein.  Medicare paid for this claim.

- Patient O.C.  Dr. Parikh's patient who Dr. Yahagi scheduled for an unnecessary carotid surgery.  Dr. Yahagi insisted on surgery even though an angiogram showed no need for surgery.

- Patient E.M. Dr. Gaalla's patient who suffered a stroke after carotid surgery performed by Dr. Yahagi. The surgery was performed inappropriately. Medicare and Medicaid paid for this claim.

- Patient M.R. Patient who died during open-heart surgery by Dr. Yahagi. The surgery was performed pursuant to the illegal referrals described herein. Medicare paid for this claim.

- Patient F.C. Patient who died on the operating room table while Dr. Yahagi was performing surgery. The surgery was performed pursuant to the illegal referrals described herein. Medicare paid for this claim.

40. As these examples reveal, the Medicare and Medicaid claims that CMC has submitted are false claims under the Federal False Claims Act. The Government is entitled to recover damages for *all* of Defendants' false claims submitted under the illegal employment contracts between CMC and the CMC Cardiologists and the ER Physicians.

## 2. DEFENDANTS' SELF-REFERRAL PRACTICES, "CONFLICTS CREDENTIALING," AND PATIENT CARE PRACTICES RESULT IN FRAUDULENT BILLING TO FEDERAL HEALTH CARE PROGRAMS.

41. ***CMC's illegal self-referral practices.*** CMC has violated the Anti-Kickback Statute by illegally paying the CMC Cardiologists' salaries and other benefits in return for their agreement to refer cardiology Patients (as defined herein) requiring hospital services to CMC and, in many instances, to Dr. Yahagi for surgery. Specifically, CMC pays the CMC Cardiologists a salary, bills and collects for all services they provide, provides malpractice coverage for the CMC Cardiologists, provides dictation services, and offers the cardiologists health and dental insurance. *See* Exhibits "A"-"E." In return, the CMC Cardiologists perform all services at CMC and refer all surgical Patients to Dr. Yahagi, CMC's exclusive cardiac surgeon. CMC's inducement or reward to the CMC Cardiologists for referring, recommending, or arranging for federally funded medical services violates the Anti-Kickback Act. Where a hospital "provides physicians with services for free or less than fair market value, or relieves

physicians of financial obligations they would otherwise incur," evidence of inducement and a violation of the Anti-Kickback Act exists. 70 FEDERAL REGISTER 4858, 4866 (Jan. 31, 2005); *see also* 70 FEDERAL REGISTER 59015, 59018 (Oct. 11, 2005) (indicating that a computer has independent value to a physician and providing a free computer to a physician may constitute an illegal inducement).

42.     Pursuant to CMC's request and representation that the services were legally provided, the Medicare and Medicaid programs have made payment in whole or in part for many of these procedures performed on the Patients.  The Physicians have discovered that at CMC, "[a]pproximately 48 percent and 47 percent of net patient service revenues are from participation in the Medicare and state-sponsored Medicaid programs for the years ended June 30, 2009 and 2008, respectively. . . . In 2009 and 2008, net patient service revenue includes approximately $8,412,809 and $10,926,577, respectively, of funds received through the Medicaid UPL program." Exhibit "Q."[6]  As explained herein, despite CMC's representations that the services were legally provided to the Patients, Defendants' misconduct violates the Anti-Kickback Act. Further, the employment agreements between the CMC and the CMC Cardiologists and the ER Physicians violate the prohibition against the practice of medicine by entities other than physicians.

43.     CMC's agreements with the CMC Cardiologists also violate the Anti-Kickback Act because they do not meet the standards set out by the federal regulation commonly referred to as the Anti-Kickback "Safe Harbors" that provide exceptions to the Anti-Kickback Act. *See* 42 C.F.R.§ 1001.952.  In order to fall within the Anti-Kickback Safe Harbor for compensation

---

[6]     The Physicians estimate that approximately 50% of their patients participate in Medicare and approximately 15% of their patients participate in Medicaid.   Upon information and belief, these numbers are consistent with the patient populations of the CMC Cardiologists.

made pursuant to a contract for personal services, the employment agreements must meet the seven standards set out in 42 C.F.R. § 1001.953(d), one of which requires that the aggregate compensation paid to the agent over the term of the agreement is "not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs." 42 C.F.R. § 1001.952(d)(5).

