UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| *ex. rel.* DAKSHESH "KUMAR" | § | |
| PARIKH, M.D., HARISH | § | |
| CHANDNA, M.D., and AJAY | § | CIVIL ACTION NO. V-10-64 |
| GAALLA, M.D., | § | |
| | § | JURY REQUESTED |
| Plaintiffs | § | |
| | § | |
| v. | § | |
| | § | |
| CITIZENS MEDICAL CENTER, | § | |
| DAVID P. BROWN, and WILLIAM | § | |
| TODD CAMPBELL, JR., M.D., | § | |
| Defendants | | |

## RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

TO THE HONORABLE JUDGE GREGG COSTA:

COME NOW Relators Dakshesh "Kumar" Parikh, M.D., Harish Chandna, M.D., and Ajay Gaalla, M.D. (collectively "Physicians" or "Relators"), acting on behalf of and in the name of the United States of America, and file this Third Amended *Qui Tam* Complaint under the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, to recover damages, civil penalties, and other equitable relief from the Defendants Citizens Medical Center ("CMC"), David Brown ("Brown"), and Dr. William Campbell ("Campbell") (collectively "Defendants"). In support of these claims, Relators respectfully show this Court the following:

# I.
# PARTIES AND *QUI TAM* DISCLOSURES

1.    Drs. Parikh, Chandna, and Gaalla are citizens of the United States and physicians duly licensed to practice medicine in Texas.   Their practices are in Victoria County, Texas.

2.    CMC is a county-owned hospital[1] operating in the State of Texas pursuant to Texas Health and Safety Code Chapter 263 and doing business in Victoria County, Texas at 2701 Hospital Drive, Victoria, Texas 77901-5749. CMC has been served in this lawsuit and has filed a responsive pleading.

3.    David P. Brown is the Administrator of CMC.[2]   Brown has been served in this lawsuit and has filed a responsive pleading.

---

[1]    While CMC publically promotes itself as a non-profit hospital, its actions tell otherwise.  In one case, for example, when a patient required a coronary artery bypass operation, David Brown intervened on March 20, 2008, and insisted, "[n]ot without making financial arrangements.  Deposit or something."  Exhibit "A."  Moreover, unlike many county hospitals, CMC and its employed cardiologists have refused to treat patients who lack insurance.  For example, CMC refused to treat patient M.G. in 2007 because she lacked insurance, instead transferring her from Victoria to UTMB in Galveston for treatment.  In another instance, CMC's employed cardiologists refused to treat patient E.M. on October 27, 2007, because he lacked insurance, even though he had a massive heart attack in CMC's emergency room.  Further, unlike many county hospitals, CMC does not share its profits with Victoria County.  Instead, CMC retains its funds and currently maintains approximately $90 million in cash-on-hand.

[2]    David Brown is employed by BioCare, Inc., a management company he owns and operates.  While qualified immunity is inapplicable to FCA claims, even if qualified immunity applied, it is inapplicable to Brown because he is not a government employee.  Likewise, since Brown is an employee of BioCare, Inc., he is capable of conspiring with CMC, Campbell, the ER Physicians, and other physicians with privileges at CMC.

<u>RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT</u>
2

4.      William Todd Campbell, Jr., M.D. is a cardiologist licensed to practice in the State of Texas.  Campbell has been served in this lawsuit and has filed a responsive pleading.

5.      Pursuant to 31 U.S.C. § 3730(b)(2), a copy of this complaint and written disclosure of substantially all material evidence and information the Physicians possess has been or is being served on the United States Government ("Government") in accordance with FED. R. CIV. P. 4(d)(4).

6.      Pursuant to 31 U.S.C. § 3730(e)(4)(B), before filing this suit, the Physicians provided the Attorney General of the United States and the United States Attorney for the Southern District of Texas, a statement of material evidence and information demonstrating the actions that serve as the basis for this action. This action is not based on any public disclosure of information within the meaning of 31 U.S.C. § 3730(e)(4)(A).   The Physicians have direct and independent knowledge, within the meaning of 31 U.S.C. § 3730(e)(4)(B), of the information on which the allegations in this complaint are based.  To the extent any of these allegations may have been publicly disclosed within the meaning of 31 U.S.C. § 3730, the Physicians voluntarily provided this information to the Government before any such disclosure.

## II.
## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this matter under 31 U.S.C. § 3729, *et seq*. and 28 U.S.C. § 1331.

8.     Venue is proper in the Southern District of Texas pursuant to 31 U.S.C. § 3732(a) because it is the judicial district in which Defendants can be found, reside, transact business, and/or in which the acts giving rise to this false claims case occurred.

## III.
## BACKGROUND AND SUMMARY OF *QUI TAM* CLAIMS

9.     This is an action to recover damages and civil penalties on behalf of the United States of America arising out of false claims and records presented to the United States.  This action arises under 31 U.S.C. § 3729, known as the False Claims Act ("FCA").

10.    The FCA claims in this case are based on the Defendants' illegal conspiracy to submit and actual submissions of false and fraudulent Medicare and Medicaid patient claims, false statements, and hospital cost reports to the United States in order to obtain millions of dollars in payments for various healthcare services.  These false claims and false statements are part of Brown's and CMC's unlawful scheme to obtain business by paying kickbacks and illegal remunerations

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

to physicians and entering into prohibited financial relationships with physicians to induce those physicians to refer patients to CMC's facility and its exclusive cardiac surgeon, Dr. Yusuke Yahagi ("Dr. Yahagi").

11.   The FCA is a civil statute that prohibits the knowing submission of false or fraudulent claims to the Government for payment. *See* 31 U.S.C. § 3729, *et seq.* A claim to the Government is rendered "false" for purposes of the FCA when medical services or items are furnished in violation of the Anti-Kickback Act or the Stark Act, notwithstanding the fact that the services or items provided may have themselves been appropriate and proper. *See, e.g., U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F.Supp.2d 1017, 1047 (S.D. Tex. 1998); 42 U.S.C. § 1320a-7b ("[A] claim that includes items or services resulting from a violation of [the Anti-Kickback Act] constitutes a false or fraudulent claim for the purposes of the [FCA].").

12.   The Anti-Kickback Act, 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that payoffs to those who influence healthcare decisions will result in the provision of goods and services that are medically unnecessary, of poor quality, or harmful to a vulnerable patient population. To protect the integrity of the healthcare system, Congress enacted a *per se* prohibition against even the *offering* or *soliciting* of kickbacks in any form. The Anti-Kickback Act prohibits

anyone from knowingly or willfully soliciting or receiving any remuneration directly or indirectly, overtly or covertly, in exchange for referring an individual to a person or entity for the furnishing (or arranging for the furnishing) of any item or service for which payment may be made in whole or in part under a federal health care program, including services provided under the Medicare and Medicaid programs. *See* 42 U.S.C. § 1320a-7b(b).  Violators of the Anti-Kickback Act may be prosecuted criminally and/or be subject to civil monetary penalties and excluded from the Medicare/Medicaid programs. *Id.*; 42 U.S.C. § 1320a-7a(a)(7). Additionally, violators may be subject to civil monetary fines of $50,000.00 per violation and three times the amount of remuneration paid. *See* 42 U.S.C. §§ 1320a-7(b)(7), 1320a-7a(a)(7).  Compliance with the Anti-Kickback Act is a material condition of receiving payment from federally funded healthcare programs, including Medicare and Medicaid.

13.  For purposes of the Anti-Kickback Act, physician privileges within a hospital are a form of "remuneration."  A hospital's discretionary decision making as to physician privileges or credentialing can result in what is called "economic credentialing" in violation of the Anti-Kickback Act and state law.  The Anti-Kickback Act covers any arrangement where <u>one</u> purpose of the remuneration is to obtain money for the referral of services or to induce further referrals.

**RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT**

9266289v.1

14.   Texas Health & Safety Code § 241-1015 also prohibits hospitals from engaging in economic or conflicts credentialing of physicians.  Section 241-1015 provides in pertinent part:

> A hospital . . . may not refuse or fail to grant or renew staff privileges, or condition staff privileges, based in whole or in part on the fact that the physician or a partner, associate, or employee of the physician is providing medical or health care services at a different hospital or hospital system.

TEX. HEALTH & SAFETY CODE § 241-1015.

15.   Texas law prohibits the corporate practice of medicine. *See, e.g.,* TEX. OCC. CODE § 165.156 (precluding the corporate practice of medicine); *see also id.* § 164.052(a)(17) (recognizing that the practice of medicine is restricted to licensed physicians); § 164.052(a)(17) (prohibiting a licensed physician from permitting another to use his license).  The Texas Medical Practice Act prohibits, directly or indirectly, aiding or abetting, the practice of medicine by anyone who is not licensed to practice medicine by the Texas Medical Board. *See id.* at § 164.052. This provision prohibits an entity that is not licensed to practice medicine, such as CMC and David Brown, from employing a physician and collecting the fees generated by that physician. *See id.*[3]

---

[3]     While there are certain exceptions to the prohibition on the corporate practice of medicine, CMC does not meet any of those exceptions.  For example, certain government

<u>RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT</u>

16.   The Stark Act, 42 U.S.C. § 1395nn, imposes restrictions on referrals by physicians to providers of certain designated health services under the Medicare and Medicaid programs.  Subject to specific exceptions, the Stark Act provides that if a physician (or a family member of a physician) has a financial relationship with an entity: (1) the physician may not make a referral to the entity for the furnishing of designated health services reimbursable under the Medicare and Medicaid programs, and (2) the entity may not bill for designated health services (including inpatient and outpatient hospital services) furnished pursuant to a prohibited referral.   A "financial relationship" includes ownership or compensation arrangements.  The Stark Act prohibits payment to a physician that is "determined in a manner that takes into account (direct or indirectly) the volume or value of any referrals by the referring physician." 42 C.F.R. § 411.357(c)(2)(ii).   The Stark Act prohibits the Defendants from submitting prohibited claims and from receiving payment for those claims.  As set forth below, CMC and has accepted referrals of Medicare and Medicaid patients from physicians with financial relationships with CMC that are prohibited under the Stark Act, and CMC, David Brown, and Dr. Campbell have submitted claims and received payment in violation of the statute.

---

hospitals have obtained legislative permission to directly employ physicians.  CMC, however, has not obtained any such statutory exemption enabling it to directly employ physicians.

**RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT**

9266289v.1

17.   The Stark Act is a strict-liability statute.  If there is a violation of the Stark Act, not only may the services rendered not be billed to Medicare or Medicaid, but also all other referrals for designated health services from the physician to the entity become tainted as prohibited referrals.  Civil monetary penalties of $15,000.00 for each wrongfully billed claim may be imposed, plus two times the reimbursement claimed, and the providers involved may be excluded from Medicare and Medicaid programs.  Furthermore, if the physician and the entity implemented a circumvention scheme, civil monetary penalties up to $100,000.00 and exclusion may be imposed upon those who entered into the scheme.  Compliance with the Stark Act is a material condition of receiving payment from federally funded healthcare programs, including Medicare and Medicaid.

18.   Falsely certifying compliance with the Stark or Anti-Kickback Acts in connection with a claim submitted to a federally funded insurance program is a violation of the FCA. *See U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 901 (5th Cir. 1997); *U.S. ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 94 (3d Cir. 2009).

19.  ***Defendants' False Claims Act Violations***.  The Physicians' *qui tam*
claims are based, in large part, on the following allegations:

1. CMC and Brown's payment of illegal bonuses to the emergency room physicians based on revenue generated from their referrals to CMC's Chest Pain Center, which violates the Anti-Kickback Act and Stark Act, and has resulted in the knowing submission of false claims to federal healthcare programs;

2. CMC and Brown's employment of five cardiologists at salaries many times more than those cardiologists earned in private practice, which violates the Anti-Kickback Act and the Stark Act, and has resulted in the knowing submission of false claims to federal healthcare programs;

3. CMC and Brown's provision of discounted office rent and other benefits to Dr. Campbell and his partners, which violates the Anti-Kickback Act and the Stark Act, and has resulted in the knowing submission of false claims to federal health care programs;

4. CMC and Brown's illegal practice of medicine, which has resulted in and continues to result in fraudulent billing to federal health care programs;

5. CMC and Brown's self-referral practices and "economic credentialing," which violate the Anti-Kickback Act and have resulted in and continue to result in fraudulent billing to federal health care programs;

6. CMC and Brown's violations of the Medicare Conditions of Participation by conditioning medical staff privileges on criteria other than individual character, competence, training, experience, and judgment, which has resulted in fraudulent billing to federal health care programs in violation of the False Claims Act;

9266289v.1

7.    Defendants' violations of the Stark Act and knowingly submissions of false claims to Medicare and Medicaid arising from those violations constitute false claims under the False Claims Act;

8.    CMC and Brown's payment of advertisements for certain preferred physicians and CMC's false advertisements for those preferred physicians, such as inflated surgical accomplishments and false board certifications, which violates the Anti-Kickback Act, and has resulted in the knowing submission of false claims to federal healthcare programs;

9.    CMC and Brown's billings to the Medicare and Medicaid programs for unnecessary and worthless procedures and hospital-acquired trauma caused by some of CMC's employees' and physicians' negligence, which violates the False Claims Act, and has resulted in the knowing submission of false claims to federal healthcare programs; and

10.   CMC and Brown's operation of a colonoscopy screening program and illegal payment of bonuses to certain participating gastroenterologists in exchange for referrals to the hospital. This illegal *quid pro quo* arrangement violates the Anti-Kickback Act, the Stark Act, and the False Claims Act, and has resulted in the knowing submission of false claims to federal healthcare programs.

20.   Each of these *qui tam* claims is detailed below.  With respect to each false or fraudulent payment discussed herein, CMC, David Brown, and Dr. Campbell knowingly and willfully presented or caused to be presented to the Government the false claims for payment or approval.  Further, CMC, David Brown, and Dr. Campbell knowingly and willfully made, used, or caused to be

**R**ELATORS' **T**HIRD **A**MENDED *Q*UI *T*AM **C**OMPLAINT

made or used, a false record or statement material to a false or fraudulent claim to the Government.  The Government would not have paid those claims but for Defendants' false or fraudulent material assertions.  In addition, as a condition of their participation in and payment from the Medicare program, CMC and Brown were required to certify in their annual cost reports to the Centers for Medicare and Medicaid Services ("CMS") that the services provided therein were provided in compliance with the laws and regulations regarding the provision of healthcare services, including compliance with the Anti-Kickback and Stark Acts, which must be certified by the hospital administrator or chief financial officer. *See* 42 C.F.R. §§ 413,1(a)(2), 413,23(f)(4)(ii).  CMC and Brown falsely certified in the CMS annual cost reports in 2006, 2007, 2008, 2009, 2011, and 2012, that the services identified in the reports were provided in compliance with such laws and regulations, including the Anti-Kickback and Stark Acts, despite knowing at the time that they were violating the Anti-Kickback and Stark Acts.[4]   The

---

[4]        Upon information and belief, CMC and Dr. Campbell signed CMS Provider Agreements in 2006 through 2012, which are required in order to establish eligibility to receive payment and reimbursement from Medicare, and stated as follows: I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. . . . ***I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statue and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare***.

Upon information and belief, CMC's cost report that it submitted to the Government in 2006, 2007, 2008, 2009, 2010, 2011, 2012, and 2013, along with its claims for reimbursement, stated, among other things, as follows: Misrepresentation or falsification of any

<u>RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT</u>

Governments' payment to CMC and Dr. Campbell between 2006 and 2012 was conditioned on that certification each year.   As a result of these material misrepresentations regarding compliance with the Anti-Kickback and Stark Acts between 2006 and 2012, the Government paid their false claims.

## IV.
## FACTS

21.   The Physicians are interventional cardiologists practicing in Victoria. Dr. Parikh is board certified in interventional cardiology and cardiovascular diseases, and has been licensed in Texas since 1993.   Dr. Chandna is board certified in interventional cardiology and cardiovascular diseases, and has been licensed in Texas since 1998.   Dr. Gaalla is board certified in interventional cardiology and cardiovascular diseases, and has been licensed in Texas since 1993.

---

information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law.  Furthermore, if services identifiable in this report [were] provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.  The signatory of the cost report must certify that, to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.  *I further certify that I am familiar with the laws and regulations regarding the provisions of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations*.

A false certification of compliance with the Anti-Kickback Statute and Stark Act creates liability under the FCA. *See U.S. ex rel Thompson v. Columbia HCA Health Care Corp.*, 125 F.3d 899, 901-902 (5th Cir. 1997).  CMC and Brown have falsely certified the claims set forth herein since at least 2006.

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

9266289v.1

22.  Prior to 2007, the Physicians regularly admitted patients to CMC and exercised full privileges at the hospital.  However, things changed thereafter, when CMC and Brown: (1) implemented a bonus system for CMC's emergency room physicians; (2) began engaging in inappropriate fee splitting to induce the emergency room physicians to refer Medicare and Medicaid patients to CMC's Chest Pain Center and CMC's employed cardiologists; (3) illegally employed cardiologists at salaries more than twice the amount they made in private practice and provided them discounted office space and services at rates below fair-market value; (4) demanded that the Physicians refer all of their surgical patients to CMC's exclusive cardiac surgeon, Dr. Yahagi (who has an unusually high mortality rate); (5) took actions against the Physicians for reporting patient-care concerns; and (6) refused to notify the Physicians when their patients presented to CMC's emergency room, despite patient requests to call the Physicians.

23.  CMC, at the direction of David Brown, knowingly and willfully pays the ER Physicians[5] illegal bonuses based on the volume, value, and revenue

---

[5]     The ER Physicians are Drs. David Stone, Clyde Walrod, Kris Hall, Penny Thamwiwat, Brett Zimmerman, and Cindy Zimmerman.  CMC began employing Dr. Stone on January 1, 2010, Dr. Walrod on March 1, 2010, Drs. Brett and Cindy Zimmerman on April 20, 2010, and Dr. Hall on June 15, 2010.  Drs. Stone, Walrod, and Thamwiwat had privileges at CMC prior to becoming employed, and they each received illegal Chest Pain Center bonuses during that time in exchange for referring Medicare and Medicaid patients to CMC.  In addition, prior to 2010, Drs. Patricia Allen, Boniface Gbalazeh, Victor Arrellano, Emile J. Pierre, John McNeill, and John Vaughn worked as emergency physicians at CMC and received bonuses pursuant to the Chest Pain Center bonus structure.

**RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT**

9266289v.1

generated from the ER Physicians' patient referrals to CMC's Chest Pain Center.
*See* Exhibit "B."[6]   According to the Chest Pain Center bonus formula and David
Brown's acknowledgment, the Chest Pain Center revenues are split on a 50-50
basis between CMC and the referring ER Physicians.   All patients who present to
CMC's Chest Pain Center come from referrals by a CMC ER Physician.   CMC has
paid these illegal bonuses on a quarterly basis[7] to the ER Physicians since at least
January 2, 2007. *See id.*[8]   David Brown personally designed the Chest Pain Center
bonus, he was in charge of implementing and administering it, and he explained

---

Defendants argue that the employment safe harbors under the Anti-Kickback Act and the
Stark Act apply to the illegal bonuses paid to the ER Physicians.   Even if Defendants are correct
(which they are not), the ER Physicians were not employed from January 2, 2007 (the apparent
date the Chest Pain Center bonuses became effective) and 2010 (the date of their hire).
Accordingly, Brown and CMC unquestionably violated the Anti-Kickback Act and the Stark Act
from 2007 through January 1, 2010, since the employment safe harbor is inapplicable during that
timeframe.   In addition, as set forth herein, the employment safe harbor under the Stark Act does
not apply even after the ER Physicians became employed, since the bonus structure undoubtedly
takes into consideration the volume or value of the ER Physicians' referrals to the Chest Pain
Center.   Accordingly, Defendants' attempt to hide behind the Stark employment safe harbor
fails.

[6]      Despite CMC's bonus formula, many emergency room physicians, including Dr.
Thamwiwat and Dr. Allen, have no clear understanding of *how* the bonus was calculated, other
than the fact that it was based on patient referrals to the Chest Pain Center.   When Dr. Allen
inquired about it, CMC staff failed to offer her an explanation, aside from the fact that it is based
on patient referrals to the Chest Pain Center.

[7]      While the bonuses were supposed to be issued to the ER Physicians quarterly,
they were sometimes issued somewhat sporadically over the span of several months.   The time of
issuance of the bonuses depended on the time in which CMC received reimbursement from
federal programs for the hospital services rendered in the Chest Pain Center.   In some instances,
near the end of 2009, David Brown intentionally delayed paying the Chest Pain Center bonuses
to the ER Physicians in order to coerce additional patient referrals from the ER Physicians to the
Chest Pain Center.

[8]      Dr. Walrod believes the Chest Pain Center bonus was implemented at the same
time the Chest Pain Center opened at CMC around 2004 or 2005.

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

the program to the ER Physicians upon its implementation.  In exchange for the bonus payments, the ER Physicians have referred many Medicare and Medicaid patients to CMC's Chest Pain Center for which the Government has paid reimbursement.[9]  In fact, the Chest Pain Center has experienced a significant rise in Medicare and Medicaid patient population since CMC and Brown started paying the ER Physicians significant bonuses in exchange for patient referrals.  For example, in 2009 when CMC and Brown paid the ER Physicians hundreds of thousands of dollars in illegal bonuses, CMC touted that it experienced a 12% increase in the number of patients treated in the Chest Pain Center over 2008. *See* Exhibit "C."  A number of the Medicare and Medicaid patients referred by the ER Physicians to CMC's Chest Pain Center in exchange for the illegal bonus payment are set forth below in Section V, which is incorporated herein by reference.