44.    CMC's payment to the CMC Cardiologists is directly tied to the volume or value of referrals generated between CMC and the CMC Cardiologists. *See* <u>Exhibits</u> "A"-"E." The CMC Cardiologists are paid based on a formula that is based on the physician-worked components of the Relative Value Units ("RVUs") of the services performed by the CMC Cardiologists.  Hospital and physician services are billed using CPT codes. *See id.*  Each CPT code is assigned a RVU, which contains three components, one of which is the "Physician work RVU." *See id.*   Thus, the compensation formula contained in the Physician Employment Agreements between CMC and the CMC Cardiologists is based on "Physician work RVUs" for hospital and office services provided by the physician and is tied directly to the volume of referrals or business generated between CMC and the CMC Cardiologists in direct contravention of the Anti-Kickback Safe Harbor standards. *See id.*

45.    Upon information and belief, CMC's illegal employment of the ER Physicians also violates the Anti-Kickback Act for the same reasons set forth above.

46.    ***CMC's economic or conflicts credentialing***.   CMC engaged in conflicts credentialing and other conduct, in violation of both the Anti-Kickback Act and Texas Health & Safety Code § 241-1015.

47.     In complete disregard and violation of federal and state law, Defendants attempted to remove[7] (and in effect have removed) the Physicians from the staff because they do not refer all of their surgical patients to Dr. Yahagi. Instead, the Physicians exercise their independent medical judgment, deciding what is in the best interests of their patients, in making referrals. Defendants are upset that the Physicians are not making their decisions based on what is in the best economic interests of the hospital.

48.     On December 16, 2009, CMC sent letters to the Physicians demanding answers to CMC's questions about their referral patterns and practices to Dr. Yahagi. *See* Exhibits "J" – "L." The letters informed the Physicians that CMC would take into consideration the Physicians' responses to the questions about referrals to Dr. Yahagi in considering the reappointment of the Physicians to the medical staff. *See id.* When the Physicians did not respond to the letter, Dr. Yahagi (with the significant assistance of David Brown) wrote to the Physicians that he refused to provide mandatory standby surgical care for the Physicians' patients. *See* Exhibit "I." Ultimately, CMC illegally revoked the Physicians' privileges on February 17, 2010 through the Resolution. *See* Exhibit "F."   Under the Resolution, the Physicians lost their privileges at CMC and, because of their referrals to Dr. Yahagi, the CMC Cardiologists became the exclusive providers of cardiology services at CMC. *See id.*   The Defendants also began a scheme to steer the Physicians' Patients to the CMC Cardiologists and ultimately to Dr. Yahagi for surgery.

49.     CMC's motivation for removing the Physicians' privileges is further revealed in its meeting minutes.  Specifically, CMC noted that "the Board concurred that [the letter of December 16, 2009 to the Physicians] is a business decision, and this method of communicating

---

[7]     In the Related Case, Plaintiffs filed and obtained a temporary restraining order and temporary injunction as to the termination of their privileges.

Plaintiffs' *Qui Tam* Complaint

with Doctors Parikh, Chandna, and Gaalla would be the most beneficial for the hospital in making a statement of position on the part of the Board since transferring these patients is not in our best interests."

50.     Since 2007, the Physicians have been harassed by the Defendants and retaliated against for transferring patients to other facilities.  They have been denied privileges, such as ICD privileges, because they did not refer all of their surgical patients to Dr. Yahagi.  When they have reported patient-care concerns to the peer review committee, CMC has engaged its employed cardiologist, Dr. Campbell (who is not on the peer review committee), to criticize the Physicians' patient care and turn the investigation into one focused on the Physicians.  The Defendants orchestrated this type of "reverse" investigation on the Physicians at least twice with patients L.Z. and T.L.  The Defendants also arbitrarily removed the Physicians from various hospital committees for refusing to refer patients to Dr. Yahagi.  Simply put, CMC illegally premised the Physicians' hospital privileges on the level of loyalty to CMC and patient referrals to Dr. Yahagi.