---

[9]       In 2008 through 2010, CMC and David Brown, a non-physician business person, pressured Dr. Patricia Allen and the other ER Physicians to place patients in the Chest Pain Center for observation because that would maximize CMC's reimbursement rate under the Medicare and Medicaid programs.  In exchange for referring patients to the Chest Pain Center (and thereby obtaining higher reimbursement from Medicare and Medicaid), CMC would pay bonuses to the ER Physicians.  CMC's Chest Pain Center director, Suzanne Stone, informed Dr. Allen in 2009 that reimbursement for patients admitted to the Chest Pain Center was higher than reimbursement for patients admitted to the telemetry floor.  If a cardiologist was necessary, Dr. Allen was instructed by David Brown and CMC in 2009 to call the CMC Cardiologists, which CMC favored over the Physicians because of the employment contracts CMC has with them.  Dr. Allen found it extremely problematic to refuse to call the Physicians for their patients and instead, pursuant to Mr. Brown's directive, call the CMC Cardiologists, since the patient's prior evaluations, work-ups, stress tests, EKG's, and records were not available from the CMC Cardiologists, which negatively impacted the patient's continuity of care.  CMC labeled Dr. Allen "hysterical" for occasionally refusing to adhere to CMC's directives and instead calling the patient's cardiologist.

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

24.   The Chest Pain Center generates substantial revenue from nuclear stress tests performed on patients.  In an effort to increase revenue for the Chest Pain Center by performing worthless nuclear stress tests on Medicare and Medicaid patients, CMC and David Brown began offering bonuses to the ER Physicians since at least January 2, 2007, for referring patients with chest pain to the Chest Pain Center, even when those patients had established relationships with the Physicians and requested the Physicians' services.  CMC, at the direction of David Brown, has knowingly and willfully paid significant bonuses to the ER Physicians in exchange for patient referrals covered by Medicare and Medicaid. For example, between September 16, 2008 and March 18, 2010, CMC paid the ER Physicians $647,049.25 in illegal bonuses for patient referrals. *See* Exhibit "D." From March 18, 2010 through July 22, 2010, CMC paid its ER Physicians $190,665.00 in bonuses in exchange for patient referrals. *See* Exhibit "E."  Dr. Patricia Allen's quarterly bonuses for patient referrals to the Chest Pain Center ranged from $3,000.00 to $16,000.00.[10]  Dr. Stone's bonus payment for patient

---

[10]      Dr. Allen requested clarification from CMC on how the bonuses were calculated, but she was not provided any clear answers, other than the fact that the bonus was based on patient referrals from the emergency room to the Chest Pain Center.

The only mention of the Chest Pain Bonus in some of the ER Physicians' 2010 employment agreement states as follows: "Additional compensation is available through an incentive plan agreed upon by the Hospital and the Emergency Room Medical Directors."  This provision is in the employment contract of Drs. Walrod, Thamwiwat, Brett Zimmerman, Cindy Zimmerman, and Hall.  According to Drs. Thamwiwat and Walrod, that is a reference to the

9266289v.1

referrals to the Chest Pain Center in the summer of 2010 was $18,000.00.  Another ER Physician, Dr. Thamwiwat, received quarterly bonuses for patient referrals to the Chest Pain Center ranging from $8,000.00 to $10,000.00.  Dr. Walrod's bonus on or around August 2010 for patient referrals to the Chest Pain Center was between $10,000.00 and $20,000.00.  Dr. McNeill has mentioned that the ER Physicians have received bonus checks above $20,000.00 for patient referrals to the Chest Pain Center.  These large bonus payments induced and incentivized the ER Physicians to further increase the number of Medicare and Medicaid patients they referred from CMC's emergency room to the Chest Pain Center.  CMC paid the bonuses from the hospital fees it generated in the Chest Pain Center, including the substantial fees that CMC received from federal programs, including Medicare and Medicaid.  CMC and Brown have knowingly induced and continue to induce referrals of Medicare and Medicaid patients to the Chest Pain Center by offering the ER Physicians these illegal bonuses.   The effort to steer Medicare and

---

Chest Pain Center bonus.  Dr. Stone's employment contract contains no mention of any such additional bonus compensation or how it is calculated, although he admittedly received the bonuses.

Prior to CMC's employment of the ER Physicians, the agreement stated as follows: "[F]unds will be from time to time made available for specific chest pain center care and emergency department performance. . . . These funds will be divided between participating emergency department physicians based upon the percentage of time worked."

As set forth herein, both of these agreements fail to satisfy the employment safe harbor under the Stark law because they are based on the volume or value of the patient referrals and they do not set forth the amount of compensation payable from CMC to the ER Physicians.

**RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT**

9266289v.1

Medicaid patients to the Chest Pain Center was designed and led by CMC's administrator, David Brown, a non-physician business person who reiterated his instructions to the ER Physicians on September 1, 2009, "Don't call PCG [Drs. Parikh, Chandna, and Gaalla] until the patient is out of the CPC [Chest Pain Center]." Exhibit "F."  CMC and David Brown also informed CMC's quality control manager, Cherie Brzozowski, and other CMC staff between 2007 and 2010 not to call the Physicians for their patients until a stress test was performed at CMC's Chest Pain Center.  This scheme was implemented, intended, and designed to ensure that CMC would fully benefit from the ER Physicians' illegal referrals to the hospital's Chest Pain Center in exchange for bonus payments to the referring ER Physicians.

25.    CMC and Brown intentionally and knowingly paid the Chest Pain Center bonuses to the ER Physicians in exchange for patient referrals covered by the Medicare and Medicaid programs.  Indeed, CMC and Brown intended to violate the Anti-Kickback Statute, the Stark Act, and the FCA, intended to circumvent those laws, and intended to pay remuneration to the ER Physicians in exchange for patient referrals to the Chest Pain Center, as evidenced by the formula for the calculation of the Chest Pain Center bonus (*i.e.*, the more patients referred to the Chest Pain Center, the higher the ER Physician bonuses) and the

fact that all of the participants in the scheme (David Brown, CMC, and the ER Physicians) knew the illegal bonus payment was for patient referrals—a well-settled prohibition under the FCA, the Anti-Kickback Act, and the Stark Act. Furthermore, CMC, Brown, and the ER Physicians intended to circumvent those laws and conceal the illegal payments by deceptively calling them "Chest Pain Center Medical Prof Fees" in CMC's public "Vender History Payment." *See* Exhibit "D."  In reality, the payment was a bonus for patient referrals to the Chest Pain Center, and not medical professional fees, which the ER Physicians billed separately.[11]   In another effort to further conceal these illegal payments and circumvent the healthcare laws, CMC, Brown, and the ER Physicians designed and implemented an elaborate scheme to conceal these illegal bonuses by creating shell entities to receive the illegal bonuses and distribute the payments to the ER Physicians.[12]   Initially, in 2007 the illegal bonus payments were funneled from CMC to the ER Physicians through an entity called "Crossroads Emergency Physicians P.A.," an entity owned and operated solely by ER physician Dr. Clyde

---

[11]     After the Physicians raised an issue about the illegality of the Chest Pain Center bonuses, one of the Physicians saw a written notice in or around late 2011 on the main Xerox copy machine next to the ER physician and nursing desk in CMC's emergency room that acknowledged in writing that double billing was occurring in CMC's emergency room with respect to patients being admitted for observation to the Chest Pain Center.

[12]     At various times, however, CMC would directly distribute bonus checks to the ER Physicians at CMC's emergency room in nondescript envelopes with the recipient physician's name written on the outside of the envelope. *See* Exhibit "G."

**RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT**

Walrod, which operated from 1998 to 2010. *See* <u>Exhibit</u> "D."[13]   That entity
funneled the bonus payments to the ER Physicians from at least January 2007
through January 2010.   The agreement between CMC and Crossroads Emergency
Physicians, P.A. does not mention the bonus plan, although the bonuses were paid
to that entity.[14]   The illegal bonuses were subsequently funneled from CMC to the
ER Physicians through another shell entity called "Stone Emergency Services,
P.A.," an entity owned and operated by ER physician Dr. David Stone. *See* <u>Exhibit</u>
"E."[15]   That entity transferred bonus payments from CMC to the ER Physicians
from approximately January 2010 to current.   Upon information and belief, CMC
and Brown stopped paying the illegal bonuses payments when they learned of the
Physicians' allegations in this lawsuit when it was unsealed.   The ER Physicians

---

[13]      During the time Crossroads Emergency Physicians, P.A. operated and distributed
the illegal bonus payments, the following ER Physicians were part of that group: Dr. Walrod, Dr.
Thamwiwat, Dr. Allen, Dr. Stone, Dr. John McNeill, and Dr. John Vaughn.

[14]      This agreement fails to satisfy the requirements of both the Anti-Kickback Statute
and Stark Act, which both require that the aggregate compensation paid to the agent over the
term of the agreement must be, among other things: (1) set out in advance; (2) consistent with
fair market value in arms-length transactions; and (3) not determined in a manner that takes into
account the volume or value of any referrals or business otherwise generated between the parties
for which payment may be made in whole or in part under Medicare, Medicaid, other federal
health care programs. *See* 42 C.F.R. § 1001.952(d)(5) (Anti-Kickback); 42 U.S.C.
§ 411.357(d)(1)(v) (Stark).

[15]      Dr. Stone has admitted that the only purpose of Stone Emergency Services, P.A.
in 2010 was to receive and distribute the bonus payments from CMC.  In addition, in order to
further induce patient referrals from Dr. Stone, CMC appointed him as medical director of the
emergency room and paid him $5,000.00 per month for that position.  This induced Dr. Stone to
refer additional Medicare and Medicaid patients to CMC in 2010 through 2012, in violation of
the Anti-Kickback Act, Stark Law, and False Claims Act.

<u>R<small>ELATORS</small>' T<small>HIRD</small> A<small>MENDED</small> *Q<small>UI</small> T<small>AM</small>* C<small>OMPLAINT</small></u>

intended to receive the Chest Pain Center bonuses in exchange for referring Medicaid and Medicare patients to CMC, as evidenced by their receipt of literally hundreds of thousands of dollars in bonuses from September 16, 2008 through July 22, 2010, as well as their participation in the shell companies to receive and distribute the illegal bonuses. *See* Exhibits "D" and "E."  Since at least January 2, 2007, CMC and David Brown have knowingly and intentionally submitted false and fraudulent claims to Medicare and Medicaid for patients treated in the Chest Pain Center for which illegal bonuses were paid to the ER Physicians, and Medicare and Medicaid paid those false claims.

26.   In a prior proceeding between the parties, after learning of the details of Chest Pain Center bonus scheme, Federal Judge Janis Graham Jack recognized the serious problems with the illicit bonus program.   As Judge Jack recognized at a hearing on December 16, 2010:

> Dr. Stone and the other doctor, they get a bonus system based on how many procedures, how many labs, how many EKGs, how much observation [in the  Chest Pain Center].   They don't have any interest at all in getting [the Physicians] in to take care of the patients, because it cuts down on their bonus, it cuts down on their productivity.   And it's just a sad thing when medicine is practiced this way.   The more tests, the more money.
>
> ***
>
> [W]hat I have seen from CMC is not pretty.   It makes me want to take the Victoria bypass.

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

Exhibit "H" at 280:14-22, 24-25.

27.   In 2007 and 2008, CMC began engaging in the unauthorized practice of medicine by knowingly and intentionally entering into illegal employment contracts with five cardiologists.[16]   Specifically, CMC entered into Physician Employment Agreements with five cardiologists—Drs. William Campbell, Jr., Kurtis Krueger, Robert Oakley, Tywaun Tillman, and Chelif Junor (collectively "CMC Cardiologists").   *See* Exhibits "I"-"M."   CMC paid the CMC Cardiologists, specifically Drs. Campbell, Kruger, and Oakley, many times more in salary than they earned in private practice.   Under the Physician Employment Agreements,

---

[16]   In a prior proceeding between the parties, Judge Janis Graham Jack ruled, in denying the Physicians' motion for summary judgment on Dr. Campbell's affirmative defense of official immunity, that the CMC Cardiologists' employment agreements did not violate the prohibition on the corporate practice of medicine.  The Physicians respectfully disagree with that interlocutory opinion and note that the ruling cannot be given collateral estoppel or res judicata effect in this case.

The Fifth Circuit has instructed that an interlocutory order, such as summary judgment order, should *not* be given collateral estoppel or res judicata effect in subsequent litigation. *See Avondale Shipyards, Inc. v. Insured Lloyd's*, 786 F.2d 1267, 1270 (5th Cir. 1986).  As the Fifth Circuit recognized, "[w]e have . . . throughout the years on several occasions recognized that such partial summary judgment orders lack the finality necessary for preclusion." *Id.* (internal citations omitted).  The Fifth Circuit has consistently applied *Avondale* in refusing to give preclusive effect to interlocutory summary judgment orders. *See, e.g., Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 395 (5th Cir. 1998) ("[W]e premised our decision refusing to grant preclusive effect to the partial summary judgment order on the basis that it was unappealable."); *Hunter v. Transamerica Life Ins. Co.*, 498 F. App'x 430, 439 (5th Cir. 2012) ("[T]he district court here did not err by declining to offensively apply the doctrine of issue preclusion to Transamerica's defense.  We have declined to offensively apply collateral estoppel in situations where the ruling at issue was neither final nor subject to appellate review, finding that it would be unfair to apply issue preclusion to such an order.") (internal citations omitted).  Accordingly, Judge Jack's prior interlocutory summary judgment order is not binding in this case.

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

CMC employs the CMC Cardiologists, bills and collects for all the medical services they provide, including both hospital and office-based services, pays the physicians a salary, allows the cardiologists to participate in CMC's health and dental insurance, provides limited malpractice coverage, provides reimbursement for continuing medical education programs, and provides dictation services. *See id.* According to CMC, it employed the CMC Cardiologists because "[r]eimbursement for the cardiologists has continued to erode over the past year due to declining reimbursement from Medicare and other payors, and their office overhead is too high." Exhibit "N."   The lucrative employment offers extended to the CMC Cardiologists would, according to CMC, "not only improve their income level but help with their working situation as well." *Id.*   At the time CMC entered into the employment agreements with the CMC Cardiologists, the prohibition against the corporate practice of medicine was well settled.   CMC and Brown knowingly agreed to pay (and the CMC Cardiologists knowingly agreed to accept) above-market salaries and fringe benefits in exchange for Medicare and Medicaid patient referrals from the CMC Cardiologists to CMC.   Dr. Campbell has admitted to referring all of his stress tests and echocardiograms to CMC since his hiring.   This illegal *quid pro quo* relationship between the CMC Cardiologists and CMC began in 2007 and continues to date.

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

28.  When CMC employed the CMC Cardiologists, the hospital agreed to collect the CMC Cardiologists' accounts receivable generated in private practice. In doing so, CMC and the CMC Cardiologists agreed to split the recovered receivables on a "90-10" split basis, where CMC would receive 10% of the medical fees recovered. *See* <u>Exhibit</u> "I."

29.  Additionally, upon information and belief, CMC rents office space to the CMC Cardiologists on CMC's campus at a significantly reduced rate below the fair market value for similar office space.  Dr. Campbell entered into a lease agreement with CMC on September 17, 2007, in which he rents 192 square feet of office space at $1.12 per square foot per month on a 36-month term, which includes janitorial services and telecommunication services.[17]  On information and belief, this is well below fair market rate for that type of office space in that location in September 2007 through current.  Each of the other cardiologists employed by CMC has a similar lease agreement with CMC.  Their office space is located at 2700 Citizens Plaza, Suite 300, Victoria, Texas.  In September 2010, CMC entered into lease agreement extensions with Dr. Campbell and the other CMC Cardiologists on the same terms and conditions as the prior agreements with

---

[17]     The CMC Cardiologists' employment agreements merely mention that they will lease personal office space in CMC's medical office facility "at the prevailing rate," which is not defined in the agreements. *See, e.g.*, <u>Exhibit</u> "I" ¶ 4 at p. 3.  Moreover, the lease agreements do not mention telephone and facsimile costs being covered in the rent, but CMC does pay those expenses for the CMC Cardiologists, and has done so since September 2007.

<u>**RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT**</u>

9266289v.1

a 36-month term, with the only change being a *three cent increase* in rent to $1.15 per square foot.  The rent amount was also well below market rate for September 2010 through current.   David Brown negotiated and signed all of the lease agreements with the CMC Cardiologists.  According to Drs. Campbell, Krueger, Tillman, and Junor, they are not even sure whether they actually paid any rent to CMC.  Dr. Campbell has affirmatively denied paying any rent to CMC despite the lease agreement, and he does not pay for the janitorial services, telephone services, or utilities provided to him by CMC.

30.  These discounted lease arrangements (assuming any rent was paid at all) between CMC and the cardiologists employed by CMC are intended to (and have actually led to) increase the Medicare and Medicaid patient referrals from the employed cardiologists and CMC.  Specifically, for example, Dr. Campbell's and his partners' referrals to CMC have increased dramatically since 2007, when they entered into the discounted lease agreement with CMC.  Prior to entering into the lease agreement with CMC (between 2003 and 2006), Dr. Campbell transferred many Medicare and Medicaid heart surgery patients out of CMC to other hospitals for treatment.  He believed those transfers were in the patients' best interest.  However, since entering into the discounted lease agreement with CMC and becoming employed by CMC, Dr. Campbell and his partners starting referring

nearly all Medicare and Medicaid heart surgery patients to CMC and its exclusive cardiac surgeon, Dr. Yahagi, despite Dr. Yahagi's unusually high mortality rate.[18] For example, Dr. Campbell only attempted to transfer *one patient* from CMC in 2010.  He only transferred *two to three patients* out of CMC in 2009, and the same number in 2008.  In fact, Dr. Campbell understood that his employment contract with CMC *obligated* him increase his use of Dr. Yahagi at CMC.  CMC and Brown's intent to induce Medicare and Medicaid patient referrals from Dr. Campbell has succeeded in increasing Dr. Campbell's Medicare and Medicaid patient referrals to CMC from 2007 to current.  Dr. Campbell has acknowledged that CMC would lose substantial income if the CMC Cardiologists were not at CMC, and CMC would lose all of their group's patient referrals to the hospital. Thus, the CMC Cardiologists are extremely valuable to CMC because of their patient referrals, which CMC recognizes by paying them inflated salaries well above market-rate in exchange for their patient referrals.  Dr. Krueger has similarly admitted that, since becoming employed by CMC, he keeps as many cardiac surgery patients at CMC as possible.  His Medicare and Medicaid patient referrals

---

[18]       By way of example only, in March 2010, Dr. Campbell referred Medicare patient J.B. to CMC and Dr. Yahagi for surgery in exchange for his above-market salary and fringe benefits described herein.  In June 2011, Dr. Tillman referred Medicare patient M.B. to CMC for in-hospital admission and cardiac testing in exchange for his above-market salary and fringe benefits described herein.  In December 2009, Dr. Tillman referred Medicare patient W.W. to CMC for treatment in exchange for his above-market salary and fringe benefits described herein.

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

to CMC are in exchange for discounted office space and an above-market salary. CMC and David Brown knowingly and intentionally sought, induced, and obtained payment from Medicare and Medicaid in 2007 through 2013 for hospital fees generated from referrals from the CMC Cardiologists under this illegal employment arrangement.

31.   In exchange for Medicare and Medicaid patient referrals, CMC and Brown have also offered the CMC Cardiologists the exclusive right to perform cardiology-related services at the hospital.  In February 2010, CMC and Brown passed a resolution closing the cardiology department exclusively to the CMC Cardiologists.   As one CMC board member, Dr. Andrew Clemmons, acknowledged in October 2010, the CMC Cardiologists are the "preferred providers" of cardiology at CMC.  CMC and Brown have successfully induced and continue to induce referrals of Medicare and Medicaid patients from the CMC Cardiologists by offering these physicians illegal incentives and remuneration, including above-market salaries, discounted office space, and exclusive rights to CMC's cardiology department.   CMC and David Brown knowingly and intentionally sought, induced, and obtained payment from Medicare and Medicaid in 2007 through 2013 for hospital fees generated from referrals from the CMC Cardiologists under this illegal *quid pro quo* arrangement.

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

9266289v.1

32.  Prior to CMC hiring the CMC Cardiologists in 2007, carotid doppler studies, ultrasound studies, and peripheral vascular studies were read only by vascular surgeons at CMC.  Presently, the CMC Cardiologists and CMC's exclusive cardiac surgeon, Dr. Yahagi, are the only physicians that CMC and Brown allow to read these studies.  This is done to increase the number of carotid and peripheral surgical procedures at CMC, generate revenue for CMC, and provide large salaries for the CMC Cardiologists.  Upon information and belief, since 2007, the number of carotid surgeries and peripheral vascular surgeries has increased nearly 300% at CMC, and Medicare and Medicaid have reimbursed CMC, the CMC Cardiologists (for reading studies), and Dr. Yahagi (for performing surgery) for those worthless procedures.  This increase was caused by CMC's unnecessary and worthless femoral popliteal bypass surgeries, carotid endarterectomies, peripheral angioplasty, and stent procedures.

33.  David Brown has systematically and intentionally used below-market lease arrangements with physicians to induce Medicare and Medicaid patient referrals to CMC.  For example, David Brown entered into lease agreements with physicians in which he charged for less square footage than was actually leased by the physician.  By way of example, in November 2004, Brown entered into a lease agreement with a physician to lease 2,654 square feet of medical office space for

$1.07 per square foot. *See* <u>Exhibit</u> "O."  However, in the written lease agreement, Brown expressly agreed to only charge the physician rent for 1,780 square feet for the first month (870 square feet less than the true square footage leased), 1,860 square feet for the second month (794 square feet less than the true square footage leased), and so on.  Only after the first year did Brown charge the physician the correct square footage amount of 2,654 square feet.  This was an illegal kickback to the physician in exchange for patient referrals in violation of the Anti-Kickback Statute, the Stark Act, and the FCA.  When Brown entered into these illegal lease arrangements with referring physicians, his intent and design was to induce patient referrals to CMC, as evidenced by the benefits and discounts afforded to the physicians in the lease agreements.  Additionally, on information and belief, under the lease agreement referenced above, Brown and CMC intentionally failed to renew the lease in 2010, and instead continued to lease the office space to the physician at a discounted rate without a valid lease agreement in place.

34.  Consistent with CMC and Brown's systematic and intentional scheme of illegal kickbacks in the form of below-market lease agreements with referring physicians, Brown also provided expensive transcription services to referring physicians.  For example, CMC and Brown provided Dr. Yahagi with free office transcription services when Dr. Yahagi moved into CMC's office building, and Dr.