51.     This is not the only time CMC has engaged in economic credentialing.  For example, as CMC's Executive Committee discussed:

> **Low Volume, No Volume Providers**:  Mr. Brown reported that we have several members of the Medical Staff who have never utilized the hospital.  This prevents us from performing an adequate competency assessment of these physicians at reappointment because of their low, or no, utilization of our services.  Examples were provided of Dr. [redacted], physiatrist, who has never used the hospital, and Dr. [redacted] who has recently retired and only assists with surgical procedures.  *As our low volume physicians are reappointed, consideration will need to be given to Staff status as well as clinical privileges requested.*

CMC even considered amending its Medical Staff Bylaws "to prohibit the transfer of patients when a capability exists at Citizens Medical Center."   CMC also closely tracked the number of

Plaintiffs' *Qui Tam* Complaint

transfers the Physicians initiated and even provided that information to the peer review committee for consideration.

52.      By conditioning the grant of privileges on referrals for services or items reimbursable by the federal health care programs, including Medicare and Medicaid, the Defendants violated the Anti-Kickback Act and state law.  Because CMC's policy violates the Anti-Kickback Act, any claim for medical services submitted for those services would not be in compliance with all applicable laws and regulations.

53.      ***CMC's poor patient-care practices.***  In addition, Defendants have engaged in the following poor patient-care practices resulting in false claims being submitted to the Government:

a.      In conspiracy with Dr. Yahagi, the Defendants precluded the Physicians from performing various medical procedures at CMC, which are performed by the CMC Cardiologists, because Dr. Yahagi refused to provide surgical back-up for the Physicians.  Dr. Yahagi refused to provide standby for the Physicians because they did not refer patients to him.  CMC acquiesced in Dr. Yahagi's misconduct, despite the fact that the hospital bylaws required Dr. Yahagi to provide standby for the Physicians.

b.      David Brown ensures that the CMC Cardiologists get all patient referrals by dictating to whom patients are referred.

c.      CMC has instructed the ER Physicians and their staff to not refer patients to or consult with the Physicians because of their lack of patient referrals to Dr. Yahagi.

d.      CMC only pays the CMC Cardiologists for call in the emergency room and inappropriately affords its cardiologists exclusive credentials.

e.      CMC only offers a financial stake in CMC's imaging center to physicians who exclusively refer patients for services at CMC.

f.      CMC advertises enhanced professional credentials in its physician directory for certain physicians who exclusively practice at CMC, while at the same time failing to completely list the professional credentials of certain physicians who share their practices between CMC and a competitor, DeTar Hospital.

g.    CMC pays for advertisements of physicians, including the CMC Cardiologists and Dr. Yahagi, who exclusively refer patients to CMC. For example, CMC routinely advertises the services of Dr. Yahagi and the CMC Cardiologists.

h.    CMC threatens non-renewal of privileges to physicians who do not refer to CMC physicians.

i.    CMC removes physicians from its Peer Review Committee who are critical of any care provided by CMC or its favored physicians.

j.    Qualified physicians who hold privileges at both CMC and the competitor, DeTar Hospital, are denied credentials for which they are qualified, while unqualified physicians who practice exclusively at CMC are afforded credentials to perform procedures they are not qualified to perform.

k.    Physicians unqualified to perform procedures for which they have been credentialed by CMC are performing those procedures for the financial benefit of themselves and CMC. To this end, CMC has created an atmosphere where those physicians will not face any peer review for bad outcome resulting from such procedures.

l.    CMC grants exclusive privileges to read certain diagnostic tests to physicians who exclusively refer patients to CMC, thereby foreclosing the treating physician from performing and billing for the professional component of those tests.

m.    Certain CMC physicians receive expensive memberships at CMC's Citizens Healthplex to reward them for their exclusive use of CMC and compliance with David Brown's directives. Defendant Dr. Campbell has inappropriately and illegally been awarded the chairmanship of the Healthplex facility and program.

n.    Dr. Frank Parma and CMC physicians or surgeons have office space in Citizens Professional Building and get a significant financial break on their rent, as well as free phone, janitorial service, and in some cases, use of the hospital dictation service.

o.    CMC has rewarded various physicians who refer exclusively to CMC free computers, EKG machines, flat screen televisions, furniture, and fish tanks. These physicians, in turn, constantly send business to CMC or its emergent care.