Yahagi, in turn, continued to refer his Medicare and Medicaid patients to CMC. By way of example, Dr. Yahagi utilized the transcription service at CMC in transcribing the medical records of patient J.S. on February 13, 2009.  Dr. Yahagi referred patients to CMC in exchange for these kickbacks, including Medicare patient N.C., who Dr. Yahagi referred to CMC and Dr. Tillman in March 2008 for cardiac testing and treatment.  CMC and Brown do not offer transcription services to every physician at CMC.  Instead, they only offer such services to physicians in exchange for patient referrals, including Medicare and Medicaid patients.

35.  The Physician Employment Agreements provide that the CMC Cardiologists and their medical practice activities are subject to the control of CMC.  The Agreements between CMC and Drs. Campbell, Krueger, and Oakley state, "The relationship between [CMC] and [Dr. Campbell/Krueger/Oakley] shall be that of an employer and employee.  Employee shall be in the paid service of [CMC] (a governmental unit) and, as such, [CMC] has the legal right to control the tasks performed by [the doctors] pursuant to this Agreement.  Employee shall not be an independent contractor."  Exhibits "I"-"K."  The Agreements between CMC and Drs. Tillman and Junor state that "the relationship between [CMC] and [Drs. Tillman/Junor] shall be that of an employer and employee.  Employee shall be considered and treated as having an employee status."  Exhibits "L"-"M."  This

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

type of employment relationship with the CMC Cardiologists is illegal because it violates the prohibition on the corporate practice of medicine. *See* TEX. OCC. CODE § 165.156 (precluding the corporate practice of medicine); *see also id.* § 164.052(a)(17) (recognizing that the practice of medicine is restricted to licensed physicians).  This case is a prime example of the reason for the prohibition on the practice of corporate medicine: David Brown, a non-physician business person, is instructing physicians *how* to practice medicine and making medical decisions for the employed physicians. *See, e.g.*, Exhibit "E."  As Dr. Patricia Allen, a former emergency room physician at CMC, has explained, the directives from David Brown requiring patients to be admitted to the Chest Pain Center negatively impact patient care, negatively affect continuity of care, and endanger patient lives.  CMC has knowingly billed for and obtained millions of dollars in payments from Medicare and Medicaid for medical services provided under these illegal contracts since 2007.

36.  While CMC's employment of the CMC Cardiologists (at salaries many times more than what they earned in private practice) has caused CMC to lose significant money on their office practices, David Brown has admitted that CMC has profited from their patient referrals to CMC.  In 2008, the CMC Cardiologists' office practices lost over $400,000, and in 2009 their practices lost nearly

$1,000,000.00.   CMC, however, makes significant money on the Medicare and Medicaid patient referrals from the CMC Cardiologists.   For example, between 2007 and 2012, the CMC Cardiologists have referred many Medicare and Medicaid patients to CMC and Dr. Yahagi for cardiac surgery in exchange for the large salaries and fringe benefits.   The enormous profits realized by CMC from the CMC Cardiologists' referrals is precisely why CMC continues to employ the cardiologists, despite the significant losses of their office practices.   Indeed, the CMC Cardiologists' exclusive use of the hospital coupled with their exclusive and continuous referrals of Medicare and Medicaid patients to CMC and Dr. Yahagi (who performs all of his surgical procedures at CMC) is so significant that CMC profits from the employment of the CMC Cardiologists because of these referrals. Dr. Campbell acknowledged in 2010 that CMC financially gains from all of his patient referrals to CMC.   By employing the CMC Cardiologists at above-market rates and receiving all of their referrals in exchange, CMC can and has billed Medicare and Medicaid for all of the additional stress tests and echocardiograms performed at CMC.   In exchange for salaries several times what they earned in private practice, the CMC Cardiologists repay CMC in the form of Medicare and Medicaid patient referrals.   This *quid pro quo* relationship between CMC and the

CMC Cardiologists has proven to be a profitable venture for CMC, as evidenced by CMC's cash position of $95,000,000.00 as of September 2010.

37.  CMC also illegally employs a group of emergency room physicians. The emergency room physicians are Drs. David Stone, Clyde Walrod, Penny Thamwiwat, Brett Zimmerman, and Cindy Zimmerman.[19]  These employed emergency room physicians have referred Medicare and Medicaid patients to CMC and its employed cardiologists in exchange for employment and bonus payments. By way of example only, on January 29, 2010, Dr. Thamwiwat referred Medicare patient J.B. (a patient of Dr. Parikh) to CMC and CMC Cardiologist Dr. Campbell for treatment in exchange for her employment arrangement and bonuses.  CMC also illegally employs hospitalists Drs. Bruce Wheeler, Alexandra Vidachek, Glen Vo, and John Scroggins.  These employment relationships are illegal because they violate the prohibition on the corporate practice of medicine.  Moreover, the hospitalists and their employed physician assistants illegally refer the Physicians' patients to CMC and the CMC Cardiologists in exchange for employment benefits and a salary, despite the patient's preexisting relationship with the Physicians.  For example, on April 30, 2012, hospitalist physician assistant Terry Brasher steered Dr. Parikh's patient, J.T., a Medicare recipient, to CMC Cardiologist Dr. Tillman

---

[19]     As discussed above, prior to 2010, the ER Physicians were not employed by CMC, but they still received Chest Pain Center bonuses.  Dr. Stone has recently left the employment of CMC.

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

so that CMC and Dr. Tillman could bill Medicare for reading the patient's cardiac studies.  CMC and Dr. Tillman readily accepted the referral.  In exchange, CMC continued to offer P.A. Brasher employment and related benefits.   In another instance, on October 25, 2010, a CMC employed hospitalist referred Dr. Parikh's patient, G.C., a Medicare recipient, to CMC Cardiologist Dr. Campbell so that CMC and Dr. Campbell could bill Medicare for reading the patient's cardiac studies.  CMC and Dr. Campbell readily accepted the referral.  In exchange for the referral, CMC and David Brown continued to offer employment and related benefits to the hospitalist.  CMC has knowingly billed for and obtained payments from Medicare and Medicaid for medical services provided under these illegal contracts.

38.   In September 2008, Brown, a non-physician business person, personally instructed CMC's quality control manager, Cherie Brzozowski, and CMC staff that all cardiology patients who present to the emergency room or the Chest Pain Center should be referred to the CMC Cardiologists, regardless of the patient's relationship with the Physicians.  Since CMC paid the CMC Cardiologists a salary far in excess of what they earned in private practice, the CMC Cardiologists adhered to CMC's and Brown's strict instructions to refer all surgical patients to CMC and Dr. Yahagi, regardless of the patient's best interest.  This *quid*

*pro quo* referral scheme violates the False Claims Act, the Anti-Kickback Act, and the Stark Act, and has resulted in the presentation and payment of thousands of false claims to the Government.

39.   In 2008, 2009, and 2010, CMC, Brown, and Dr. Campbell also began tracking and documenting all transfers the Physicians made out of the hospital, so they could later punish the Physicians for those transfers.   In fact, in November 2009, David Brown personally instructed CMC's quality control manager, Cherie Brzozowski, to accumulate data to show the Physicians' admissions, catheterizations, consultations at CMC, as well as a list of the physicians who referred patients to the Physicians.   In doing so, CMC and Brown violated HIPAA, inappropriately involved non-members in the peer review process, such as Suzanne Stone and Dr. Campbell, and Suzanne Stone and other CMC staff, including Dr. Frank Parma, "tweaked" certain peer review documents.   In retaliation for the Physicians' lack of referrals to CMC, David Brown, a non-physician, personally referred at least one of the Physicians' case to peer review in 2009.   CMC's quality control manager was personally instructed by David Brown in 2009 to submit several cases involving the Physicians to peer review.   Some of the Physicians' patient transfers were submitted to peer review in 2009, merely because the patient was transferred out of CMC.

**RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT**

9266289v.1

40.  Dr. Yahagi was so upset about the Physicians' lack of patient referrals to him that he (with the assistance of David Brown and suggestion of Dr. Campbell) wrote a letter to the Physicians on January 14, 2010, stating that he would not provide surgical standby coverage for them, despite the bylaw requirement that he to do so.  As Dr. Yahagi wrote to the Physicians:

> For the past many years, I have been providing standby coverage for angioplasties but have been disappointed with the inconsistency of your not referring those same patients to me when they need my services.  It seems best, I think, if I no longer provide standby coverage. This decision is effective January 18, 2010.

<u>Exhibit</u> "P."  Despite Dr. Yahagi's violation of the bylaws in refusing to provide standby, CMC and Brown failed to correct the situation until nearly a month later, when the Physicians' counsel demanded adherence to the bylaws.   In the meantime, CMC and Brown permitted (and actually enabled) patients' lives to be put in danger by Dr. Yahagi in an effort to coerce the Physicians to refer patients to Dr. Yahagi and CMC or else force the Physicians out of the hospital.

41.  Rather than referring all of their patients to Dr. Yahagi and CMC, as CMC and Brown demanded and as the CMC's Cardiologists do, the Physicians exercised their independent medical judgment in making referrals based on the best interests of their patients.  Referrals to Dr. Yahagi are often not in the best interests of the Physicians' patients since Dr. Yahagi has an unusually high mortality rate

<u>RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT</u>

among heart surgery patients.  Despite this fact, CMC, Brown, and Dr. Campbell continued to demand that the Physicians make their medical decisions based on the best economic interests of CMC, and not the patient's best interest.

42.   As a result the Physicians' failure to comply with Defendants' demands related to patient referrals, on December 16, 2009, the chairman of CMC's board of directors, at David Brown's request, wrote to each of the Physicians criticizing them for referring surgical patients to another facility.  The letters stated:

> As you are aware, bypass surgery is performed at Citizens Medical Center by Dr. Yusuke Yahagi. Nevertheless, it is our understanding that rather than refer patients to Dr. Yahagi and have a bypass procedure performed at Citizens Medical Center, you refer patients to another cardiovascular surgeon for evaluation.
>
> While it is certainly your right to exercise your medical judgment as you see fit, likewise, it is the responsibility of the Board of Directors at Citizens Medical Center to exercise their judgment as to what is in the *best interest of the business of Citizens Medical Center* and its patients and Medical Staff.  It is the Board's firm belief that it is in the best interest of Citizens Medical Center for patients who are capable of being treated at  Citizens Medical Center to be treated at Citizens Medical Center and not be transferred elsewhere.
>
> In this connection, it is our understanding that, for the past several years, you have not referred cardiac surgical candidates to Dr. Yahagi but, rather, have referred those patients either out of town or to cardiovascular surgeons who do not have privileges at Citizens Medical Center.

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

Exhibits "Q"-"S" (emphasis added).  The letters go on to ask numerous questions about the Physicians' referral patterns, and whether the Physicians "intend to refer future cardiac surgical patients to Dr. Yahagi."  The correspondence concludes that "[w]e are convinced that it is not *in the best interest of Citizens Medical Center* to have patients at our hospital who are potential cardiac surgical candidates referred to other physicians at other hospitals when Dr. Yahagi is competent to perform these procedures at Citizens Medical Center." *Id.* (emphasis added).

43.   Most shocking is the demand for responses to the inquires about the Physicians' patient referrals to Dr. Yahagi "**so that we may take them into consideration during your reappointment process**." *Id.* (emphasis added).  As CMC described the letters, they ask "very pointed questions regarding [the Physicians'] utilization of Dr. Yahagi's and the hospital's services, patient transfers, and asking whether they should reapply to the Medical Staff."  These letters are so appalling that CMC's former counsel drafted a letter to the Physicians' counsel, after the filing of a related case, in which he futilely attempted to convey that the letters do not mean what they say. *See* Exhibit "T."  Nonetheless, David Brown continues to embrace economic credentialing.  Brown informed Dr. Kruger in February 2010 that he was going to direct the Physicians' patients to the CMC Cardiologists.  CMC and Brown's intent in doing so was to

increase patient referrals to CMC since the CMC Cardiologist refer nearly all of their patients to CMC.  The Defendants' conduct violates the False Claims Act, the Anti-Kickback Act, and the Stark Act, and has resulted in the knowing submission and presentation and payment of false claims to the Government.

44.  The December 16, 2009 correspondence is consistent with the same type of economic pressure the Physicians have received in the past from CMC, Brown, and Dr. Campbell.  For example, on September 18, 2007, David Brown wrote to Dr. Chandna asking why a patient was discharged to the competing hospital, DeTar Hospital, where the patient underwent a successful bypass surgery. At the behest of CMC, Brown, and Dr. Campbell, CMC's staff also initiated harassing and false complaints about Dr. Parikh's and Dr. Chandna's transfer of a patient to Houston for open-heart surgery.  Dr. Gaalla received similar treatment for the transfer of patients to other facilities for heart surgery. On October 8, 2007, Dr. Parikh received similar correspondence from David Brown, a non-physician business person, questioning his admission of a patient to DeTar Hospital even when no such transfer from CMC had occurred.  In 2010, CMC, Brown, and Dr. Campbell began reviewing every one of the Physicians' transfers in peer review dating as far back as 2006.  CMC, Brown, and Dr. Campbell were  upset with the

Physicians because they "do not refer patients to him [Dr. Yahagi] for surgical care."

45.  In order to increase CMC's profits, CMC, Brown, and Dr. Campbell began steering the Physicians' patients to the CMC Cardiologists.  To this end, even when the Physicians' patients present to CMC's emergency room and specifically request the Physicians, they were not called.  Instead, David Brown instructed his employees and medical staff that, regardless of the patient's cardiologist, "[w]e will refer all such patients to our cardiology group.  Pre established relationship or not." Exhibit "U."  When the Physicians refused to succumb to Defendants' pressure to refer their patients to Dr. Yahagi, CMC, Brown, and Dr. Campbell began steering the Physicians' patients to the CMC Cardiologists who, in turn, referred those patients to CMC and Dr. Yahagi.

46.  On February 17, 2010, at the behest of Brown, CMC passed a resolution that granted the CMC Cardiologists the exclusive right to practice cardiology at CMC ("Resolution").[20]  The Resolution also ratified the hospital's exclusive contract with Dr. Yahagi.   The Resolution rewarded the CMC

---

[20]   Notwithstanding anything herein to the contrary, Relators are not asserting a cause of action for retaliation under 31 U.S.C. § 3730(h) or any other cause of action or seeking damages or other relief related to their removal from CMC pursuant to the Resolution or any continuation or extension of the Resolution adopted by the Board of Managers of CMC on February 17, 2010.

Cardiologists for their Medicare and Medicaid patient referrals to Dr. Yahagi and CMC, and it also induced them to continue to refer Medicare and Medicaid patients to Dr. Yahagi and CMC.

47.   CMC, Brown, and Dr. Campbell took actions against the Physicians because they did not participate in Defendants' FCA violations outlined herein. When the Physicians reported Dr. Yahagi's unnecessary, worthless, and inappropriate surgeries to CMC, the Physicians were subjected to inappropriate peer reviews.   CMC and David Brown removed the Physicians from various leadership positions within the hospital, including but not limited to, removal from the Peer Review Committee and Chest Pain Center Committee on May 6, 2009, once it became known that the Physicians would not participate in Defendants' FCA violations.   Dr. Parikh was kept from being added as a member of the Executive Committee for similar reasons, and the Relators were wrongfully denied certain privileges at CMC.

48.   CMC, Brown, and Dr. Campbell ultimately succeeded in their illegal efforts to steer the Physicians' patients to the CMC Cardiologists and ensure Dr. Yahagi and CMC receive all Medicare and Medicaid patient referrals.   In fact, in 2009 CMC touted that it experienced a 12% increase in the number of patients treated in the Chest Pain Center over 2008. *See* Exhibit "C."   Additionally, CMC's

internal chart showing the number of PCI procedures[21] performed per cardiologist shows an increase for some of the CMC Cardiologists from 2007 through 2009, while during the same time period those procedures decreased substantially for the Physicians at CMC.  These significant increases in treatment are evidence that CMC and Brown's inducements to the CMC Cardiologists to refer patients to CMC were successful.

49. CMC, Brown, and Dr. Campbell's conduct in trying to force the Physicians to make decisions based on the hospital's economic interests, as set forth in the December 16, 2009 letters, runs directly afoul of the Anti-Kickback Statute.  That statute prohibits the offering, payment, solicitation, or receipt of any remuneration in exchange for a patient referral or referral of other business for which payment may be made by a federal health care program, including Medicare and Medicaid.  Because many of the Physicians' surgeries are covered by Medicare and Medicaid, CMC has violated this statute by conditioning the grant of privileges on patient referrals, paying above-market salaries to the CMC Cardiologists, paying bonuses to the ER Physicians for patient referrals to the Chest Pain Center, and by offering discounted rent and other services in exchange for referrals for services or items reimbursable by the federal health care programs.

---

[21]     PCI stands for percutaneous coronary intervention, which is a non-surgical procedure used to treat the narrowed coronary arteries of the heart found in coronary heart disease.

**RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT**

9266289v.1

50.  CMC, Brown, and Dr. Campbell's knowing and reckless misconduct has (and continues to) caused significant damage to the Government for which recovery is warranted.

## V.
## *QUI TAM* CLAIMS

1.    **CMC AND BROWN'S BONUS PAYMENTS TO THE ER PHYSICIANS BASED ON THE LEVEL OF REFERRALS TO CMC'S CHEST PAIN CENTER VIOLATES THE ANTI-KICKBACK STATUTE AND STARK ACT, AND RESULTS IN THE SUBMISSION AND PAYMENT OF FALSE CLAIMS TO FEDERAL HEALTH CARE PROGRAMS.**

51.  ***Anti-Kickback Violations***.   As set forth above and incorporated herein by reference, CMC and Brown have paid substantial bonus money to the ER Physicians based on the level of Medicare and Medicaid patient referrals made to CMC's Chest Pain Center.  These bonus payments have been paid for a number of years starting in January 2007 and continuing today.  As CMC's documents reflect, the ER Physicians receive 50% of reimbursement received by the Chest Pain Center, including reimbursement from Medicare and Medicaid. *See* <u>Exhibit</u> "B." The obvious intent of the Chest Pain Center bonus is to increase patient referrals to CMC in exchange for bonus payments to the referring ER Physicians, as evidenced by the structure of the bonus system and the significant monetary inducements paid to the ER Physicians for such referrals.  As of 2011, CMC had paid bonuses to the ER Physicians exceeding $1,096,845.00, in exchange for patient referrals to the

Chest Pain Center. *See* Exhibit "D"; Exhibit "E"; Exhibit "V."  The more patients the ER Physicians refer to the Chest Pain Center, the higher the bonuses they receive.  This illicit *quid pro quo* arrangement runs directly afoul of the Anti-Kickback Act and the Stark Act and thereby the False Claims Act.

52.  The total amount of Medicare and Medicaid reimbursement paid to CMC and the ER Physicians under this illegal kickback scheme is in the millions. CMC and Brown knowingly and falsely certified to the Government in CMC's annual cost reports in 2006, 2007, 2008, 2009, 2010, 2011, and 2012, that they complied with all laws and regulations, including the Anti-Kickback and Stark Acts, in seeking payment and reimbursement for these false claims, which is a material prerequisite to payment and reimbursement.  The payments under this scheme are remuneration in exchange for patient referrals and, as such, are violations of the Anti-Kickback provisions of 42 U.S.C. § 1320a-7b.

53.  CMC and Brown's violations of Anti-Kickback Act have resulted in fraudulent billing to federal health care programs.  Specifically, since at least January 2007, CMC, at the direction of Brown, has knowingly billed federal health programs for services and procedures performed on Patients (as defined below) and others in its Chest Pain Center for nuclear stress tests, as well as other procedures, that were referred to CMC by the ER Physicians in exchange for

illegal remuneration in the form of bonuses.   CMC, at Brown's direction, knowingly submitted false and fraudulent Medicare and Medicaid claims for these services and procedures performed in the Chest Pain Center in 2006 through 2012. Thus, the Medicare and Medicaid claims that CMC has submitted, and the Government paid, arising from this scheme are false claims under the FCA.

54.   CMC and Brown's knowing payment of bonuses to the ER Physicians for referrals to the Chest Pain Center has also resulted in worthless procedures and unnecessary nuclear stress tests for which Medicare and Medicaid have paid. Following are numerous examples of unnecessary and worthless nuclear stress tests conducted on the Physicians' patients in the Chest Pain Center (and the Physicians were not called) for which Medicare, Medicaid, and other government payors were billed:[22]

- Patient C.G., a Medicare patient, was treated by CMC's emergency room staff on May 7, 2010.  The patient was referred by Dr. Stone from CMC's emergency room to the Chest Pain Center on May 7, 2010.  He was falsely informed by the emergency room staff that his cardiologist, Dr. Parikh, ordered a nuclear stress test.  Dr. Parikh did not order the test. Dr. Parikh was never informed of patient's presence in the emergency room.  Dr. Stone, a former ER Physician, then ordered and performed a nuclear stress test in the Chest Pain Center on May 7, 2010, despite the patient's wife's protestations that Patient C.G. not have the test in light of his recent heart surgery.  The patient became sick after the nuclear stress test.   The stress test results were normal, as expected, and the sole purpose of subjecting Patient C.G. to the test was to generate revenue for

---

[22]      The Court previously held CMC in contempt in a related case for its refusal to call the Physicians when their cardiac patients presented to CMC and requested the Physicians.

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

CMC and bonuses for the ER Physicians.  The referring physician, Dr. Stone, knowingly received a bonus payment in exchange for the Medicare patient referral to the Chest Pain Center.  The services were unnecessary and worthless, and Medicare was knowingly billed in or around May 2010, and paid for this worthless testing and false claim.