54.    CMC's conduct has resulted and continues to result in harm to the Medicare and Medicaid Program. For example:

Plaintiffs' *Qui Tam* Complaint

5892572v.2

a.  The CMC Cardiologists and Dr. Yahagi, who benefit from some or all of the remuneration listed above, perform unnecessary diagnostic testing and unnecessary procedures for the financial benefit of the physician and CMC, even when contraindicated for the patient involved.

b.  Physicians not qualified to perform certain procedures nevertheless perform such procedures at CMC, leading to complications for the patients requiring follow-up care that would not be necessary if such procedure was performed properly initially.

c.  Referring physicians are incentivized to only refer their patients to certain CMC physicians (who practice exclusively at CMC), despite specific referral requests by patients, so that CMC and the CMC Cardiologists can perform unnecessary tests or procedures, and to ensure that CMC will be the hospital performing services for the patient.

55.  Medicare's revised enrollment application requires providers to certify that they will comply with Medicare laws, regulations, and program instructions and that they understand that payment of claims by Medicare is conditioned upon the claim and underlying transaction complying with such laws, regulations and program instructions, including the Anti-Kickback Act. A false certification of compliance with the Anti-Kickback Statute and Stark Act creates liability under the False Claims Act. *See U.S. ex rel Thompson v. Columbia HCA Health Care Corp.*, 125 F.3d 899, 901-902 (5th Cir. 1997).

56.  Upon information and belief, CMC was and is aware that compliance with the applicable law is a condition of Medicare payment, including the Anti-Kickback Act, yet it submitted claims knowing it was ineligible for the payments demanded. Upon information and belief, CMC has submitted Medicare and Medicaid cost reports to the Government for Patients containing certifications that CMC was in compliance with applicable laws, including the Anti-Kickback Act. These reports were false. Based on CMC's misrepresentations, upon information and belief, Medicare paid for the illegal medical services. Upon information and belief, the Government's decision to pay CMC's claims was conditioned upon its certification of

Plaintiffs' *Qui Tam* Complaint

27

5892572v.2

compliance with the pertinent laws. Upon information and belief, CMC took steps to conceal the violations from the Government.

57.    ***CMC's billing for medically unnecessary and worthless services.***  The billing of services or items provided to Medicare or Medicaid beneficiaries that were themselves inappropriate or improper is a violation of the False Claims Act. Upon information and belief, that is what occurred in this case. Following is a list of examples of unnecessary and worthless procedures arising from Defendants' violations of the Anti-Kickback Act:

a.    A patient had an MRI angiogram who demonstrated no significant narrowing and only moderate disease of the common carotid, but was subjected to carotid endarteretomy by CMC's vascular surgeon.

b.    There are several instances of Dr. Yahagi performing or scheduling carotid arteries surgery on asymptomatic patients solely on the basis of self-read or unreliable doppler studies. Additional information or testing on some of the scheduled patients suggested no significant blockages.

c.    Dr. Yahagi deliberately falsified the severity of disease on the operative reports of patients who had carotid artery surgery and aortic aneurysm repair.

d.    Dr. Yahagi scheduled or performed surgical procedures for abdominal aortic aneurysm when not indicated, and, on information and belief, received payment from Medicare.

e.    Dr. James Taylor and Dr. Yahagi have performed elective vascular surgeries on patients at CMC with pre-existing cardiac conditions without getting necessary pre-op clearance from the patient's cardiologist. This resulted in severe and permanent harm to patients and required Medicare to incur significant additional costs due to repeat hospitalizations.

f.    One primary care physician at CMC performed carotid doppler studies in his office and a technician's report was generated, which the primary care physician signed. The primary care physician has no formal training in reading or interpreting carotid doppler studies. He then referred the patient to Dr. Yahagi for re-do carotid surgery, which Dr. Yahagi performed without any further objective evaluation. Before surgery, the patient was not given any further options in spite of this being a re-do carotid surgery. Other options such as carotid artery stenting are available and are routinely done in other hospitals in Victoria and many centers. Because of Dr. Yahagi's limited evaluation and poor surgical technique, the patient's surgery failed. The patient then had another doppler study done at the primary care

physician's office which showed a poor surgical outcome. The patient had to undergo carotid artery angiogram for further evaluation and had to undergo additional stent procedure at St. Luke's Hospital in Houston to correct Dr. Yahagi's mistake.

g.  Dr. Yahagi has performed unnecessary balloon angioplasty and stent procedures on leg arteries.

h.  Dr. Yahagi has preformed unnecessary femoral-popliteal bypass procedures on legs.