- Patient I.I., a Medicaid patient, had an unnecessary nuclear stress test performed by CMC's ER Physician, Dr. Thamwiwat, on July 3, 2010.  The patient was referred from CMC's emergency room to the Cheat Pain Center by Dr. Thamwiwat on July 3, 2010  Patient I.I. had a previous heart valve surgery and his cardiologist, Dr. Parikh, was not called.  The patient's emergency room record appears to fabricate facts by CMC's ER personnel.  According to the patient log, it appears that a call may have been placed to Dr. Parikh at approximately 6:04 p.m. on July 3, 2010; however, the log states that this call was "received" by "Michelle McAdams," an employee of CMC.  Medicare was knowingly billed in or around July 2010, and paid for the worthless testing and false claim.  The patient underwent an unnecessary and worthless stress test.  The ER Physician, Dr. Thamwiwat, knowingly received a bonus in exchange for referring the Medicaid patient to the Chest Pain Center.

- Patient R.C., a Medicaid patient of Dr. Parikh's, was referred from CMC's emergency room to the Chest Pain Center on January 29, 2008 by Dr. Walrod.  The patient underwent a stress test in the Chest Pain Center on January 28, 2008.  Medicaid was knowingly billed in or around January 2008, and paid for this false claim.  Dr. Walrod knowingly referred the Medicaid patient to the Chest Pain Center and ordered testing in exchange for a bonus payment from CMC.

- Patient M.R., a Medicare patient, presented at CMC's emergency room on November 12, 2011, and was referred from the emergency room to the Chest Pain Center that same day by emergency room physician Dr. Patrick Schaner for a stress test.  The patient underwent a stress test on November 12, 2011 at the Chest Pain Center, and Medicare was knowingly billed in or around November 2011, and paid for the testing and false claim.  The referring emergency room physician knowingly received a bonus in exchange for referring the Medicare patient to the Chest Pain Center.

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

- Patient M.M., a 79-year-old Medicare patient, was referred from CMC's emergency room to the Chest Pain Center by Dr. Stone on November 30, 2008.  The patient underwent a stress test at the Chest Pain Center on November 30, 2008.   Medicare was knowingly billed in or around November 2008, and paid for the testing and false claim.   The ER Physician, Dr. Stone, knowingly received a bonus in exchange for referring the Medicare patient to the Chest Pain Center.

- Patient I.R., a 72-year-old Medicare and Medicaid recipient and Dr. Parikh's patient, presented to CMC's emergency room on September 1, 2011.   The patient asked for Dr. Parikh to be called to evaluate her. CMC's ER Physician did not call Dr. Parikh; instead, the ER Physician, Dr. Patrick Schaner, referred the patient from CMC's emergency room to the Chest Pain Center on September 2, 2011.  On September 2, 2011, the patient underwent a nuclear stress test without discussing it with Dr. Parikh.   The patient had a previous defibrillator, and consultation with Dr. Parikh would have prevented unnecessary testing and billing of Medicare and Medicaid.   Instead, the patient underwent an unnecessary and worthless stress test.   Medicare and Medicaid were knowingly billed in or around September 2011, and paid this false claim.  The Medicare and Medicaid patient was referred to the Chest Pain Center in exchange for a bonus payment to ER Physician, Dr. Schaner.  On April 9, 2013, the patient was against referred from CMC's emergency room to the Chest Pain Center for a stress test.  Dr. Ashkok Gokhale, an emergency room physician at CMC, knowingly referred the Medicare and Medicaid patient to the Chest Pain Center for testing on April 9, 2013.  Medicare and Medicaid were knowingly billed in or around April 2013 for the worthless testing and false claim.

- Patient P.H., a Medicare recipient and Dr. Parikh's patient, presented to CMC's emergency room on March 4, 2009.  Dr. Parikh was not notified. The patient was kept overnight, and ER Physician Dr. John McNeill referred the patient from the emergency room to the Chest Pain Center for a stress test on March 5, 2009.  The patient underwent a nuclear stress test in the Chest Pain Center on March 5, 2009, and Dr. Parikh was not notified.  Medicare was knowingly billed in or around March 2009, and paid for this false claim.  The Medicare patient was knowingly referred to

the Chest Pain Center in exchange for a bonus payment to ER Physicians. The patient underwent an unnecessary and worthless stress test.

- Patient K.H., a Medicare and Medicaid patient, was referred from CMC's emergency room to the Chest Pain Center by Dr. John McNeill on February 21, 2010.  The patient had an unnecessary nuclear stress test performed by Dr. Penny Thamwiwat on February 21, 2010.  During the test, the patient developed a severe asthma attack.  The patient had lung problems, and this type of adenosine chemical stress testing was contraindicated.  His cardiologist, Dr. Parikh, was not informed before Dr. Thamwiwat performed the nuclear stress test.  The test was knowingly done to generate revenue for CMC in exchange for a bonus for the ER Physician, Dr. Thamwiwat, despite the fact that the test jeopardized the patient's safety.  The patient underwent an unnecessary and worthless stress test, and Medicare and Medicaid were knowingly billed in or around February 2010, and paid for the procedures and false claims.   A copy of the patient's written statement related to the inappropriate testing is attached hereto and incorporated as Exhibit "W."

- Patient R.G., a 68-year-old male and Medicare recipient, had an unnecessary and worthless nuclear stress test at CMC's Chest Pain Center on July 2, 2010.  The patient was referred from the emergency room to the Chest Pain Center by Dr. Stone on July 2, 2010.  Neither Dr. Walrod nor Dr. Thamwiwat informed the patient's cardiologist, Dr. Parikh, of the patient's presentation to the emergency room.  Since the patient had a drug eluting stent placed three months earlier, on April 19, 2010, and the patient's cardiac history was known, Dr. Parikh would have strongly advised against the nuclear stress test.  The patient became quite sick as a result of the nuclear stress test, and Medicare and Medicaid were knowingly billed in or around July 2010, and paid for the unnecessary and worthless stress test and false claim.  The Medicare patient was knowingly referred to the Chest Pain Center in exchange for a bonus payment to ER Physicians.

Patient R.G. was seen again at CMC's emergency on July 9, 2011. Again, the patient was referred from CMC's emergency room to the Chest Pain Center on July 9, 2011, this time by Dr. Zimmerman.  The patient underwent another nuclear stress test in the Chest Pain Center.

Dr. Parikh was not called during this visit either.  Notably, the patient's progress note was fabricated to state that the patient had not had a stress test in over a year-and-a-half.  However, the patient underwent a stress test at CMC's Chest Pain Center only one year earlier.  This information was readily available from CMC's radiology department and hospital electronic records.  Further, a phone call to the patient's cardiologist would have revealed the inappropriateness of both nuclear stress tests.  Instead, the worthless tests were performed at the Chest Pain Center, and Medicare and Medicaid were knowingly billed in or around July 2011, and paid for the false claim.  The patient was knowingly referred to the Chest Pain Center by the ER Physicians in exchange for illegal bonus payments from CMC.

- Patient C.F., a 77-year old Medicare patient, was referred by Dr. McNeil from CMC's emergency room to the Chest Pain Center on August 13, 2007.  The patient underwent a stress test in the Chest Pain Center on August 13, 2007.  Medicare was knowingly billed in or around August 2007, and paid for this false claim.  The patient was knowingly referred to the Chest Pain Center in exchange for a bonus payment to ER Physicians.  A letter from the patient's daughter regarding the testing in the Chest Pain Center is attached as Exhibit "X."

- Patient A.C., a 56-year-old male Medicaid recipient, was referred from CMC's emergency room to the Chest Pain Center by Dr. Walrod on April 27, 2010.  While in the Chest Pain Center, the patient underwent nuclear stress tests on three separate occasions in the Chest Pain Center without any consultation with the patient's cardiologists, Drs. Parikh and Gaalla, before the repeated testing.  Dr. Walrod ordered the first nuclear stress test on April 27, 2010, without informing the patient's cardiologist.  Dr. Zimmerman ordered the second nuclear stress test on May 10, 2011, and did not consult with the patient's cardiologist.  Two months later, in July, 2011, the patient underwent a third nuclear stress test at the Chest Pain Center.  Each time the patient was referred from CMC's emergency room to the Chest Pain Center by the ER Physician.  The patient's cardiologist was not consulted prior to this test either.  If the patient's cardiologist would have been consulted prior to these tests, they could have provided the patient's cardiac history, and the patient would not have underwent three separate nuclear stress tests in a 15-month period.

Instead, Medicare was knowingly billed in or around April 2010, May 2011, and July 2011, and paid for each of these three tests and false claims. The patient underwent unnecessary and worthless stress tests at CMC, and Medicaid was billed and paid the claim. The Medicaid patient was knowingly referred to the Chest Pain Center in exchange for bonus payments to the ER Physicians for the referrals.

- Patient E.E., a 78-year-old Medicare patient, presented to CMC's emergency room and was referred from the emergency room to the Chest Pain Center on September 27, 2012 by Dr. Walrod. The patient underwent a stress test in the Chest Pain Center on September 27, 2012. Medicare was knowingly billed in or around September 2012, and paid for the false claim. In exchange for the Medicare patient referral to the Chest Pain Center, ER Physician Dr. Walrod was knowingly paid a bonus for referring the Medicare patient to the Chest Pain Center.

- Patient C.G., a 79-year-old female Medicare and Medicaid patient, underwent open-heart surgery within the past year. On February 15, 2009, Dr. Stone referred the patient from CMC's emergency room to the Chest Pain Center. On February 15, 2009, the patient was subjected to an unnecessary and worthless nuclear stress test at the Chest Pain Center by Dr. Stone without first discussing it with the patient's cardiologist, Dr. Chandna. Medicare and Medicaid were knowingly billed in or around February 2009, and paid for the false claim. In exchange for the patient referral to the Chest Pain Center, ER Physician Dr. Stone was knowingly paid a bonus for referring the Medicare and Medicaid patient to the Chest Pain Center.

- Patient A.S., a 92-year-old male and Medicare recipient, had a pharmacological nuclear stress test in the Chest Pain Center on July 23, 2011. The patient was referred from CMC's emergency room to the Chest Pain Center by Dr. Thamwiwat on July 23, 2011. The patient underwent a nuclear stress test in the Chest Pain Center without prior consultation with the patient's cardiologist, Dr. Chandna. Dr. Chandna would have objected to the administration of a nuclear stress test on this elderly patient. The ER Physician, Dr. Thamwiwat, nonetheless proceeded with the nuclear stress test to bill Medicare and increase CMC's revenue and their bonuses. Medicare was knowingly billed in or

around July 2011, and paid for this false claim.  The ER Physicians knowingly received a bonus payment from CMC in exchange for this Medicare patient referral, and the patient underwent an unnecessary and worthless stress test.

• Patient V.G., a 69-year-old female and Medicare recipient, underwent a nuclear stress test in the Chest Pain Center on July 21, 2011.  The patient was referred from CMC's emergency room to the Chest Pain Center on July 21, 2011 by Dr. Walrod.  Dr. Walrod ordered the testing in the Chest Pain Center, but the patient's cardiologist, Dr. Gaalla, was not consulted.  If he had been consulted, Dr. Gaalla could have provided the patient's cardiac history.  Because Dr. Gaalla was not consulted, Medicare was knowingly billed in or around July 2011, and paid for the worthless testing and false claim.  The Medicare patient was knowingly referred to the Chest Pain Center in exchange for a bonus payment to the referring physician, Dr. Walrod.

• Patient S.H., a 57-year-old female and Medicaid recipient, underwent an unnecessary nuclear stress test at the Chest Pain Center on June 6, 2011.  The patient was referred from CMC's emergency room to the Chest Pain Center on June 6, 2011 by an ER Physician. The patient had a normal nuclear study on September 9, 2010, as an outpatient.  If the patient's cardiologist would have been consulted, the patient's cardiac history could have been provided and the unnecessary and worthless stress test could have been avoided.  The finding of the unnecessary and worthless stress at CMC was a "normal study," as expected.  Medicaid was knowingly billed in or around June 2011, and paid for this false claim. The Medicare patient was knowingly referred to the Chest Pain Center in exchange for a bonus payment to the referring ER Physician.

• Patient H.B., an 82-year-old male and Medicare recipient, had a critical aortic valve stenosis and was awaiting a complex surgical procedure on his aortic value at the Texas Heart Institute or the Cleveland Clinic.  On March 9, 2011, the patient presented to CMC's emergency room where he was referred to the Chest Pain Center by Dr. Walrod.  In the Chest Pain Center, the patient underwent an unnecessary and worthless nuclear stress test on March 9, 2011.  There was no medical indication to justify a nuclear stress test on this patient with critical aortic stenosis who was

under the care of four cardiologists (Drs. Chandna and Parikh in Victoria; Dr. Surendra Jain in Houston; and a cardiologist at the Cleveland Clinic). The patient's cardiologists were not called upon his presentation to CMC despite the patient's severe heart condition. Instead, the patient was referred to the Chest Pain Center and subjected to potentially dangerous diagnostic testing despite his underlying medical condition. Medicare was knowingly billed in or around March 2011, and paid for this false, worthless, and dangerous testing. The Medicare patient was knowingly referred to the Chest Pain Center in exchange for a bonus payment to the referring ER Physician, Dr. Walrod.

- Patient C.S., an 83-year-old male and Medicare recipient, was referred from CMC's emergency room to the Chest Pain Center by Dr. Thamwiwat on April 11, 2011. The patient underwent a nuclear stress test at the Chest Pain Center on April 11, 2011, despite the patient's previous complete cardiac workup on July 17, 2010, including advanced cardiac nuclear imaging. If the patient's cardiologist, Dr. Chandna, had been called, the patient's cardiac history could have been relayed and the unnecessary and worthless testing could have been avoided. Instead, Medicare was knowingly billed in or around April 2011, and paid for the worthless testing and false claim. The Medicare patient was knowingly referred to the Chest Pain Center in exchange for a bonus payment to the referring physician, Dr. Thamwiwat.

- Patient C.S., a 76-year-old female and Medicare patient, was referred from CMC's emergency room to the Chest Pain Center on June 23, 2010 by Dr. Hall. The patient underwent a stress test at the Chest Pain Center on June 23, 2010, and Medicare was knowingly billed in or around June 2010, and paid the false claim. In exchange for the Medicare patient referral to the Chest Pain Center, ER Physicians Dr. Hall was knowingly paid a bonus for referring the Medicare patient to the Chest Pain Center.

- Patient W.W., a Medicare recipient and Dr. Gaalla's patient, was referred from CMC's emergency room to the Chest Pain Center on December 18, 2009 by ER Physician, Dr. McNeill. The patient underwent a stress test, and Medicare was knowingly billed in or around December 2009, and paid for the testing and false claim. Two months later, on February 14, 2010, the patient was again referred from CMC's emergency room to the

Chest Pain Center by Dr. Stone.  The patient underwent an unnecessary and worthless stress test, and Medicare was again knowingly billed in or around February 2010, and paid for the worthless testing and false claim. The Medicare patient was knowingly referred to the Chest Pain Center both times in exchange for bonus payments to the ER Physicians for the referrals.

- Patient M.G., a Medicare recipient and Dr. Parikh's patient, presented to CMC's emergency room, and Dr. Parikh was not called.  Instead, on August 9, 2007, Dr. Walrod referred the patient from CMC's emergency room to the Chest Pain Center.  In the Chest Pain Center, the patient underwent a nuclear stress test on August 9, 2007.  Again on December 7, 2012, the patient was referred from CMC's emergency room to the Chest Pain Center by Dr. Cindy Zimmerman, and a stress test was performed.  The patient underwent two unnecessary and worthless stress tests, and Medicare was knowingly billed in or around August 2007 and December 2012, and paid for both false claims.  In exchange for the Medicare patient referrals to the Chest Pain Center, ER Physicians Drs. Walrod and Zimmerman were knowingly paid bonuses for referring the Medicare patient to the Chest Pain Center.

- Patient C.J., a Medicare patient and Dr. Parikh's patient, presented to CMC's emergency room on February 17, 2010, and Dr. Parikh was not called.  On February 17, 2010, Dr. Walrod referred the patient from the emergency room to the Chest Pain Center.  That same day, Dr. Walrod performed a nuclear stress test on the patient at CMC in the Chest Pain Center without notifying Dr. Parikh.   The patient underwent an unnecessary and worthless stress test, and Medicare was knowingly billed in or around February 2010, and paid for the false claim.  In exchange for the patient referrals to the Chest Pain Center, ER Physician Dr. Walrod was knowingly paid a bonus for referring the Medicare patient to the Chest Pain Center.  The patient underwent an unnecessary and worthless stress test.  A copy of the patient's statement regarding the unnecessary procedure is attached hereto as Exhibit "Y."

- Patient R.M., a Medicare recipient and Dr. Parikh's patient, presented to CMC's emergency room, and Dr. Parikh was not notified.  Instead, the patient was referred from CMC's emergency room to the Chest Pain

Center on March 6, 2010 by an ER Physician.  The patient was kept overnight and nuclear stress testing was conducted on the patient in the Chest Pain Center without notifying Dr. Parikh.  The patient underwent an unnecessary and worthless stress test.  Medicare was knowingly billed in or around March 2010, and paid for this false claim.  The Medicare patient was referred to the Chest Pain Center in exchange for a bonus payment to the referring ER Physician.

- Patient R.C., a Medicaid recipient and Dr. Parikh's patient, presented to CMC's emergency room on September 8, 2012.  Dr. Cindy Zimmerman referred the patient to the Chest Pain Center on September 8, 2012, and Dr. Brett Zimmerman performed a nuclear stress test on the patient in the Chest Pain Center the same day.  Medicaid was knowingly billed in or around September 2012, and paid for the false claim.  In exchange for the patient referrals to the Chest Pain Center, the referring ER Physician was knowingly paid a bonus for referring the Medicaid patient to the Chest Pain Center.

- Patient I.P., a 75-year-old Medicare recipient and Dr. Parikh's patient, presented to CMC's emergency room on September 15, 2008, and CMC's emergency room physician, Dr. David Stone, referred her to the Chest Pain Center on September 16, 2008.  In the Chest Pain Center, the patient underwent a nuclear stress test without Dr. Parikh being notified.  Medicare was knowingly billed in or around September 2008, and paid for the false claim.  In exchange for the patient referral to the Chest Pain Center, ER Physician Dr. Stone was knowingly paid a bonus for referring the Medicare patient to the Chest Pain Center.

- Patient J.W., a Medicare patient, was referred from CMC's emergency room to the Chest Pain Center by Dr. Thamwiwat on May 10, 2010.  Dr. Chandna's patient presented to CMC's emergency room, and Dr. Chandna was not called.  The patient underwent a nuclear stress test at CMC's Chest Pain Center on May 10, 2010.  Medicare was knowingly billed in or around May 2010, and paid for this worthless and false claim.  Dr. Thamwiwat knowingly referred the patient to the Chest Pain Center for testing in exchange for a bonus payment from CMC.

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

- Patient N.G., a Medicare patient, was referred by Dr. Cindy Zimmerman from CMC's emergency room to the Chest Pain Center on December 31, 2010. The patient underwent a stress test on December 31, 2010 in the Chest Pain Center. Medicare was knowingly billed in or around December 2010, and paid for the false claim. In exchange for the patient referral to the Chest Pain Center, ER Physician Dr. Zimmerman was knowingly paid a bonus for referring the Medicare patient to the Chest Pain Center. The patient's letter regarding her experience in the Chest Pain Center is attached hereto as <u>Exhibit</u> "Z."

- Patient E.M., a Medicare patient, was referred from CMC's emergency room to the Chest Pain Center by Dr. Thamwiwat on June 7, 2009. Dr. Chandna's patient presented to CMC's emergency room and Dr. Chandna was not called. The patient underwent a nuclear stress test at CMC's Chest Pain Center on June 7, 2009. Medicare was knowingly billed in or around June 2009, and paid for this false claim. Dr. Thamwiwat knowingly referred the patient to the Chest Pain Center for testing in exchange for a bonus payment from CMC.[23]

55.   In each of these cases, contacting the patient's cardiologist would have prevented unnecessary and worthless billing to Medicare and Medicaid in the Chest Pain Center. CMC and Brown elected not to call the Physicians for their patients because it was financially beneficial to conduct unnecessary and worthless testing at the hospital's Chest Pain Center, notwithstanding the risk to the patient and the fraud committed on the Government. CMC, Brown, and the ER

---

[23]   These patients are collectively referred to as the "Patients." The Patients shall include all other patients identified herein, as well as other patients uncovered during discovery. The Patients' initials are utilized herein to protect the Patients' confidentiality. The Physicians believe CMC has obtained many more illegal payments from the Government based on CMC, Brown, and Dr. Campbell's violations of the Anti-Kickback and Stark Act, which will be revealed during the discovery phase. Thus, the definition of "Patients" is also intended to include *all* persons for whom Defendants submitted false claims for payment to the Government.

<u>R</u>ELATORS' <u>T</u>HIRD <u>A</u>MENDED *<u>Q</u>UI <u>T</u>AM* <u>C</u>OMPLAINT

Physicians knowingly and intentionally participated in this *quid pro quo* bonus arrangement and knowingly and intentionally submitted false and worthless claims to the Government for payment.

56. ***Stark Act Violations***. CMC and Brown's engagement of the ER Physicians from 2004 to 2010 (*i.e.*, the compensation arrangement), CMC's employment contracts with the ER Physicians from 2010 to current, and the illegal bonus payments made to the ER Physicians in exchange for patient referrals each constitute a "financial relationship" between CMC and the ER Physicians under § 1395nn(a)(i) of the Stark Act.  Under the Stark Act, a physician has a "financial relationship" with an entity if the physician has "a compensation arrangement" with the entity. *See* 42 U.S.C. § 1395nn(a)(2).  The Stark Act restricts such patient referrals when a physician has a financial arrangement with an entity.

57. Referrals by the ER Physicians to CMC's Chest Pain Center are prohibited by the Stark Act unless one of the specific statutory exceptions to the Act apply (these are often referred to as the Stark "Safe Harbors").  However, none of the Safe Harbors are applicable.

58. The ER Physicians have referred Patients to CMC's Chest Pain Center for designated health services, such as nuclear stress tests, observation, EKG tests, among other designated health services, since at least January 2, 2007.