58.  There have also been poor surgical results requiring follow-up care resulting from professional negligence, and in many of these cases Medicare and Medicaid were billed for such worthless services.

**3.  DEFENDANTS' VIOLATIONS OF THE MEDICARE CONDITION OF PARTICIPATION BY CONDITIONING MEDICAL STAFF PRIVILEGES ON CRITERIA OTHER THAN INDIVIDUAL CHARACTER, COMPETENCE, TRAINING, EXPERIENCE, AND JUDGMENT HAVE RESULTED IN FRAUDULENT BILLING TO FEDERAL HEALTH CARE PROGRAMS IN VIOLATION OF THE FALSE CLAIMS ACT.**

59.  Defendants' conditioning of the Physician's privileges on the economic interests of CMC is a violation of the Medicare Conditions of Participation. *See* 42 U.S.C. § 482. In particular, the governing body of a hospital that participates in the Medicare program is required to ensure that the criteria for selection of the medical staff are "individual character, competence, training, experience, and judgment." 42 U.S.C. § 482.12(a)(6). As CMC's letters of December 16, 2009 to the Physicians and CMC's Resolution reveal, CMC selected medical staff based on economic criteria, and not on individual character, competence, training, experience, and judgment. *See* Exhibits "J" – "L." Defendants' submission of claims for services provided to Medicare and Medicaid beneficiaries while Defendants were in violation of the Medicare and Medicaid Conditions of Participation constitute a false claim under the False Claims Act.

60.  CMC engaged in conflicts credentialing and other conduct, in violation of the Medicare Conditions of Participation. CMC's submission of claims for services provided to

Plaintiffs' *Qui Tam* Complaint

29

Medicare beneficiaries while CMC was in violation of the Medicare Conditions of Participation constitute a false claim under the False Claims Act.

**4. CMC's NUMEROUS STARK ACT VIOLATIONS HAVE RESULTED IN FRAUDULENT BILLING TO FEDERAL HEALTH CARE PROGRAMS.**

61.   The compensation arrangements created by CMC's employment agreements with the CMC Cardiologists and ER Physicians constitute a "financial relationship" under Section 1395nn(a)(i) of the Stark Act.  Under the Stark Act, a physician has a "financial relationship" with an entity if the physician has "a compensation arrangement" with the entity. *See* 42 U.S.C. § 1395nn(a)(2).  The Stark Act provides that if a physician has a financial arrangement with an entity then:

> (A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

> (B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn.  An entity that collects payment performed under a prohibited referral must refund all collected amounts within 60 days. *See* 42 C.F.R. §§ 1395nn(a)(1)(B), 411.353(b).

62.   "Designated health services" includes inpatient and outpatient hospital services. *See id.* at § 1395nn(h)(6).  Therefore, referrals of Patients by the CMC Cardiologists and ER Physicians to CMC are prohibited by the Stark Act unless one of the specific statutory exceptions to the Act apply (these are often referred to as the Stark "Safe Harbors").  However, none of the Safe Harbors are applicable.  The employment agreements do not constitute a "bona fide employment relationship" under § 1395nn(e)(2) because, as pointed out above, such physician/hospital relationships are prohibited under Texas law. *See, e.g.,* TEX. OCC. CODE

§ 165.156 (precluding the corporate practice of medicine); *see also id.* § 164.052(a)(17) (recognizing that the practice of medicine is restricted to licensed physicians). Further, the employment agreements do not create a "personal service arrangement" or a "group practice arrangement" because they do not meet the criteria necessary to fall within these Safe Harbors.

63.    The CMC Cardiologists and ER Physicians have referred some of the Patients to CMC for designated health services. Further, CMC has submitted Medicare and or Medicaid claims for some of the Patients' inpatient services referred by the CMC Cardiologists and ER Physicians.

64.    The Defendants, the CMC Cardiologists, and the ER Physicians have violated the Stark Act prohibitions. Medicare's revised enrollment application requires providers to certify that they will comply with Medicare laws, regulations, and program instructions and that they understand that payment of claims by Medicare is conditioned upon the claim and underlying transaction complying with such laws, regulations and program instructions, including the Stark Act. Because the Defendants have and continue to violate the Stark Act, the Medicare and Medicaid claims that have been submitted by CMC are false claims under the Federal False Claims Act.