Additionally, the ER Physicians have received substantial bonus payments from CMC based on their level of patient referrals, including Medicare and Medicaid patients, to CMC's Chest Pain Center since at least January 2007. *See* Exhibits "B," "C," "D." Further, as set forth above and incorporated herein by reference, CMC and Brown have knowingly and intentionally submitted false Medicare and/or Medicaid claims for the inpatient hospital services referred by the ER Physicians for which bonuses were paid.

59. CMC has violated the Stark Act prohibitions. Medicare's revised enrollment application (CMS-855A) requires providers to certify that they will comply with Medicare laws, regulations, and program instructions and that they understand that payment of claims by Medicare is conditioned upon the claim and underlying transaction complying with such laws, regulations, and program instructions, including the Anti-Kickback and Stark Act.[24] CMC and Brown, at the time they completed and submitted the enrollment applications, knew that they

---

[24]    A copy of the Certification Statement from CMS-855A is attached hereto as Exhibit "FF." Section 3 required CMC and Brown to certify as follows as a condition payment: "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare." Exhibit "FF" at ¶ 3. Section 5 further requires the following certification: "I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity." *Id.* at ¶ 6. CMC and Brown certified compliance in CMS-855A since at least since 2006.

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

would be violating the Anti-Kickback and Stark Acts.  Indeed, in 2006 they began illegally employing the CMC Cardiologists, providing them above-market salaries and discounted or free rent and office services, and in January 2007 they began paying illegal bonus payments to the ER Physicians in exchange for Medicare and Medicaid patient referrals to the Chest Pain Center.  During that frame, as discussed below, CMC and David Brown also began paying illegal bonuses to certain gastroenterologists in exchange for patient referrals.  Because CMC and Brown have and continue to knowingly violate the Anti-Kickback and Stark Act, the Medicare and Medicaid claims that have been submitted by CMC and Brown are false claims under the FCA.

60.  As set forth above, the ER Physicians to whom CMC and Brown provided illegal remuneration and kickbacks, and with whom CMC and Brown entered into illegal financial relationships referred large volumes of Patients, including Medicare and Medicaid patients and beneficiaries of other government health programs, to CMC in violation of federal law.  CMC and Brown, in turn, then knowingly submitted false claims to Medicare, Medicaid, and other government healthcare programs in 2007, 2008, 2009, 2010, 2011, 2012, and 2013, and obtained millions of dollars in payments from the United States.  Under the

**RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT**

9266289v.1

FCA, such claims are false and/or fraudulent because CMC had no entitlement to payment for services provided on illegal referrals for such Patients.

61.  CMC and Brown also violated the FCA by making or causing to be made false statements when knowingly submitting these claims for payment to Medicare, Medicaid and other government programs.  As set forth herein, CMC and Brown falsely certified to the Government in 2006 through 2013 that the claims and statements for payment and reimbursement were true and/or correct and, as such, they were entitled to payment and reimbursement from Medicare and Medicaid.

62.  To conceal their unlawful conduct and avoid refunding payments made on these false claims, CMC and Brown also knowingly and falsely certified to the Government in 2006 through 2013, in violation of the FCA, that the services identified in their CMS annual cost reports were provided in compliance with federal law, including the prohibitions against kickbacks, illegal remuneration to physicians, and improper financial relationships with physicians.  The false certifications, made with each annual CMS cost report submitted to the Government between 2006 and 2013, were part of CMC and Brown's unlawful scheme to defraud Medicare and other governmental healthcare programs and circumvent the Anti-Kickback and Stark Acts.  Brown and CMC also knowingly

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

implicitly certified compliance with federal law, including the FCA, Anti-Kickback Act, and Stark Act, when they continued to violate their duty to comply with the regulations and laws upon which payment from Medicare and Medicare was conditioned in 2006-2013.  But for CMC and Brown's false certifications, the Government would not have paid the false claims submitted between 2006 and 2013.

63.  Pursuant to this scheme, pattern, and practice described above, CMC and Brown provided illegal remuneration, inducements, and kickbacks to the ER Physicians, certified and submitted false and fraudulent claims, and fraudulently obtained payments from the Government on patient referrals by the ER Physicians in violation of the Anti-Kickback Act, the Stark Act, and the FCA, as set forth above and incorporated herein by reference.

64.  Each Form CMS-1500, CMS-2552, UB-92, UB04, and HCFA-2552 submitted by CMC, Brown, and the ER Physicians for payment from at least January 2007 to current related to the ER Physicians' referrals to the Chest Pain Center and unnecessary and worthless nuclear stress testing was a false claim, statement, or record.  Further, as discussed below, each Form CMS-1500, CMS-2552, UB-92, and UB04 submitted by CMC, Brown, and the ER Physicians for payment related to the ER Physicians, the CMC Cardiologists, and the hospitalists

since their illegal employment was a false claim, statement, or record.  CMC and Brown have profited unlawfully from the payment of illegal remuneration and kickbacks to the ER Physicians, the CMC Cardiologists, and the hospitalists.  Dr. Campbell, as a recipient of illegal remuneration in the form of an above-market salary, discounted (or free) office space, and exclusive use of CMC's cardiology department, has profited unlawfully from those kickbacks provided to him in exchange for his referral of Medicare and Medicaid patients to CMC.

65.   The Government has been damaged by paying claims falsely submitted by CMC, Brown, and the ER Physicians between 2006 and 2013.  Treble damages for these false claims are appropriate and will likely amount to millions of dollars. The maximum statutory civil penalty for each false claim should also be imposed against CMC and Brown because of their knowing conduct and flagrant disregard for the law, such as falsely certifying compliance with the Anti-Kickback and Stark Acts, attempting to and actually inducing Medicare and Medicaid patient referrals in exchange for illegal kickbacks to the physicians listed herein, knowingly submitting false claims for payment to Medicare and Medicaid arising from those referrals, and knowingly obtaining millions of dollars in reimbursement and payments from Medicare and Medicaid for those false claims.  In this regard, CMC and Brown were told on more than one occasion that their conduct was illegal.  In

response to one such warning, David Brown replied that the Government would not come after CMC because it was a small county-owned hospital.

**2.      CMC AND BROWN'S UNAUTHORIZED AND ILLEGAL PRACTICE OF MEDICINE AND FRAUDULENT BILLING TO FEDERAL HEALTH CARE PROGRAMS.**

66. In 2007 and 2008, CMC and Brown entered into Physician Employment Agreements ("Agreements") with the CMC Cardiologists. *See* Exhibits "I"-"M."   Under the Agreements, CMC directly employs the CMC Cardiologists, bills and collects for the services they provide, pays the CMC Cardiologists a salary, and the CMC Cardiologists and their medical practice activities are subject to CMC's control. *See id.*   For example, the Agreements provide:

> The relationship between [CMC] and [Dr. Campbell, Krueger, Oakley] shall be that of an employer and employee.   Employee shall be in the paid service of [CMC] (a governmental unit) and, as such, [CMC] has the legal right to control the tasks performed by [the Doctors] pursuant to this Agreement.   Employee shall not be an independent contractor.

Exhibits "I"-"K."   The Agreements between CMC and Drs. Tillman and Junor provide that "the relationship between [Citizens Hospital] and [Dr. Tillman/Junor] shall be that of an employer and employee.   Employee shall be considered and treated as having an employee status." Exhibits "L"-"M."

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

63

67.  This type of employment relationship between CMC and the CMC Cardiologists is illegal. *See, e.g.,* TEX. OCC. CODE § 165.156 (precluding the corporate practice of medicine); *see also id.* § 164.052(a)(17) (recognizing that the practice of medicine is restricted to licensed physicians).  The Texas Medical Practice Act prohibits, directly or indirectly, aiding or abetting, the practice of medicine by anyone who is not licensed to practice medicine by the Texas Medical Board. *See id.* at § 164.052.  This provision prohibits an entity that is not licensed to practice medicine, such as CMC, from employing a physician and collecting the fees generated by a physician. *See id.*  Because the Agreements violate the Texas Medical Practice Act, the Agreements are void.

68.  CMC and Brown also illegally employs the ER Physicians and various hospitalists, including Dr. Bruce Wheeler, Alexandra Vidachek, Glen Vo, and John Scroggins.  These contracts are also illegal for the reasons set forth above.

69.  CMC and Brown's unauthorized practice of medicine has resulted in fraudulent billing to federal health care programs for procedures performed on Patients.  Since 2007, CMC has billed federal health programs for services and procedures performed by the CMC Cardiologists while CMC was illegally employing the CMC Cardiologists.  Upon information and belief, since 2010, CMC has billed federal health programs for services and procedures performed by

the ER Physicians while CMC was illegally employing the ER Physicians. Likewise, upon information and belief, CMC has billed federal health programs for services and procedures performed by various hospitalists when CMC illegally employed those physicians.

70.   By way of example only (and not limitation), the Physicians assert that the following Medicare and/or Medicaid Patients, as a representative sample, have been wrongfully steered to the CMC Cardiologists and CMC (and in some cases Dr. Yahagi) by the ER Physicians and others in violation of the Anti-Kickback Act and the Stark Act.  CMC and Brown knowingly billed Medicare and/or Medicaid for the false claims, and those claims were paid claims based on CMC and Brown's misrepresentations and certifications that the services rendered were legal and in compliance with the Anti-Kickback and Stark Acts:[25]

1.   Dr. Parikh's Patients:

- Patient J.B. (March 2010).  This Medicare patient presented to CMC's emergency room in March 2010, and was steered to Dr. Campbell for treatment by Dr. Thamwiwat in March 2010.  Dr.. Campbell then referred the patient to CMC and Dr. Yahagi for surgery, and the patient died after surgery performed by Dr. Yahagi at CMC.  Medicare was billed in or around March 2010 for the services and worthless surgery, and paid those false claims.

---

[25]    CMC continued its refusal to call the Relators when their patients presented to CMC even in the face of an injunction requiring them do so.  In fact, CMC's blatant disregard of its duties resulted in a contempt finding in a related case.

**RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT**

- Patient A.B. (April 2008).  This Medicare recipient and Dr. Parikh's patient presented to CMC's emergency room with bradycardia in April 2008, and Dr. Parikh was not notified. Instead, the patient was treated at CMC and received a pacemaker for which Medicare was knowingly billed in or around 2008 and paid the false claim.

- Patient D.R. (January 2010).  This Medicare recipient and Dr. Parikh's patient presented to CMC's emergency room in January 2010, and Dr. Parikh was not called.  Instead, the patient was referred by an ER Physician to a CMC Cardiologist, who read the patient's echocardiogram January 2010.   Medicare was billed knowingly billed in or around January 2010, and paid the false claim.

- Patient R.H. (February 2010).  This Medicare recipient and Dr. Parikh's patient was admitted to CMC's emergency room in February 2010, and then to the CMC floor.  The patient's family repeatedly requested for her cardiologist, Dr. Parikh, to be called. Those requests were denied, and Dr. Parikh was not notified. Instead, the patient was referred to CMC by an ER Physician in February 2010, and Medicare was knowingly billed in or around February 2010, and paid for the false claim.

- Patient W.J. (August 2008).  This Medicare recipient and Dr. Parikh's patient presented to CMC's emergency room in August 2008, and Dr. Parikh was not notified.  Instead, an ER Physician admitted the patient to CMC's cardiologist, Dr. Tillman, pursuant to the illegal referrals described herein.  Medicare was knowingly billed in or around August 2008, and paid for this false claim.

- Patient I.P. (September 2008).  This Medicare recipient and Dr. Parikh's patient presented to CMC's emergency room in September 2008.   In September 2008, CMC emergency room physician Dr. David Stone referred the patient to the Chest Pain Center, wherein a nuclear stress test was performed on the patient without notifying Dr. Parikh.  The patient was knowingly referred to the Chest Pain Center in exchange for a bonus payment to Dr.

Stone.  Medicare was knowingly billed in or around September 2008, and paid for this false.  After the stress test, Dr. Stone then ordered a cardiac consultation with a CMC Cardiologist, Dr. Tillman, in September 2008 in an attempt to steer the Medicare patient away from Dr. Parikh, the patient's cardiologist.  The patient subsequently insisted that Dr. Parikh be called, and finally the floor nurse called Dr. Parikh after the patient's primary care physician agreed to the patient's request.  CMC and its ER Physician intentionally transferred the patient to the Chest Pain Center for a stress test in order to increase revenue for CMC and bonus payments to the ER Physician.

- Patient N.C. (March 2008).  Dr. Yahagi steered Dr. Parikh's patient and Medicare recipient to CMC's cardiologist, Dr. Tillman, in March 2008 pursuant to the illegal referrals and kickbacks described herein.  Medicare was knowingly billed in or around March 2008, and paid for this false claim.

- Patient M.R. (July 2009):  The Medicare patient had lung surgery by Dr. Yahagi at CMC in July 2009, and died three days after surgery in the hospital.  Dr. Parikh was not called to consult on the patient before surgery despite the patient's family's request that Dr. Parikh be called to evaluate the patient before surgery.  Instead, Dr. Yahagi referred the patient to CMC and a CMC Cardiologist for pre-surgery consultation in order to increase revenue for CMC and to continue to receive illegal kickbacks in return.  Medicare was knowingly billed in or around July 2009, and paid for this false and worthless claim.

- Patient M.B. (June 2011).  This Medicare recipient and Dr. Parikh's patient presented to CMC's emergency room in June 2011, and the ER Physician did not call Dr. Parikh.  Instead, the ER Physician referred the patient to the Chest Pain Center in June 2011, and ordered an unnecessary and worthless nuclear stress test on the patient.  The ER Physician referred the patient to the Chest Pain Center in order to receive illegal bonus payments from CMC for the referral.  The patient refused to sign a consent for the testing.  Subsequently, the ER Physician referred the patient to

CMC and CMC Cardiologist, Dr. Tillman, for in-hospital admission and more procedures in June 2011. Dr. Tillman then ordered the patient not to eat or drink anything so he could do more testing on the patient. The patient did not want Dr. Tillman to care for her; she wanted her cardiologist, Dr. Parikh, to care for her, and she refused further testing. Finally, the patient's primary care physician was informed of the patient's admission and he requested that Dr. Parikh see the patient. Medicare was knowingly billed in or around June 2011, and paid for the false claims.

2. Dr. Chandna's Patients:

- Patient L.B. Dr. Chandna's patient and a Medicare recipient was referred to CMC and to a CMC Cardiologist by Dr. Yahagi in or around 2009 after cardiac surgery. The patient suffered significant complications and had multiple readmissions at CMC following surgery by Dr. Yahagi. The surgery was worthless, and Medicare was nonetheless billed in or around 2009, and paid for the false claim. Finally, the patient had to go to Houston for repeat heart valve surgery to correct the problems created by Dr. Yahagi's prior valve surgery on the patient. The heart surgeon in Houston informed the patient's family that Dr. Yahagi had placed a "wrong valve" in the patient's heart. Dr. Yahagi referred the patient to CMC and the CMC Cardiologist in exchange for discounted office rent and free transcription services that CMC offered to Dr. Yahagi in exchange for patient referrals.

- Patient C.C. Dr. Chandna's patient and a Medicare recipient was referred to CMC, CMC Cardiologist Dr. Tillman, and Dr. Yahagi in or around 2009, without Dr. Chandna's knowledge. The patient died in or around 2009 after worthless mitral valve heart surgery performed by Dr. Yahagi at CMC, and Medicare was nonetheless knowingly billed in or around 2009, and paid for the worthless and false claim.

- Patient M.T: Dr. Chandna's patient and a Medicare recipient was referred in 2009 by CMC's exclusive cardiac surgeon, Dr. Yahagi, to CMC and to CMC Cardiologist Dr. Tillman for a

transesophageal echocardiogram ("TEE") at CMC.  Dr. Yahagi made the referral in exchange for discounted office space and free transcription services.   Medicare was knowingly billed in or around 2009, and paid for the false claim.

- Patient L.S. (February 2009). Dr. Chandna's patient and a Medicare presented to CMC's emergency room in February 2009, and Dr. Chandna was not called.  An ER Physician referred the patient to CMC and to CMC cardiologist Dr. Oakley.  Medicare was knowingly billed in or around February 2009, and paid for this false claim.

- Patient E.G. (January 2009). Dr. Chandna's patient and a Medicare recipient presented to CMC's emergency room on January 13, 2010, and Dr. Chandna was not called.  Instead, an ER Physician referred the patient to CMC and to CMC Cardiologists, Drs. Junor and Tillman, who consulted the patient, pursuant to the illegal referrals described herein.  Medicare was knowingly billed in or around January 2009, and paid for this false claim.

- Patient L.G. (February 2010). This Medicare recipient and Dr. Chandna's patient presented to CMC's emergency room in February 2010, and Dr. Chandna was not called.  Instead, an ER Physician referred the patient to CMC and to CMC Cardiologist Dr. Krueger, who consulted the patient, pursuant to the illegal referrals described herein.  Medicare was knowingly billed in or around February 2010, and paid for this false claim.

- Patient F.D.  This Medicare patient presented to CMC on April 25, 2008, and he and his family requested Dr. Chandna or Dr. Gaalla. Dr. Yahagi refused to call either doctor, and instead consulted with CMC's cardiologist, Dr. Tillman.  Medicare was knowingly billed in or around April 2008, and paid for this false claim.

3.  Dr. Gaalla's Patients:

- Patient B.L. Dr. Gaalla's patient and Medicare recipient presented to CMC's ER in or around 2010, and was informed by CMC Staff

that Dr. Gaalla no longer practiced at CMC.  The patient was then referred by an ER Physician to CMC Cardiologist Dr. Oakley. Medicare was knowingly billed in or around 2010, and paid for this false claim.

- Patient R.S. (January 2010):  An ER Physician wrote an illegal order on a Physician's Order Sheet in January 2010 to attempt to transfer Dr. Gaalla's patient and Medicare recipient to CMC and Dr. Junor's service.  In spite of this order, the patient insisted that she remain under Dr. Gaalla's care.

- Patient L.H. (July 2008).  This Medicare recipient and Dr. Gaalla's patient underwent an echocardiogram test at CMC in July 2008, and Dr. Gaalla was not notified, pursuant to the illegal referrals described herein.  Medicare was knowingly billed in or around April 2008, and paid for this false claim.

- Patient I.G. (January 2010).  This Medicare recipient and Dr. Gaalla's patient underwent an echocardiogram test at CMC in January 2010, and Dr. Gaalla was not notified, pursuant to the illegal referrals described herein.  Medicare was knowingly billed in or around January 2010, and paid for this false claim.

- Patient P.S. (November 2009). This Medicare recipient and Dr. Gaalla's patient underwent an echocardiogram test at CMC in November 2009, and Dr. Gaalla was not notified, pursuant to the illegal referrals described herein.  Medicare was knowingly billed in or around November 2009, and paid for this false claim.

- Patient E.B. (January 2009). This Medicare recipient and Dr. Gaalla's patient was admitted to CMC in February 2009, and Dr. Gaalla was not notified, pursuant to the illegal referrals described herein.  Medicare was knowingly billed in or around January 2009, and paid for this false claim.

- Patient O.M. (March 2010). This Medicare recipient and Dr. Gaalla's underwent an echocardiogram test at CMC in March 2010, and Dr. Gaalla was not notified, pursuant to the illegal

referrals described herein.  Medicare was knowingly billed in or around March 2010, and paid for this false claim.

- Patient W.W. (December 2009).  This Medicare recipient and Dr. Gaalla's patient underwent a procedure at CMC in December 2009 performed by CMC's cardiologist, Dr. Tillman, and Dr. Gaalla was not notified, pursuant to the illegal referrals described herein. Medicare was knowingly billed in or around December 2010, and paid for this false claim.

- Patient N.M. (September 2008).  Dr. Gaalla saw this patient in consultation.  CMC subsequently steered the patient away from Dr. Gaalla in September 2008 to a CMC Cardiologist pursuant to its illegal referral process described herein.  Medicare was knowingly billed in or around September 2008, and paid for this false claim.

71.  As these examples reveal, the Medicare and Medicaid claims that CMC knowingly submitted are false claims under the FCA.  The Government is entitled to recover damages for *all* of the false claims submitted by CMC, David Brown, the CMC Cardiologists, the ER Physicians, and the illegally employed hospitalists.

72.  The Government also paid claims for surgical procedures that were worthless.  By way of example only, below is a sample of those false claims:

- Patient M.T.  This Medicare recipient and Dr. Chandna's patient died after heart surgery at CMC performed by Dr. Yahagi on in or around 2009.  This was a worthless surgery, and Medicaid was knowingly billed in or around 2009, and paid this worthless claim.

- Patient A.M.  This Medicare and Medicaid patient and Dr. Chandna's patient had an amputation after a worthless leg bypass procedure performed by Dr. Yahagi at CMC in or around 2009. Medicare and Medicaid were knowingly billed in or around 2009, and paid for this worthless surgery.

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

- Patient C.B.  This Medicare recipient and Dr. Chandna's patient had an infected aorta after a worthless abdominal aortic aneurysm surgery performed at CMC by Dr. Yahagi in or around 2009. Medicare was knowingly billed in or around 2009, and paid for this worthless claim.

- Patient C.G.  This Medicare and Medicaid recipient and Dr. Chandna's patient suffered a stroke during a worthless carotid surgery performed at CMC by Dr. Yahagi in or around 2009. Medicare and Medicaid were billed in or around 2009, and paid for this worthless claim.

- Patient L.M. (2007).  This Medicare recipient and Dr. Parikh's patient underwent right carotid artery surgery at CMC by Dr. Taylor, without Dr. Parikh's knowledge, in spite of a recently documented heart attack.  The worthless surgery resulted in the patient being paralyzed and bedridden, which caused significant increase in costs and patient suffering.  The patient ultimately died a few months later in 2007.  The patient should not have undergone elective carotid surgery so soon after a heart attack and without obtaining cardiology clearance.  Medicare was billed in or around 2007, and paid for this worthless claim.