65.    Further, the referrals of some of the Patients made by the CMC Cardiologists and ER Physicians in return for the remuneration provided under the invalid employment agreements violate the Anti-Kickback Statute as does the payment of the remuneration by CMC to the CMC Cardiologists and ER Physicians. Because the employment agreements are void under Texas law, the employment agreements cannot be relied upon to meet any of the criteria necessary to exempt these actions from the application of the Stark Act and Anti-Kickback Statute.

5. **CMC's Incentive Payments to the ER Physicians Based on the Level of Referrals to CMC's Chest Pain Center Violates the Anti-Kickback Statute and Stark Act and Results in False Claims to Federal Health Care Programs.**

66. *Anti-Kickback Violations*.   In addition to the illegal employment agreements between CMC and the ER Physicians, the ER Physicians or their group have been paid additional monetary amounts based on the level of Patient referrals they make to CMC's Chest Pain Center if a nuclear stress test is performed on the referred patient.   Upon information and belief, these additional payments have been paid for a number of years.   These payments are remuneration in exchange for patient referrals and, as such, are violations of the Anti-Kickback provisions of 42 U.S.C. § 1320a-7b.

67. The Defendants' violations of Anti-Kickback Act described above have resulted in fraudulent billing to federal health care programs.   Specifically, CMC has billed federal health programs for services and procedures performed on Patients by its Chest Pain Center for nuclear stress tests as well as other procedures that were referred by ER Physicians in exchange for illegal remuneration.   The Physicians assert that CMC submitted Medicare and/or Medicaid claims for these services and procedures.   Thus, the Medicare and Medicaid claims that CMC has submitted are false claims under the Federal False Claims Act.

68. *Stark Act Violations*. The additional payments made to the ER Physicians in exchange for patient referrals constitute a "financial relationship" between CMC and the ER Physicians under § 1395nn(a)(i) of the Stark Act.   Under the Stark Act, a physician has a "financial relationship" with an entity if the physician has "a compensation arrangement" with the entity. *See* 42 U.S.C. § 1395nn(a)(2).   The Stark Act restricts such referrals provides if a physician has a financial arrangement with an entity.

69.    Referrals by the ER Physicians to CMC are prohibited by the Stark Act unless one of the specific statutory exceptions to the Act apply (these are often referred to as the Stark "Safe Harbors"). However, none of the Safe Harbors are applicable.

70.    The ER Physicians have referred Patients to CMC for designated health services. Additionally, the ER Physicians have received additional payments based on their level of referrals to CMC's Chest Pain Center, if such referral results in a nuclear stress test. Further, CMC has submitted Medicare and/or Medicaid claims for the inpatient services referred by the ER Physicians.

71.    CMC has violated the Stark Act prohibitions. Medicare's revised enrollment application requires providers to certify that they will comply with Medicare laws, regulations, and program instructions and that they understand that payment of claims by Medicare is conditioned upon the claim and underlying transaction complying with such laws, regulations and program instructions, including the Stark Act. Because CMC has and continues to violate the Stark Act, the Medicare and Medicaid claims that have been submitted by CMC are false claims under the Federal False Claims Act.

72.    As set forth above, the physicians to whom Defendants provided illegal remuneration and kickbacks and with whom Defendants entered into illegal financial relationships referred large volumes of Patients, including Medicare and Medicaid patients and beneficiaries of other government health programs, to CMC in violation of federal law. Defendants, in turn, then submitted claims to Medicare, Medicaid, and other government healthcare programs and obtained hundreds of thousands of dollars (if not millions of dollars) worth of payments from the United States. Under the False Claims Act, such claims were false

and/or fraudulent because Defendants had no entitlement to payment for services provided on referrals for such Patients.

73. Defendants also violated the False Claims Act by making or causing to be made false statements when submitting these claims for payment to Medicare and other government programs. Defendants falsely certified the claims and statements were true and/or correct and as such were entitled to payment.

74. To conceal their unlawful conduct and avoid refunding payments made on these false claims, Defendants also falsely certified, in violation of the False Claims Act, that the services identified in their annual cost reports were provided in compliance with federal law, including the prohibitions against kickbacks, illegal remuneration to physicians, and improper financial relationships with physicians. The false certifications, made with each annual cost report submitted to the Government, were part of the Defendants' unlawful scheme to defraud Medicare and other governmental healthcare programs.