- Patient O.L. (May 7, 2008).  The Medicare patient had an abdominal CT scan report done at CMC's radiology department on April 14, 2008, and read by radiologist Dr. Steven Schnicker, describing 2.2 cm small uncomplicated infrarenal abdominal aortic aneurysm.  This condition requires no surgical treatment.  The patient's primary care provider, who has an office in CMC's professional building, referred the patient to CMC and Dr. Yahagi.  Dr. Yahagi's consultation note from April 29, 2008, dictated after having seen the patient in his CMC office before an aneurysm stent graft procedure and dictated using CMC's hospital dictation system, notes that the patient had a 2.2 cm abdominal aortic aneurysm with more than 50% of contents of thrombus.  Later in the same note under "Laboratory Data," Dr. Yahagi mentions a 2.2 cm aorta with crescentic thrombus to the left that is taking approximately 60% to

70% of the internal lumen.  The physical exam conducted by Dr. Yahagi shows no abnormality.  Dr. Yahagi's assessment and plan concludes that the patient is mildly symptomatic with bilateral lower extremity fatigue after ambulation probably from microthrombi embolizing to the small arteries distal to the femoral, and that she will probably benefit from stent placement.  Dr. Yahagi subsequently scheduled the patient for an AAA stent graft procedure.

On May 7, 2008, Dr. Yahagi and his partner, Dr. James Taylor, performed an unnecessary and worthless surgical procedure on the patient at CMC using general anesthesia.  The operative report states that the post operative diagnosis is saccular abdominal aortic aneurysm with a maximum diameter of approximately 3 cm. full of thrombus.  The consultation and operative reports both appear to fabricate medical information.  The actual pre-procedure aortogram clearly demonstrates the absence of any saccular aneurysm.  The post-operative angiogram shows an occlusion of the spinal and lumbar arteries after placement of an unnecessary aortic stent graft by Drs. Yahagi and Taylor.  Since the operation, the patient has suffered from pain due to lower spinal cord ischemia and is crippled.  CMC knowingly billed the patient's Medicare insurance plan in or around May 2008 more than $81,000.00 for the worthless procedure and anesthesia.

- Patient B.K. (June 2009). This Medicare recipient and Dr. Parikh's patient had left carotid artery surgery by Dr. Yahagi at CMC on June 25, 2009.  Upon information and belief, Dr. Yahagi exaggerated the severity of the patient's carotid stenosis in the medical record.  Dr. Yahagi also failed to obtain pre-operative clearance on this patient from the patient's established cardiologist, Dr. Parikh.  If he had been called, Dr. Parikh would have advised against surgery at that time without further investigation to reduce the risk of complications in light of the patient's past cardiac problems.  This would have prevented the patient's re-hospitalization and post-surgical problems.  Medicare was knowingly billed in or around June 2009, and had to incur additional expenses as a result of the worthless procedures performed at CMC in this case.

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

- Patient M.R. (July 2009).   This Medicare recipient and Dr. Parikh's patient had lung surgery by Dr. Yahagi at CMC in July 2009, and died three days after the worthless surgery in the hospital.  The surgery was performed without adequate coronary arteriogram, and the severity of the patient's underlying medical condition was fabricated in the operative report to justify the bad outcome.  Medicare was knowingly billed in or around July 2009, and paid for this worthless claim.  Dr. Parikh was not called to see the patient before surgery, despite requests from the patient's family.

- Patient O.C.  Dr. Yahagi advised this Medicare recipient and Dr. Parikh's patient on or around late June 2008 that she needed to undergo carotid surgery at CMC.  The patient came to Dr. Parikh for an opinion before surgery, and Dr. Parikh performed a carotid arteriogram, which did not show any significant blockage.  Dr. Parikh informed Dr. Yahagi and the patient's family that surgery was worthless and unnecessary.  Dr. Yahagi nonetheless continued to insist to the patient's family that she must undergo surgery at CMC.

- Patient E.M.  This Medicare and Medicaid recipient and Dr. Gaalla's patient suffered a stroke after carotid surgery performed by Dr. Yahagi at CMC in or around 2009.  The surgery was worthless and performed inappropriately at CMC.  Medicare and Medicaid were knowingly billed in or around 2009, and paid for this worthless claim.

- Patient M.R.  The Medicare patient died on the operation room table at CMC on April 22, 2010 during open-heart surgery performed by Dr. Yahagi.  The surgery was performed without an adequate coronary arteriogram, and the severity of the patient's underlying medical condition was fabricated in the operative report to justify the bad outcome.  Medicare was knowingly billed in or around April 2010, and paid for this worthless surgery claim.

**R**ELATORS' **T**HIRD **A**MENDED *Q*UI *T*AM **C**OMPLAINT

- Patient F.C.  Dr. Yahagi took this Medicare patient for open-heart surgery at CMC in or around 2009 for the sole purpose of increasing revenues for CMC and himself.  Patient F.C. died in the operating room at CMC as a result of these actions.  Prior to his surgery at CMC, a higher level care center in Houston had advised against open-heart surgery.  Dr. Yahagi nonetheless took the patient to surgery at CMC.  Medicare was knowingly billed in or around 2009, and paid for this patient's hospitalization and worthless surgery.

- Patient L.Z.  Dr. Yahagi took this Medicare patient for heart surgery at CMC after a successful coronary angioplasty-stent procedure by Dr. Gaalla.  Dr. Yahagi performed a worthless coronary artery bypass on an open vessel, without objective documentation, in order to increase revenues for CMC and himself.  Medicare was knowingly billed and paid for this worthless procedure.

- Patient S.R.  On June 1, 2009, Dr. Yahagi falsely reported that this Medicare patient had severe carotid stenosis of 70%-80% of the left internal carotid artery by carotid doppler ultrasound.  Based on his self-read report, Dr. Yahagi scheduled a left carotid surgery at CMC on June 18, 2009 to bill Medicare for the surgery.  Before the surgery, the patient saw Dr. Chandna for his opinion.  Dr. Chandna cancelled the patient's surgery because the left carotid artery surgery was unnecessary and would be a worthless surgery designed purely to increase revenue for CMC by falsely billing Medicare and illegally increasing revenue for Dr. Yahagi.

  Dr. Chandna subsequently performed a carotid angiogram on the patient on June 23, 2009.  The carotid angiogram showed only 30%-40% stenosis of the left internal carotid artery, and this condition does not require surgery.  Dr. Chandna and the patient informed Dr. Yahagi that left carotid artery surgery was unnecessary as evidence by the angiogram.  Nonetheless, Dr. Yahagi repeatedly called the patient to schedule carotid surgery at CMC in an attempt to increase revenue by falsely billing Medicare for a worthless surgery.

**RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT**

9266289v.1

73.   Medicare was inappropriately billed by CMC and Brown in the following instances for hospital-caused injury and trauma and worthless surgery. Medicare patient M.J. was admitted to CMC on January 9, 2008, for elective heart catheterization by CMC Cardiologist Dr. Tillman.   The heart catheterization occurred prior to Patient M.J.'s scheduled open-heart surgery and mitral valve surgery by Dr. Yahagi at CMC.   During the cardiac catheterization procedure at CMC, Patient M.J. developed acute mental-status changes and suffered a stroke as a result of complications by cerebral air embolism (accidental injection of air into the right middle cerebral artery and right parietal cerebral, which are blood vessels supplying the right side of the brain).   Patient M.J. was placed on a breathing machine (ventilator) at CMC for few days and suffered permanent neurological damage as a result of the air embolism.   As a result, Patient M.J. required home health, physical, and rehabilitation therapy.   CMC knowingly billed Medicare in or around January 2008, and Medicare paid for this worthless claim, even though it should not shoulder the significant additional cost of her extended hospital stay and long-term therapy caused by wrongful conduct of CMC and the CMC Cardiologist. Upon information and belief, CMC has not taken any corrective action against Dr. Tillman as a result of this incident.

**RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT**

74.  In another incident, Dr. Tillman performed a permanent pacemaker procedure on Patient M.S., a Medicare recipient, in CMC's cardiac catheterization laboratory on January 26, 2008.  During the worthless procedure, the patient shifted on the operating table and fell to the floor.  Patient M.S. coded on the floor, and CPR was administered.  Patient M.S. died in the catheterization lab at CMC and could not be resuscitated.  Her death was a direct result of the fall.  Following the incident, CMC staff conspired to cover-up Patient M.S.' fall.  There were multiple witnesses to the incident.  The emergency room staff responded to the code blue call after the patient fell from the table and hit the floor.  CMC represented to Patient M.S.' family that she died from complications of the procedure, namely Dr. Tillman accidently puncturing her heart with the pacemaker wire while she was on the table.  Such a procedural complication, though uncommon, can occur and is not considered gross negligence.  It is certainly less shocking than a patient falling off an operating table and dying from trauma.  CMC documented Patient M.S.' cause of death as respiratory failure.  CMC distorted the patient's fall by documenting that the patient was "assisted" to the floor during intubation since she was having complications on the table during the procedure.  It is rudimentary that a patient should not be taken from the operating table to the hospital floor for endotracheal intubation.  A non-CMC employee, Dolen Smith,

**RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT**

witnessed this event.  Mr. Smith is a Medtronic Company pacemaker representative who was present in the lab when Patient M.S. fell.  After witnessing the fall, Mr. Smith expressed to others his shock that Patient M.S. fell because she was not properly secured on the table during the case.  CMC knowingly billed Medicare in or around January 2008, and Medicare paid for this worthless procedure, although Medicare should not have paid the expenses incurred as a result of hospital-acquired trauma.

75.  In addition, CMC and Brown violated the Anti-Kickback Act and the Stark Act by paying for advertisements for the CMC Cardiologists in exchange for patient referrals.  For example, CMC and Brown have paid for and placed large billboard advertisements around Victoria in 2010, placed numerous paid newspaper advertisements in the Victoria Advocate from at least 2006 to present, placed online advertisements, and placed advertisements in HealthWise Magazine in summer 2010 regarding the CMC Cardiologists' and Dr. Yahagi's practices.  Dr. Campbell has admitted that he has conducted advertising to promote CMC, that he feels obligated to appear in such advertisements.  CMC and Brown's paid promotion of the CMC Cardiologists and Dr. Yahagi was intended to (and did) cause those physicians to refer Medicare and Medicaid patients to CMC, as evidenced by those physicians' significant increase in patient referrals to CMC

since 2007 when the advertisements first started running.  CMC and Brown also violated the Anti-Kickback Act and the Stark Act by falsely advertising Dr. Oakley as a board certified interventional cardiologist in its physician directory in order to obtain patients for CMC and Dr. Oakley by giving the false impression that he is appropriately credentialed to perform PTCA procedures.[26]   These false advertisements regarding Dr. Oakley's credentials led to an increase in the number of PTCA procedures he performed at CMC and for which CMC billed and Medicare and Medicaid paid the claims.  For example, from 2007 to 2008, Dr. Oakley's PTCA procedures at CMC nearly doubled from 28 in 2007 to 46 in 2008.

3.      **CMC** AND **DAVID** **BROWN'S** **SELF-REFERRAL** **PRACTICES,** **"ECONOMIC** **CREDENTIALING,"** AND **PATIENT** **CARE** **PRACTICES** **RESULT** IN **FRAUDULENT** **BILLING** TO **FEDERAL** **HEALTH** **CARE** **PROGRAMS.**

76. ***CMC and Brown's illegal self-referral practices.***  CMC and Brown have violated the Anti-Kickback Act by illegally paying the CMC Cardiologists salaries many times more than what they earned in private practice and other benefits in return for their agreement to refer cardiology Patients requiring hospital services to CMC and, in many instances, to Dr. Yahagi for surgery at CMC.  CMC pays the CMC Cardiologists a salary well above their salaries in private practice, bills and collects for all services they provide, provides malpractice coverage for

---

[26]      PTCA is an acronym for percutaneous transluminal coronary angioplasty, which is performed to open blocked arteries caused by coronary artery disease and to restore arterial blood flow to the heart tissue without open-heart surgery.

**RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT**

the CMC Cardiologists, provides dictation services, and offers the cardiologists health and dental insurance. *See* Exhibits "I"-"M."  For example, in the year prior to CMC's employment of Drs. Campbell, Krueger, and Oakley, they earned a combined salary of $630,000.00.  Upon employment, CMC paid Dr. Campbell a guaranteed salary of $400,000 per year.  His partners, Drs. Krueger and Oakley, received guaranteed salaries of $500,000 from CMC.  Thus, in the span of a single year, that group went from making $630,000.00 in 2006 to making $1,400,000.00 in 2007, an increase of $770,000.00 in one year.  There were no market conditions that justified a two-fold salary increase; in fact, since reimbursement rates were declining at that time (as CMC and Brown have contended), the salaries should have decreased.  Tellingly, neither CMC nor Brown conducted a fair-market salary study or analysis before offering the cardiologists the staggering salaries.  And their employment contracts certainly provide no justification or basis for their enormous salaries.  Instead, the only justification offered by CMC and Brown for hiring the CMC Cardiologists is reflected in CMC's Board Meeting Minutes from March 6, 2007, which states that the cardiologists were hired to "improve their income level" and "help with their working situation." *See* Exhibit "N."  Simply put, CMC and Brown knew and intended that by paying the CMC Cardiologists

nearly double the amount they earned in practice, the CMC Cardiologists would refer nearly all of their patients to CMC, which is exactly what has happened.

77.   In January 2007, CMC and Brown agreed to hire Dr. Chelif Junor, a new cardiologist, for a guaranteed salary of $400,000.00 for two years, a $50,000.00 "sign-on" bonus, and a $25,000.00 "show-up" bonus.  Neither CMC nor Brown conducted any community need study prior to hiring the cardiologists and agreeing to pay them substantial, guaranteed salaries and bonuses.  In return for the enormous salaries and increases, the CMC Cardiologists perform their services at CMC and refer surgical Patients to Dr. Yahagi, CMC's exclusive cardiac surgeon.  Dr. Campbell has admitted that his group is financially beneficial to CMC because of their referrals to the hospital.  CMC's inducement or reward to the CMC Cardiologists for referring, recommending, or arranging for federally funded medical services violates the Anti-Kickback Act.   Where a hospital "provides physicians with services for free or less than fair market value, or relieves physicians of financial obligations they would otherwise incur," evidence of inducement and a violation of the Anti-Kickback Act exists. 70 FEDERAL REGISTER 4858, 4866 (Jan. 31, 2005); *see also* 70 FEDERAL REGISTER 59015, 59018 (Oct. 11, 2005) (indicating that a computer has independent value to a physician and providing a free computer to a physician may constitute an illegal

inducement).  Campbell violated the Anti-Kickback Act, Stark Act, and the FCA by agreeing to accept illegal remuneration in exchange for patient referrals to CMC.

78.  In addition, CMC and Brown violated the Anti-Kickback Act and the Stark Act by providing discounted rent for office space to the CMC Cardiologists. This is an impermissible financial relationship and remuneration for referrals. Likewise, CMC and Brown violated the Anti-Kickback Act and the Stark Act by providing other remuneration to the CMC Physicians for referrals, including but not limited to, free CMEs (including out-town-trips), dictation services, malpractice insurance, retirement plans, and exclusive use of CMC's cardiology department.  Further, CMC and Brown  violated the Anti-Kickback and Stark Act by agreeing that CMC and the CMC Cardiologists would split the receivables of the CMC Cardiologists, generated prior to the CMC Cardiologists employment, on a "90-10" split basis, where the CMC Cardiologists would receive 90% of the recovered receivables and CMC would receive the remaining 10%. *See* Exhibit "I" at p. 6.  Campbell violated the Anti-Kickback Act, the Stark Act, and the FCA by agreeing to accept the illegal remuneration in exchange for patient referrals to CMC.

79.  Pursuant to CMC and Brown's request, certification, and representation in the CMS annual cost reports in 2006 through 2013 that the services were legally provided, the Medicare and Medicaid programs have made payment in whole or in part for many of these procedures performed on the Patients.  The Physicians have discovered that at CMC, "[a]pproximately 48 percent and 47 percent of net patient service revenues are from participation in the Medicare and state-sponsored Medicaid programs for the years ended June 30, 2009 and 2008, respectively. . . .  In 2009 and 2008, net patient service revenue includes approximately $8,412,809 and $10,926,577, respectively, of funds received through the Medicaid UPL program." Exhibit "AA."[27]

80.  Since the employment contracts are illegal, they fall under the principal/agent exception of the Anti-Kickback Act, and they fail to satisfy that exception.  In order to fall within the Anti-Kickback Safe Harbor for compensation made pursuant to a contract for personal services, the employment agreements must meet the seven standards set out in 42 C.F.R. § 1001.953(d), one of which requires that the aggregate compensation paid to the agent over the term of the agreement is "not determined in a manner that takes into account the volume or

---

[27]    The Physicians estimate that approximately 50% of their patients participate in Medicare and approximately 15% of their patients participate in Medicaid.  Upon information and belief, these numbers are consistent with the patient populations of the CMC Cardiologists.

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs." 42 C.F.R. § 1001.952(d)(5).

81.   CMC's compensation to the CMC Cardiologists is not based on their actual work.   Instead, the CMC Cardiologists are paid many times more by the county hospital than what they earned in private practice, as compensation for their patient referrals to CMC.   In fact, as referenced herein, the CMC Cardiologists' office practices have systematically lost money, but CMC continues to employ them because of the volume and value of their patient referrals to CMC.   CMC's illegal employment of the ER Physicians and hospitalists also violates the Anti-Kickback Act for the same reasons set forth above.

82.   ***CMC and David Brown's economic credentialing***.   CMC and Brown engaged in economic credentialing and other conduct, in violation of both the Anti-Kickback Act and Texas Health & Safety Code § 241-1015.

83.   In complete disregard and violation of federal and state law, On December 16, 2009, CMC and Brown sent letters to the Physicians demanding answers to CMC's questions about their referral patterns and practices as they relate to Dr. Yahagi. *See* Exhibits "Q"-"S."   The letters informed the Physicians that CMC would take into consideration the Physicians' responses to the questions

**RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT**

Case 6:10-cv-00064   Document 49   Filed in TXSD on 05/31/13   Page 85 of 122

about referrals to Dr. Yahagi in considering the Physicians' reappointment to the medical staff. *See id.*   When the Physicians did not respond to the letter, Dr. Yahagi (with the assistance and at the direction of David Brown) wrote to the Physicians that he would refuse to provide mandatory standby surgical care for the Physicians' patients. *See* <u>Exhibit</u> "P."   Ultimately, CMC and Brown granted the CMC Cardiologists exclusive rights to the cardiology department at the hospital. As set forth above, CMC, Brown, and Campbell also began a scheme to steer the Physicians' Patients to the CMC Cardiologists and ultimately to Dr. Yahagi at CMC for surgery.

84.   CMC and Brown's motivation for sending the December 16, 2009 letters is further revealed in its meeting minutes.   CMC noted that "the Board concurred that [the letter of December 16, 2009 to the Physicians] is a business decision, and this method of communicating with Doctors Parikh, Chandna, and Gaalla would be the most beneficial for the hospital in making a statement of position on the part of the Board since transferring these patients is not in our best interests."

85.   Since 2007, the Physicians have been harassed by the Defendants for transferring patients to other facilities.   They have been denied privileges, such as ICD privileges, for the same reason.   CMC and Brown also arbitrarily removed the

<u>**RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT**</u>
85

Physicians from various hospital committees for refusing to follow CMC's inappropriate directives. When the Physicians have reported patient-care concerns to the peer review committee, CMC and David Brown engaged CMC's employed cardiologist, Dr. Campbell (who is not on the peer review committee), to manufacture problems with the Physicians' patient care and turn the investigation into one focused on the Physicians. The Defendants orchestrated this type of "reverse" investigation on the Physicians at least three times in 2009 and 2010 with patients L.Z., K.P., and T.L. These reverse investigations required Dr. Campbell and David Brown to review confidential medical information and numerous patients' charts in direct violation of HIPAA. In addition, CMC's employed staff and physicians admittedly "tweaked" certain peer review documents to implicate the Physicians.

86.   By conditioning the grant of privileges on referrals for services or items reimbursable by the federal health care programs, including Medicare and Medicaid, the CMC and Brown violated the Anti-Kickback Act and state law. Because CMC and Brown's policy violates the Anti-Kickback Act, any claim for medical services submitted for those services would not be in compliance with applicable laws and regulations, as certified in the CMS annual cost reports in 2006 through 2013.