75. Pursuant to this scheme, pattern, and practice described above, CMC provided illegal remuneration, inducements and kickbacks to the CMC Cardiologists and ER Physicians, submitted false and fraudulent claims, and fraudulently obtained payments from the United States on patient referrals by these physicians in violation of the Anti-Kickback Act, the Stark Act, and the False Claims Act.

76. Each Form CMS-1500, CMS-2552, UB-92, and UB04 submitted by the Defendants related to the CMC Cardiologist since 2007 was a false claim, statement, or record. Likewise, each Form CMS-1500, CMS-2552, UB-92, and UB04 submitted by the Defendants related to the ER Physicians since their date of employment was a false claim, statement, or

record.  Defendants profited unlawfully from the payment of illegal remuneration and kickbacks to the CMC Cardiologists, ER Physicians, and Dr. Yahagi.

77.    The Government has been damaged by paying claims falsely submitted by the Defendants.  Treble damages for these false claims are appropriate and will likely amount to hundreds of thousands of dollars, if not millions of dollars. The maximum statutory civil penalty for each false claim should also be imposed against the Defendants.  The Physicians estimate the total amount to be recovered from Defendants to be at least hundreds of thousands of dollars if not millions of dollars.

## VI.
## DAMAGES

78.    The  Government  has  been  significantly  damaged  and  continues  to  incur significant damages as a result of the Defendants' acts and omissions set forth above.  The Defendants are jointly and severally liable for the damages.

## VII.
## ATTORNEYS' FEES

79.    The Physicians have been required to retain legal counsel to prosecute this action against the Defendants.  The Physicians' attorneys' fees and expenses are recoverable pursuant to their claims under False Claims Act.  The Physicians and the Government seek to recover their attorneys' fees and costs incurred in prosecuting this matter in this United States District Court (or another United States District Court to which this case is transferred), any appeals to Fifth Circuit Court of Appeals and United States Supreme Court, as well as any certification to the Texas Supreme Court.

## VIII.
## JURY DEMAND

80.     The Physicians, acting on behalf of and in the name of the United States, hereby demand a trial by jury for all issues which are triable to a jury.

## IX.
## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, the Physicians acting on behalf of and in the name of the United States request and pray that judgment be entered in favor of the United States against Defendants as follows: (a) all damages incurred by the United States as a result of the Defendants' violations of the False Claims Act; (b) treble the amount of the United States' damages, plus civil penalties of $11,000 for each false claim; (c) all costs of this civil action, including attorneys' fees, expenses and court costs; and (d) all such other and further relief as equitable and just.

In the event the United States decides to proceed with the *qui tam* action, the Physicians request an award for bringing this action of at least 15% but not more than 25% of the proceeds of the action or settlement of the claim.   If the United States does not proceed with this action, the Physicians request an award in an amount the Court decides is reasonable for collecting the civil penalty and damages, which shall not be less than 25% or more than 30% of the proceeds of the action or the settlement.

Respectfully submitted,

JACKSON WALKER L.L.P.
100 Congress Avenue, Suite 1100
Austin, Texas 78701
(512) 236-2000 (Telephone)
(512) 236-2002 (Facsimile)

By: _____
     Monte F. James
     Attorney-in-Charge
     State Bar No. 10547520
     Southern District Bar No. 29591
     Joshua A. Romero
     State Bar No. 24046754
     Southern District Bar No. 725205
     Megan M. Honey
     State Bar No. 24050781
     Southern District Bar No. 990024

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

Pursuant to the False Claims Act, I hereby certify that the above and foregoing instrument was served on the United States of America in the above entitled and numbered cause this the ___th day of August, 2010, via the following:

| | |
|---|---|
| ___✓___ | Certified Mail, Return Receipt Requested |
| _____ | Regular Mail |
| _____ | Facsimile |
| _____ | Overnight Delivery |
| _____ | Electronic Delivery |

Eric H. Holder, Jr.
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Jose Angel Moreno
U.S. Attorney for Southern District of Texas
U.S. Attorney's Office
Southern District of Texas
P.O. Box 61129
Houston, TX 77208

Mr. Jose Vela
Assistant U.S. Attorney for Southern District of Texas
U.S. Attorney's Office
Southern District of Texas
P.O. Box 61129
Houston, TX 77208

_Monte F. James_

Monte F. James

Plaintiffs' *Qui Tam* Complaint

5892572v.2