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

9266289v.1

87. ***CMC's worthless patient-care practices.***   CMC and Brown have engaged in the following worthless patient-care practices resulting in worthless and false claims being submitted to the Government:

      a.    In conspiracy with Dr. Yahagi, CMC and Brown precluded the Physicians from performing various medical procedures at CMC in 2009 and 2010, which are performed by the CMC Cardiologists, because Dr. Yahagi refused to provide surgical back-up for the Physicians.  Dr. Yahagi, with the assistance of David Brown, refused to provide standby for the Physicians because they did not refer patients to him.  CMC and Brown actively acquiesced in Dr. Yahagi's misconduct, and actually assisted him, despite the fact that the hospital bylaws required Dr. Yahagi to provide standby for the Physicians.  As a result, numerous Medicare and Medicaid patients were referred to CMC and Dr. Yahagi in 2009 and 2010, and those federal programs were knowingly billed for the false claims.

      b.    Since at least 2007, CMC and David Brown have attempted to ensure that the CMC Cardiologists get all patient referrals by dictating to whom patients are referred, as set forth above.  As a result, numerous Medicare and Medicaid patients were illegally referred to CMC and the CMC Cardiologists from 2007 to 2012, and those federal programs were knowingly billed for the false claims.

      c.    In 2007, 2008, 2009, 2010, and 2011, CMC and David Brown instructed the ER Physicians and their staff to not refer patients to the Physicians.  Instead, the ER Physicians and their staff were ordered by CMC and David Brown to refer those patients to the Chest Pain Center and the CMC Cardiologists, who in turn, refer the patients to Dr. Yahagi for surgery at CMC.  The ER Physicians were induced to make these referrals through the illegal bonus scheme described herein.  As a result of these illegal referrals, Medicare and Medicaid were knowingly billed and paid for the false claims.

d.  CMC advertises enhanced professional credentials in its physician directory for certain physicians, such as Dr. Oakley, who exclusively practice at CMC, while at the same time failing to completely list the professional credentials of certain physicians who share their practices between CMC and a competitor, DeTar Hospital.

e.  CMC pays for advertisements of physicians, including the CMC Cardiologists and Dr. Yahagi, who exclusively refer patients to CMC.  For example, CMC routinely advertises the services of Dr. Yahagi and the CMC Cardiologists, as set forth above.  In exchange for this remuneration, those physicians refer Medicare and Medicaid patients to CMC, which has resulted in the submission of false claims from 2007 through current.

f.  In 2009 and 2010, CMC and Brown threatened the Physicians with non-renewal of privileges because they do not always refer their patients to CMC, Dr. Yahagi, and Dr. Taylor for surgery.

g.  CMC and David Brown removed the Physicians from its Peer Review Committee on May 6, 2009 for being appropriately critical of inappropriate and worthless testing conducted by CMC or its favored physicians, *i.e.*, the CMC Cardiologists and Dr. Yahagi.

h.  Qualified physicians who hold privileges at both CMC and the competitor hospital, DeTar Hospital, are denied credentials for which they are qualified, while other physicians who practice exclusively at CMC are afforded credentials to perform procedures even when they lack the necessary training and do not meet the requisite guidelines for credentialing.

i.  CMC grants exclusive privileges to read certain diagnostic tests to physicians who exclusively refer patients to CMC, thereby foreclosing the treating physician from performing and billing for the professional component of those tests, as set forth above.

j.    Defendant Dr. Campbell has been awarded the directorship of the cardiac rehabilitation program at CMC's Healthplex facility since inception of the facility in or around 2006. CMC has paid Dr. Campbell many times more than the amounts permitted by law, in exchange for his group's patient referrals to CMC. As a result, Medicare and Medicaid have been billed for and paid these false claims.

k.    Dr. Frank Parma, Dr. Juan Llompart, Dr. Yusuke Yahagi, Dr. Richard Leggett, and certain other CMC physicians have office space in CMC's Professional Building and receive discounted rent, as well as free phone, janitorial service, and in some cases, furniture and use of the hospital dictation service in exchange for patient referrals to the hospital.

l.    CMC and David Brown have rewarded some physicians, such as Dr. Espinosa, who refer patients to CMC with free computers, EKG machines, flat screen televisions, furniture, and/or fish tanks. These physicians, in turn, refer Medicare and Medicaid patients to CMC, which has resulted in the submission of false claims to Medicare and Medicaid.

88.  CMC's knowing and intentional conduct has resulted and continues to result in harm to the Medicare and Medicaid Program. For example:

a.    The CMC Cardiologists and Dr. Yahagi, who benefit from some or all of the remuneration listed above, perform unnecessary and worthless diagnostic testing and unnecessary procedures for the financial benefit of the physician and CMC, even when contraindicated for the patient involved.

b.    Physicians not qualified to perform certain procedures nevertheless perform such procedures at CMC, leading to complications for the patients requiring follow-up care that would not be unnecessary if the procedures were initially performed properly.

c.  Referring physicians are induced to only refer their patients to certain CMC physicians (who practice exclusively at CMC), despite specific referral requests by patients, so that CMC and the CMC Cardiologists can perform unnecessary tests or procedures, and to ensure that CMC will be the hospital performing services for the patient.

89.   Medicare's revised enrollment application requires providers to certify that they will comply with Medicare laws, regulations, and program instructions and that they understand that payment of claims by Medicare is conditioned upon the claim and underlying transaction complying with such laws, regulations and program instructions, including the Anti-Kickback Act and the Stark Act. See Exhibit "FF."  A false certification of compliance with the Anti-Kickback Statute and Stark Act creates liability under the FCA. *See U.S. ex rel Thompson v. Columbia HCA Health Care Corp.*, 125 F.3d 899, 901-902 (5th Cir. 1997).  CMC and Brown have falsely certified these claims since at least 2006.

90.   CMC and Brown were and are aware that compliance with the applicable law is a condition of Medicare payment, including the Anti-Kickback Act, yet they submitted claims in 2006 through 2013 knowing they were ineligible for the payments demanded.  At the time of making the certifications, CMC and Brown knew they were violating the Anti-Kickback and Stark Acts related to the activity set forth herein.  CMC and Brown have knowingly submitted Medicare and Medicaid cost reports to the Government for Patients containing certifications

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

that CMC was in compliance with applicable laws, including the Anti-Kickback Act, Stark Act, and the FCA.  These reports were false.  Based on CMC and Brown's misrepresentations, Medicare and Medicaid paid for the illegal medical services.  The Government's decision to pay CMC's claims was conditioned upon its certification of compliance with the pertinent laws, including the Anti-Kickback and Stark Acts.  As set forth herein, CMC and Brown knowingly and actively took steps to conceal the violations from the Government, including falsifying public accounting records related to the ER Physicians' bonus payments, failing to charge the CMC Cardiologists rent, camouflaging the colonoscopy screening bonuses as "directorship" fees, and making bonus payments to shell companies.

91. ***CMC and David Brown's billing for medically unnecessary and worthless services.***   The billing of services or items provided to Medicare or Medicaid beneficiaries that were themselves inappropriate or worthless is a violation of the FCA.  Following is a list of examples of unnecessary and worthless procedures arising from CMC and Brown's FCA violations:

   a.   There are several instances of Dr. Yahagi performing or scheduling carotid arteries surgery at CMC on asymptomatic patients in or around 2009 solely on the basis of self-read or unreliable doppler studies, as set forth above.  Additional information or testing on some of the scheduled patients suggested no significant blockages.  Medicare and Medicare were knowingly billed by CMC for these worthless services in or around 2009.

    b.     Dr. Yahagi deliberately falsified the severity of disease on the operative reports of patients at CMC in 2008, 2009, and 2010, who had carotid artery surgery and aortic aneurysm repair at CMC. Medicare and Medicare were knowingly billed by CMC for these worthless services in or around 2008 through 2010.

    c.     Dr. Yahagi scheduled or performed surgical procedures at CMC in 2008, 2009, and 2010 for abdominal aortic aneurysm when not indicated, and CMC received payment from Medicare for those worthless services.

    d.     Dr. James Taylor and Dr. Yahagi have performed elective vascular surgeries on patients at CMC with pre-existing cardiac conditions without getting necessary pre-operative clearance from the patient's cardiologist. This resulted in severe and permanent harm to patients in 2006 through 2010, and required Medicare to incur significant additional costs due to repeat hospitalizations.

    e.     Dr. Yahagi has performed unnecessary balloon angioplasty and stent procedures on leg arteries at CMC in 2008 through 2010, and CMC has knowingly billed and received payment from Medicare for the worthless procedures.

    f.     Dr. Yahagi has preformed unnecessary femoral-popliteal bypass procedures on patients' legs at CMC in 2008 through 2010, and CMC has knowingly billed and received payment from Medicare for the worthless procedures..

92.   There have also been poor surgical results requiring follow-up care resulting from worthless procedures, and in many of these cases Medicare and Medicaid were billed for such worthless services.

93.   CMC and Brown also violated that Anti-Kickback Act by providing an all-expense-paid trip to certain referring physicians to New Orleans, Louisiana.

**RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT**

CMC and Brown sent four of its principal referring physicians to an all-expense-paid "leadership conference" in New Orleans. The trip took place from approximately April 28 through 30, 2011. CMC and Brown knowingly provided this trip and paid all expenses in exchange for Medicare and Medicaid patient referrals, which led to actual referrals of Medicare and Medicaid patients to CMC. The participants included the following physicians and, in some instances, their spouses:

1.  Richard H. Leggett, D.O. and his wife, Jenny Leggett, attended the event. Dr. Leggett is in private practice as a family practitioner. He is slated to become CMC's new chief-of-staff. His medical office is in the CMC office building. He informed Dr. Gaalla that he saved about $15,000.00 in rent by moving to CMC from a very similar non-CMC office space in Victoria, Texas. Upon information and belief (*i.e.*, Dr. Leggett's representation of significant savings), the cost was not included in Dr. Leggett's monthly rent.

    Dr. Leggett recently moved from an upper floor office in the CMC building to a larger office space on the first floor. Upon information and belief, the finish-out for the new office space was approximately $30,000.00 to $50,000.00, which CMC paid and did not charge Dr. Leggett. In return for this illegal remuneration and the paid trip, Dr. Leggett has referred Medicare and Medicaid patients to CMC since May 1, 2011.

2.  Fabian Espinosa, M.D. and his wife, Patricia Espinosa, attended the event. Dr. Espinosa is in private practice as an internal medicine physician. His office is at CMC's office building. According to Dr. Espinosa, he received approximately $14,000.00 worth of furniture, including a flat screen television, free of charge when he moved into

CMC's office space.[28]   He told the Physicians that he was at Detar Hospital's office building and moved to CMC's building because he received a much better deal at CMC for similar office space. He moved to CMC in late 2008.  David Brown, CMC's administrator, personally brought an EKG machine to Dr. Espinosa's office.  Upon information and belief, CMC provided Dr. Espinosa the EKG machine free of charge. In return for this illegal remuneration and the paid trip, CMC and David Brown intend and expect to induce Medicare and Medicaid patient referrals to CMC.

3.     Juan Antonio Llompart, M.D. and his wife, Tita Llompart, attended the event.  Dr. Llompart is the chief-of-medicine at CMC.  He is a pulmonologists in private practice.  His office is in CMC's office building.  CMC pays him $400.00 every alternative night for being on call.  Dr. Llompart personally instructed Dr. Gaalla to "cover up" Dr. Yahagi's unnecessary and worthless surgeries and complications.  A nurse who witnessed this conversation has provided a sworn statement of the conversation. *See* Exhibit "BB."  Dr. Llompart has insisted that the Physicians refer patients to CMC and Dr. Yahagi despite his unnecessary surgeries, severe complications, and high mortality rate. Dr. Yahagi's unnecessary procedures have resulted in Medicare fraud. In return for this illegal remuneration and the paid trip, Dr. Llompart has referred Medicare and Medicaid patients to CMC since May 1, 2011.

4.     Tanya E. Seiler, M.D. attended the event.  She is an OBGYN in private practice in Victoria.  She is on staff at CMC.  Dr. Seiler, along with Dr. Leggett and Dr. Llompart, signed a threatening letter to Dr. Chandna on April 13, 2010, placing conditions on his reappointment to the medical staff at CMC.  Dr. Chandna had raised genuine concerns about patient safety and unnecessary procedures performed at CMC that have resulted in Medicare fraud.  Rather than address his concerns and take action to prevent patient suffering and Medicare fraud, CMC sent Dr. Chandna a threatening letter and placed conditions on his reappointment.  In return for the paid trip, Dr. Seiler

---

[28]     Brown purchased some of this office furnishings from Dr. Shah Afridi for $10,000.00 on May 17, 2007, which Brown then gave to Dr. Espinosa in exchange for Medicare and Medicaid patient referrals.

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

has referred Medicare and Medicaid patients to CMC since May 1, 2011.

94.   CMC paid for these four physicians' stay at the Ritz Carlton in New Orleans for four nights as a reward for their Medicare and Medicaid patient referrals to CMC and in an effort to induce more referrals.  CMC also paid for the four physicians' flights to and from New Orleans and for their food.  In exchange, the participating physicians have since referred Medicare and Medicaid patients to CMC.

95.   In addition to these kickbacks, Dr. Espinosa, an internal medicine physician and referring physician at CMC, had a son suffer a fracture while in Mexico.  Dr. Espinosa's son was treated at CMC in February 2011.  The bill was $22,000.00, and David Brown instructed that the bill be written off entirely. Additionally, Dr. Espinosa's wife had surgery at CMC, and David Brown instructed that the insurance deductible be written off.  These kickbacks are in direct violation of the Anti-Kickback Act.  In exchange for these kickbacks, CMC and David Brown intend and expect to induce Medicare and Medicaid patient referrals to CMC.

96.   CMC and David Brown have also violated the Anti-Kickback Statute, the Stark Act, and the FCA with respect to the offering and performance of lithotripsy and cystoscopy procedures at CMC.  Since at least December 1, 2004,

CMC has contracted with third-party entities, including Matagorda Lithotripsy, LLP ("Matagorda"), to provide the portable equipment necessary to perform lithotripsy procedures.   Upon information and belief, CMC and Brown pay Matagorda approximately $2,500.00 per procedure for its services, and Matagorda in turn pays $1,000.00 of this fee to the physicians performing the procedure. Matagorda is owned, at least in part, by two urologists with privileges at CMC: Drs. John White and Christopher Manatt (collectively "Urologists").[29]   The Urologists, as well as urologist Dr. Marshall Weiner, have office space at CMC pursuant to which they receive below-market rent that includes free janitorial and telecommunications services.

97.   Upon information and belief, CMC and Brown exclusively contract with the lithotripsy company owned by the Urologists and pay this premium to the company in order to induce Medicare and Medicaid patient referrals from the Urologists.  Upon information and belief, the Urologists refer virtually all of their patients, including their Medicare and Medicaid patients, to CMC in exchange for CMC's payment of inflated fees for their company's lithotripsy equipment and discounted rent at CMC's office building.   Upon information and belief, the Urologists, as well as Dr. Weiner, refuse to perform lithotripsy procedures at DeTar Hospital because the Urologists will only perform lithotripsy procedures at

---

[29]     The Urologists rent clinical office space at CMC's office complex.

**RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT**

the hospital that engages their company, Matagorda (in which they have ownership interest), to provide the lithotripsy equipment and CMC offers them discounted office space.

98.   The three Urologists will consult with Medicare and Medicaid patients at DeTar Hospital, and in many cases, they discharge those patients and subsequently perform all of the urology procedures at CMC, such as urology surgery, cystoscopy, and lithotripsy.   For example, Dr. Weiner consulted with Medicare patient R.T. at DeTar Hospital on or about late October 2012, and Dr. Weiner subsequently directed the patient to CMC to undergo prostate surgery on November 7, 2012.  The Medicare patient underwent prostate surgery at CMC, and Medicare was knowingly billed and paid for the false claim.  In another case, Dr. Weiner saw Medicare patient P.R. at DeTar Hospital in or around March 2, 2013, and Dr. Weiner subsequently directed the patient to CMC for urology surgery on or around March 6, 2013.  The patient underwent urology surgery at CMC on or around March 6, 2013, and Medicare was knowingly billed and paid for the false claim.  Dr. Weiner has referred Medicare and Medicaid patients to CMC because of the illegal financial benefits he receives from CMC.

99.   This is a direct violation of the Anti-Kickback Act and the Stark Act, which bar any payment or receipt of remuneration in exchange for patient referrals.

**R**ELATORS' **T**HIRD **A**MENDED *Q**UI** T**AM** **C**OMPLAINT

9266289v.1

Upon information and belief, Matagorda offered a similar financial relationship to DeTar Hospital, but DeTar Hospital declined to accept Matagorda's offer.

### 4. CMC AND BROWN'S VIOLATIONS OF THE MEDICARE CONDITION OF PARTICIPATION BY CONDITIONING MEDICAL STAFF PRIVILEGES ON CRITERIA OTHER THAN INDIVIDUAL CHARACTER, COMPETENCE, TRAINING, EXPERIENCE, AND JUDGMENT HAVE RESULTED IN FRAUDULENT BILLING TO FEDERAL HEALTH CARE PROGRAMS IN VIOLATION OF THE FALSE CLAIMS ACT.

100. CMC and Brown's conditioning of the Physician's privileges on the economic interests of CMC, as evidenced in the December 16, 2009 letters, is a violation of the Medicare Conditions of Participation. *See* 42 U.S.C. § 482.[30]  In particular, the governing body of a hospital that participates in the Medicare program is required to ensure that the criteria for selection of the medical staff are "individual character, competence, training, experience, and judgment." 42 U.S.C. § 482.12(a)(6).  As CMC's letters of December 16, 2009 to the Physicians reveal, CMC and Brown selected medical staff based on economic criteria, and not on individual character, competence, training, experience, and judgment. *See* Exhibits

---

[30]     Defendants believe that compliance with CMS' terms of participation are not a condition of payment for Medicare and Medicaid claims.  However, Section 3 of CMS' Certification Statement from CMS-855A expressly required CMC and Brown to certify as follows as a condition payment: "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. . . .  I understand that ***payment of a claim by Medicare is conditioned upon*** the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), ***and on the provider's compliance with all applicable conditions of participation in Medicare***." Exhibit "FF" (emphasis added).  Thus, the conditions of participation are expressly made a condition of payment under CMS-855A.

<u>RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT</u>

"Q"-"S"; <u>Exhibit</u> "CC."   CMC and Brown's  submission of claims for services provided to Medicare and Medicaid beneficiaries while they were in violation of the Medicare and Medicaid Conditions of Participation in 2010 constitute a false claim under the FCA.

101.  CMC and Brown engaged in conflicts credentialing in violation of the Medicare Conditions of Participation.  CMC and Brown's submission of claims for services provided to Medicare beneficiaries while they were in violation of the Medicare Conditions of Participation in 2010 constitute a false claim under the FCA.

**5. CMC AND BROWN'S NUMEROUS STARK ACT VIOLATIONS HAVE RESULTED IN FRAUDULENT BILLING TO FEDERAL HEALTH CARE PROGRAMS.**

102. The compensation arrangements created by CMC's employment agreements with the CMC Cardiologists, the ER Physicians, and the hospitalists constitute a "financial relationship" under Section 1395nn(a)(i) of the Stark Act. Under the Stark Act, a physician has a "financial relationship" with an entity if the physician has "a compensation arrangement" with the entity. *See* 42 U.S.C. § 1395nn(a)(2).   The Stark Act provides that if a physician has a financial arrangement with an entity then:

> (A) the physician may not make a referral to the entity
> for the furnishing of designated health services for which

payment otherwise may be made under this subchapter, and

(B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn.  An entity that collects payment performed under a prohibited referral must refund all collected amounts within 60 days.  *See* 42 C.F.R. §§ 1395nn(a)(1)(B), 411.353(b).  CMC has failed to do so.

103.  "Designated health services" includes inpatient and outpatient hospital services.  *See id.* at § 1395nn(h)(6).  Therefore, referrals of Patients by the CMC Cardiologists, ER Physicians, and the hospitalists to CMC are prohibited by the Stark Act unless one of the specific statutory exceptions to the Act apply ("Safe Harbors").  However, none of the Safe Harbors are applicable.  The employment agreements do not constitute a "bona fide employment relationship" under § 1395nn(e)(2) because, as pointed out above, such physician/hospital relationships are prohibited under Texas law.  *See, e.g.,* TEX. OCC. CODE § 165.156 (precluding the corporate practice of medicine; *see also id.* § 164.052(a)(17) (recognizing that the practice of medicine is restricted to licensed physicians).  Further, the employment agreements do not create a "personal service arrangement" or a "group practice arrangement" because they do not meet the criteria necessary to

fall within these Safe Harbors.  In addition, the payment to the CMC Cardiologists is well above market rate.

104.  In the unlikely event the Court deems the employment contracts legal and not in violation of the prohibition against the corporate practice of medicine, the ER Physician employment contracts still violate the Stark Act because, among other things, the salaries and bonus payments to the ER Physicians are "determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician." 42 U.S.C. § 1395nn(e)(2).  In order to satisfy the bona fide employment safe harbor under the Stark Act, CMC and Brown  must establish each of the following elements:

1. the employment is for identifiable services;

2. the amount of the remuneration under the employment—

   (i) is consistent with fair market value of the services, and

   (ii) is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals were made to the employer,

3. the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer, and

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

4.  the employment meets such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse.

42 U.S.C. § 1395nn(e)(2).  CMC's employment agreements with the ER Physicians fail to satisfy any of the elements of the safe harbor.  Specifically, the bonus portion of the agreement is not for identifiable services.  As the employment agreements state with respect to the bonuses, "Additional compensation is available through an incentive plan agreed upon by the Hospital and the Emergency Room Medical Director."  This does not identify the services for which remuneration is being provided.  The lack of identifiable services is buttressed by the fact that several ER Physicians, including Drs. Allen and Thamwiwat, have no idea how the bonus is calculated, other than the fact that it is based on their patient referrals to the Chest Pain Center.  The employment agreements also fail under Stark because they expressly take into account the value or volume of patient referrals to CMC. *See* Exhibit "B."  As the bonus formula reveals, and as the ER Physicians have admitted, the bonus is calculated by the revenue generated by the Chest Pain Center, which is a function of the number of patients the ER Physicians refer to the Chest Pain Center, since the ER Physicians are the sole source of referrals for the Chest Pain Center.  Simply put, the ER Physicians would not receive a bonus but for their patient referrals to the Chest Pain Center.  Finally, the employment agreements fail because the bonus payments for patient referrals is not

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

commercially reasonable if no referrals were made to CMC.  Indeed, it would be commercially *unreasonable* for CMC and Brown to offer hundreds of thousands of dollars in bonuses to the ER Physicians in exchange for nothing.  Because CMC and Brown cannot satisfy *all* four elements (much less one element) necessary to satisfy the Stark bona fide employment safe harbor, the ER Physicians' employment agreements are not subject to the Stark safe harbor.[31]  As such, they violate the Stark Act and subject CMC and Brown to significant damages.  Pursuant to Stark, not only may the services rendered by the ER Physicians not be billed to Medicare or Medicaid, but also all other referrals from the ER Physicians to CMC for designated health services become tainted as prohibited referrals.  In addition, civil monetary penalties of not more than $15,000,00 for each wrongfully billed claim may be imposed, and the providers involved may be excluded from the Medicare and Medicaid programs.

105. Similarly, CMC and Brown's employment agreements with the CMC Cardiologists fail to satisfy the bona fide employment safe harbor under Stark.  Specifically, the amount of remuneration under the employment contracts is not

---

[31]     Even if the ER Physicians' employment contracts satisfied the Stark employment safe harbor (which they do not), the safe harbor is inapplicable from 2004 to 2010 because the ER Physicians were not employed by CMC during that timeframe, although they received significant Chest Pain Center bonuses during that time.  Thus, CMC and Brown undoubtedly violated the Stark Act from 2004 to 2010 by paying the illegal bonuses in exchange for patient referrals, and no Stark safe harbor applies.

consistent with fair market value.   Indeed, as set forth above, Drs. Campbell, Kruger, and Oakley were paid nearly double the amount they earned in private practice *in a declining cardiology market with declining reimbursement rates*. Thus, the Stark safe harbor does not apply. *See* 42 C.F.R. § 411.357(c)(2)(i). Further, Drs. Tillman and Junor were offered guaranteed salaries of $625,000.00 in addition to significant signing bonuses.   According to CMC and Brown's expert, Deloitte LLP, the median salary for invasive cardiologists in 2009 was $481,878, which is substantially below what Drs. Junor and Tillman were paid in their first years of practice (2008 and 2007, respectively).   For these same reasons, the employment contracts fail to satisfy the Stark employment safe harbor because the remuneration provided is not commercially reasonable even if no referrals were made to CMC.   Indeed, as set forth above, CMC loses significant money on the CMC Cardiologists' office practices; it more than makes up for the losses on the CMC Cardiologists' patient referrals.   This is fatal to any claim that the agreements meet the safe harbor requirements.   For these reasons, CMC's employment contracts with the CMC Cardiologists fail to satisfy the employment safe harbor of the Stark Act.   As such, the referrals from the CMC Cardiologists to CMC in exchange for above-market salaries, discounted office rent, CME allowance, health and insurance allowance are subject to Stark liability.[32]

---

[32]        The discounted office space, health insurance, paid vacation, participation in

**RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT**

106.  As set forth herein, the CMC Cardiologists, the ER Physicians, and the hospitalists have referred some of the Patients to CMC for designated health services.  Further, as set forth herein, CMC has knowingly submitted Medicare and or Medicaid claims for some of the Patients' inpatient services referred by the CMC Cardiologists, the ER Physicians, and the hospitalists, and Medicare and Medicaid have paid those false claims.

107.  The Defendants, the CMC Cardiologists, the ER Physicians, and the hospitalists have violated the Stark Act prohibitions.   Medicare's revised enrollment application requires providers to certify that they will comply with Medicare laws, regulations, and program instructions and that they understand that payment of claims by Medicare is conditioned upon the claim and underlying transaction complying with such laws, regulations and program instructions, including the Stark Act.  *See* <u>Exhibit</u> "FF."   CMC and Brown made such certifications to CMS since at least 2006, and they knew those certifications were false at the time they were made.  Because the Defendants have and continue to violate the Stark Act, the Medicare and Medicaid claims that have been submitted by CMC and Brown are false claims under the FCA.

---

CMC's retirement program, free advertisements, CME allowance, coverage of medical malpractice insurance premiums, free office janitorial services, medical record transcription, billing and collections, and deferred compensation program offered by CMC to the CMC Cardiologists increase the overall value of the CMC Cardiologists compensation packages and place them even more out of the line with the fair market value.

<u>R</u>ELATORS' <u>T</u>HIRD <u>A</u>MENDED *<u>Q</u>UI <u>T</u>AM* <u>C</u>OMPLAINT

9266289v.1

108. Further, the referrals of some of the Patients made by the CMC Cardiologists, ER Physicians, and hospitalists in return for the remuneration provided under the invalid employment agreements violate the Anti-Kickback Statute, as does the payment of the remuneration by CMC to the CMC Cardiologists and ER Physicians.  Because the employment agreements are void under Texas law, the employment agreements cannot be relied upon to meet any of the criteria necessary to exempt these actions from the application of the Stark Act and Anti-Kickback Statute.

6. **CMC AND DAVID BROWN OPERATE A COLONOSCOPY SCREENING PROGRAM AND PAY SOME OF THE PARTICIPATING PHYSICIANS ILLEGAL BONUSES IN EXCHANGE FOR PATIENT REFERRALS TO THE HOSPITAL, WHICH VIOLATES THE ANTI-KICKBACK ACT, THE STARK ACT, AND THE FCA.**

109. Since at least 2006, CMC and Brown have operated a colonoscopy screening program ("Program") at the hospital that offers insured patients, including Medicare and Medicaid patients, colonoscopy screenings at CMC. *See* Exhibit "DD" at ¶ 3.  CMC has several gastroenterologists on staff that participate in the Program, including Dr. Loren C. Owensby, Dr. Richard E. Rogers, Dr. Chinea, and Dr. Verma. *See id.*  These physicians receive compensation for each colonoscopy screening performed in the program by billing Medicare, Medicaid, or private insurers for their professional services, and CMC receives its

compensation by billing separately for its hospital charges. *See id.* at ¶ 6. Thus, both the physician and the hospital are fully compensated for their services. Many of the patients who participate in the program are Medicare and Medicaid recipients. *See id.* at ¶ 5.

110. In addition to the professional fees the participating physicians receive as compensation for the colonoscopy screenings, CMC and Brown provide Drs. Owensby, Rogers, and Chinea an additional bonus payment ("Additional Bonus Payment") for the screenings.[33] CMC and Brown pay an Additional Bonus Payment of approximately $1,000 per day to the participating physician for each day per month that the physician participates in CMC's screening program. *See id.* at ¶ 6. David Brown determines how many days and how much time each participating physician receives in the screening program each month. *See id.* The amount of the Additional Bonus Payment varies based on the time the physician spends conducting colonoscopy screenings at CMC. David Brown assigns disproportionate time to various participating physicians based on their patient referrals to CMC. For example, Brown affords Dr. Owensby the most days per month in the screening program in exchange for patient referrals to CMC. Brown afford Dr. Owensby four days per month in the screening program, and CMC and

---

[33]      Dr. Verma does not accept any Additional Bonus Payment, although Brown has offered such payment to him in exchange for referring patients to CMC and utilizing CMC for his procedures.

Brown pay him an Additional Bonus Payment of approximately $4,000.00 per month for his participation (approximately $1,000.00 per day). *See id.* at ¶ 4.  CMC and Brown afford Dr. Rogers two to three days of screening time per month and pay him an Additional Bonus Payment of approximately $2,000.00 to $3,000.00 per month for his participation.  CMC and Brown afford Dr. Chinea two days per month in the screening program and pay him an Additional Bonus Payment of approximately $2,000.00 per month.   In exchange for the Additional Bonus Payments, the participating physicians who receive the Additional Bonus Payments conduct most of their procedures at CMC, which is an enormous financial benefit to CMC because it bills the patients' insurer, including Medicare and Medicaid, for the hospital fees related to each procedure.

111.  In an effort to conceal the true nature of the illegal Additional Bonus Payments, CMC and Brown intentionally and deceptively refer to the Additional Bonus Payment as a "directorship" fee, implying that the Additional Bonus Payment is compensation for some additional work or oversight by the participating physicians in the screening program.  However, there is no additional work or oversight required by participating physicians in the screening program. *See id.* at ¶ 6. The participating physicians simply conduct colonoscopies during each screening day.   Instead, CMC and Brown misleadingly designate the

participating physician as the "director" of the program the day they participate in the program.  For example, when Dr. Owensby participates in the program one day, CMC and Brown call him the "director" that day and pay him approximately $1,000.00 in Additional Bonus Payments for being the "director."  The next day, when another physician participates in the program, that physician is called the "director," and CMC and Brown pay him approximately $1,000 in Additional bonus Payments for being the "director" that day.  This is a farce, as acknowledged by at least one participating physician who refuses to accept the Additional Bonus Payment, Dr. Verma.  There are absolutely no director responsibilities or duties for participating physicians. *See id.*  Instead, the sole purpose of the Additional Bonus Payment is to induce participating physicians to use CMC's hospital services for their procedures, which allows CMC to bill and receive payment from Medicare and Medicaid, in exchange for the monthly bonus payments.

112.  CMC and Brown's intentionally deceptive and illegal remuneration provided to some of the participating physicians has been successful in inducing Medicare and Medicaid patient referrals to CMC.  For example, Dr. Owensby, the recipient of approximately $4,000.00 per month in Additional Bonus Payments, performs approximately 70% of his cases at CMC, which include many Medicare and Medicaid patients, in exchange for the Additional Bonus Payments.  The next

largest recipient of Additional Bonus Payments (approximately $2,000.00 to $3,000.00 per month), Dr. Rogers, performs approximately 90% of his cases at CMC, which include many Medicare and Medicaid patients, in exchange for the Additional Bonus Payment. This *quid pro quo* bonus structure—bonus money paid to participating physicians in exchange for patient referrals to CMC—is a direct violation of the Anti-Kickback Act, the Stark Act, and the FCA. CMC and Brown acted knowingly and willfully in perpetrating this scheme and inducing Medicare and Medicaid patient referrals, as set forth above, and CMC and Brown paid the Additional Bonus Payments to the physicians (and the physicians received and accepted those payment) with the intent to pay in exchange for patient referrals. CMC and David Brown submitted false and fraudulent claims to Medicare and Medicaid for patients screened in the screening program for which illegal bonuses were paid, as well as for patients inappropriately referred to CMC by the participating physicians. Upon information and belief, when CMC and Brown learned of the allegations in this lawsuit related to the illegal Additional Bonus Payments, they stopped paying the illegal kickbacks.

113. Each Form CMS-1500, CMS-2552, UB-92, UB04, and HCFA-2552 submitted by CMC, Brown, and Drs. Owensby, Rogers, and Chinea for payment from at least 2006 to current (when the Additional Bonus Payment program was in

place) related to those physicians' referrals to CMC for hospital services was a false claim, statement, or record.  CMC and Brown falsely certified in the CMS annual cost reports to the Government that they were in compliance with the Anti-Kickback and Stark Acts in 2007 through current, when in fact they were not. When they made these certifications, they knew the certifications were false because they were paying illegal kickbacks to the participating physicians in exchange for referrals.  But for their false certifications in 2006 through 2013, the Government would not have paid the claims.

114.  CMC and Brown's implementation of the colonoscopy screening program and engagement of the participating physicians from 2006 to current (*i.e.*, the compensation arrangement) and the illegal bonus payments made to certain of the participating physicians (*i.e.*, Drs. Owensby, Rogers, and Chinea) in exchange for patient referrals each constitute a "financial relationship" between CMC and those physicians under §1395nn(a)(i) of the Stark Act.  Under the Stark Act, a physician has a "financial relationship" with an entity if the physician has "a compensation arrangement" with the entity. *See* 42 U.S.C. § 1395nn(a)(2).  The Stark Act restricts such patient referrals when a physician has a financial arrangement with an entity.

115.   Referrals by the participating physicians to CMC are prohibited by the Stark Act unless one of the specific statutory exceptions to the Act apply. However, none of the Safe Harbors are applicable.

116.  The participating physicians have referred Medicare and Medicaid patients to CMC for designated health services, such as colonoscopies, among other designated health services, since at least 2006.   Additionally, some the participating physicians (*i.e.*, Drs. Owensby, Rogers, and Chinea) have knowingly and intentionally received Additional Bonus Payments in exchange for patient referrals to CMC, including Medicare and Medicaid patients, since at least 2006. Further, since at least 2006, CMC and Brown have knowingly and intentionally submitted Medicare and/or Medicaid claims for the inpatient hospital services referred by the participating physicians and falsely certified compliance with the Anti-Kickback and Stark Acts in order to obtain reimbursement from federal programs.

117. CMC and Brown's Additional Bonus Payments violate the Stark Act prohibitions.  Medicare requires providers to certify that they will comply with Medicare laws, regulations, and program instructions and that they understand that payment of claims by Medicare is conditioned upon the claim and underlying transaction complying with such laws, regulations, and program instructions,

including the Anti-Kickback and Stark Act.  Because CMC and Brown have and
continue to knowingly and intentionally violate the Anti-Kickback and Stark Act,
the Medicare and Medicaid claims that have been submitted and certified to the
Government by CMC and Brown from 2006 through 2013 related to the
colonoscopies for which the Additional Bonus Payments have been made, as well
as the illegal referrals made to CMC in exchange for the bonuses, are false claims
under the FCA.

118.  As set forth above, the physicians to whom CMC and Brown provided
Additional Bonus Payments and with whom CMC and Brown entered into illegal
financial relationships referred large volumes of patients, including Medicare and
Medicaid patients and beneficiaries of other government health programs, to CMC
in violation of federal law.  CMC and Brown, in turn, then knowingly and
intentionally submitted false certifications and claims to Medicare, Medicaid, and
other government healthcare programs and obtained millions of dollars in
payments from the United States.  Under the FCA, such claims are false and/or
fraudulent because CMC had no entitlement to payment for services provided on
illegal referrals for such patients.

119. CMC and Brown also violated the FCA by knowingly and intentionally
making or causing to be made false material statements when submitting these

claims for payment to Medicare, Medicaid, and other government programs.  CMC and Brown knowingly and intentionally falsely certified to the Government between 2006 through 2013 that the claims and statements were true and/or correct, that they complied with the Anti-Kickback Act and Stark Act, and as such they were entitled to payment.

120.  To conceal their unlawful conduct and avoid refunding payments made on these false claims, CMC and Brown also falsely certified to the Government in 2006 through 2012, in violation of the FCA, that the services identified in their annual cost reports were provided in compliance with federal law, including the prohibitions against kickbacks, illegal remuneration to physicians, and improper financial relationships with physicians.  The false certifications, made with each annual cost report submitted to the Government between 2006 and 2012, were part of CMC and Brown's unlawful scheme to defraud Medicare and other governmental healthcare programs.  Brown and CMC also implicitly certified to the Government in 2006 through 2012 compliance with federal law, including the FCA, Anti-Kickback Act, and Stark Act, when they continued to violate their duty to comply with the regulations and laws upon which payment was conditioned. But for CMC and Brown's false certifications regarding complaint with the Anti-

Kickback and Stark Acts, the Government would not have paid their false claims submitted between 2006 and 2012.

121. Pursuant to this scheme, pattern, and practice described above, CMC and Brown intentionally and knowingly provided illegal Additional Bonus Payments to the participating physicians, submitted false and fraudulent claims, and fraudulently obtained payments from the Government on patient referrals by the participating physicians in violation of the Anti-Kickback Act, the Stark Act, and the FCA, as set forth above and incorporated herein by reference.

122. The Government has been damaged by paying claims falsely submitted by CMC, Brown, and Drs. Owensby, Rogers, and Chinea.  Treble damages for these false claims are appropriate and will likely amount to millions of dollars.  The maximum statutory civil penalty for each false claim should also be imposed against CMC and Brown because of their knowing conduct and flagrant disregard for the law.

# VII.
# CONSPIRACY

123.   Pursuant  to  42  U.S.C.  § 3729(a)(1)(C),  the  Physicians  assert  that CMC, David Brown, David Brown's employer, BioCare, Inc.,[34] Dr. Campbell, Dr. Yahagi, the employed hospitalists, and the ER Physicians (who were not employed until 2010)[35] conspired to commit the misconduct set forth above, to wit: (1) knowingly present, or cause to be presented, false or fraudulent claims for payment or approval to the Government; (2) knowingly make, use, or cause to be made or used, false records or statements material to false or fraudulent claims; (4) knowingly assisting in causing the Government to pay claims grounded in fraud; and (4) possession or control of property of money used, or to be used, by the Government and knowingly deliver, or cause to be delivered, less than all of that money or property.   The details of the conspiracy are set forth above and are incorporated herein by reference.   Accordingly, each Defendant is jointly and severally liable for the misconduct alleged in this case.

---

[34]   David Brown is an employee of BioCare, Inc. *See* Exhibit "EE" at ¶ I.E.   "[A] corporation may be vicariously liable under the FCA for the acts of an employee where the employee is acting within the scope of his employment and with the purpose of benefitting the employer." *U.S. ex rel. Vavra v. Kellog Brown & Root, Inc.*, 903 F.Supp.2d 473, 492 (E.D. Tex. 2011).  Here, Brown was acting for the benefit of his employer, BioCare, as well as CMC and his own personal financial benefit.

[35]   As set forth above, since the CMC Cardiologists and the ER Physicians cannot legally be employed by CMC, the Physicians can assert a conspiracy claim against the Defendants.  Additionally, Dr. Yahagi is not a CMC employee and therefore a conspiracy claim is appropriate.

**RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT**

124. CMC, David Brown, and the ER Physicians took overt acts in furtherance of the conspiracy to defraud the Government and violate the FCA, including entering into an agreement to pay and receive illegal bonus payments for the referral of patients to CMC's Chest Pain Center, the ER Physicians' actual referral of patients to CMC, CMC's acceptance of those patient referrals, the ER Physicians' knowing assistance in causing the false claims to be submitted and paid by the Government, and Brown and CMC's payment and the ER Physicians' receipt of illegal bonuses for patient referrals to CMC's Chest Pain Center. Further information regarding patient identity, the referring ER Physician, the date of the referral, and the payment and receipt of the illegal bonuses is set forth above in Section V, and is incorporated herein by reference.

125. CMC, David Brown, BioCare, Inc., and Campbell took overt acts in furtherance of the conspiracy to defraud the Government and violate the FCA, including reaching an agreement to split Campbell's professional fees on a 90-10 basis and following through on that agreement, reaching an agreement to pay Dr. Campbell and the other CMC Cardiologists a salary well above market rate in order to induce them to refer patients to CMC and following through on that agreement, reaching an agreement to knowingly assist in causing the Government to pay clams grounded in fraud, and reaching an agreement to offer Dr. Campbell

discounted office space and free janitorial and dictation services in order to increase Dr. Campbell's patient referrals to CMC and following through on that agreement.

126. In addition, David Brown, CMC, and Drs. Owensby and Rogers knowingly conspired since at least 2006 to commit the misconduct set forth above related to CMC's colonoscopy screening program, to wit: (1) Brown and CMC designed a kickback program for the participants in the screening program in exchange for Medicare and Medicaid patient referrals to CMC; (2) Brown and CMC implemented a deceptive bonus scheme to pay illegal kickbacks to the participating physicians in order to induce patient referrals to CMC; (3) Drs. Owensby and Rogers agreed to accept and did accept the illegal bonus payments and steadily referred patients to CMC in exchange for the illegal payments; (4) Drs. Owensby and Rogers knowingly assisted David Brown and CMC in causing the Government to pay claims grounded in fraud, and (5) the parties agreed to disguise the illegal bonuses as "directorship" fees in order to avoid detection and scrutiny, despite the fact that no directorship duties or responsibilities attached to a physician participating in the screening program.

127. Brown and CMC also illegally conspired to falsely certify in CMS' annual costs reports submitted between 2006 and 2013, that CMC was in

compliance with the Anti-Kickback and Stark Acts, in order to obtain reimbursement from the Medicare and Medicaid programs.

## VIII.
## DAMAGES

128. The Government has been significantly damaged and continues to incur significant damages as a result of the Defendants' acts and omissions set forth above.  The Defendants are jointly and severally liable for the damages.

## IX.
## ATTORNEYS' FEES

129.  The Physicians have been required to retain legal counsel to prosecute this action against the Defendants.  The Physicians' attorneys' fees and expenses are recoverable pursuant to their claims under FCA.  The Physicians and the Government seek to recover their attorneys' fees and costs incurred in prosecuting this matter in this United States District Court, any appeals to Fifth Circuit Court of Appeals and United States Supreme Court, as well as any certification to the Texas Supreme Court.

## X.
## JURY DEMAND

130.  The Physicians, acting individually and on behalf of and in the name of the United States, hereby demand a trial by jury for all issues which are triable to a jury.

RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT

9266289v.1

# XI.
## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, the Physicians acting on behalf of and in the name of the United States, and individually, request and pray that judgment be entered in their favor and in favor of the United States against Defendants as follows: (a) all damages incurred by the United States as a result of the Defendants' violations of the False Claims Act; (b) treble the amount of the United States' damages, plus civil penalties of $10,000 (or more if adjusted higher by the Federal Penalty Adjustment Act of 1990, 28 U.S.C. § 2461) for each false claim; (c) all costs of this civil action, including attorneys' fees, expenses and court costs; ; and (d) all such other and further relief, in law or equity, special and general, as equitable and just.

In the event the United States decides to proceed with the *qui tam* action, the Physicians request an award for bringing this action of at least 15% but not more than 25% of the proceeds of the action or settlement of the claim. *See* 31 U.S.C. § 3730(d)(1).  If the United States does not proceed with this action, the Physicians request an award in an amount the Court decides is reasonable for collecting the civil penalty and damages, which shall not be less than 25% or more than 30% of the proceeds of the action or the settlement. *See id.*

9266289v.1

§ 3730(d)(2).  The Physicians also respectfully request all other relief, special or general, in law or equity, to which they may be justly entitled.

Respectfully submitted,

JACKSON WALKER L.L.P.
100 Congress Avenue, Suite 1100
Austin, Texas 78701
(512) 236-2000 (Telephone)
(512) 236-2002 (Facsimile)

By: /s/ Monte F. James
      Monte F. James
      *Attorney-in-Charge*
      State Bar No. 10547520
      Southern District Bar No. 29591
      Joshua A. Romero
      State Bar No. 24046754
      Southern District Bar No. 725205

ATTORNEYS FOR RELATORS

**RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT**

9266289v.1

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to the False Claims Act, I hereby certify that the above and foregoing instrument was served on the United States of America in the above entitled and numbered cause this the 31st day of May, 2013, via the following:

|  |  |
|---|---|
| _____✓_____ | Certified Mail, Return Receipt Requested |
| _____ | Regular Mail |
| _____ | Facsimile |
| _____ | Overnight Delivery |
| _____✓_____ | Electronic Delivery |

Eric H. Holder, Jr.
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Jose Angel Moreno
U.S. Attorney for Southern District of Texas
U.S. Attorney's Office
Southern District of Texas
P.O. Box 61129
Houston, TX 77208

Mr. Jose Vela
Assistant U.S. Attorney for Southern District of Texas
U.S. Attorney's Office
1000 Louisiana Street, Suite 2300
Houston, TX 77002

Kevin Michael Clark
King & Spalding LLP
1100 Louisiana Street
Suite 4000
Houston, TX  77002

/s/ Monte F. James
Monte F. James

**RELATORS' THIRD AMENDED *QUI TAM* COMPLAINT**

9266289v.1