UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

UNITED STATES OF AMERICA, *ex. Rel.* §
DAKSHESH PARIKH, *et al*, §
                        §
     Plaintiffs, §
VS. §    CIVIL ACTION NO. 6:10-CV-64
                        §
CITIZENS MEDICAL CENTER, *et al*, §
                        §
     Defendants. §

## MEMORANDUM AND ORDER

This is a *qui tam* suit brought against Citizens Medical Center, a county owned hospital in Victoria, alleging multiple violations of the False Claims Act (the FCA). Relators are three cardiologists who formerly practiced at Citizens. Defendants are Citizens and two individuals: David Brown, the hospital's administrator, and Dr. William Campbell, Jr., a cardiologist employed by the hospital. Relators allege that Citizens has been violating the FCA since at least 2007 by, among other things, running a kickback scheme in which it paid bonuses and financial incentives to physicians who referred patients for treatment at the hospital, employing physicians in violation of Texas's ban on the corporate practice of medicine, and providing worthless and unnecessary medical services.

Defendants move to dismiss Relators' claims under Rule 12(b)(6), arguing that Relators have failed to plead legally sufficient claims and that the individual Defendants are entitled to qualified immunity. The Court has considered the

1

parties' briefing, the applicable law, and the pleadings, and now **GRANTS IN PART** and **DENIES IN PART** Defendants' motions to dismiss.

## I.   BACKGROUND

### A. Procedural History

Relators are Drs. Dakshesh Parikh, Harish Chandna, and Ajay Gaalla, three cardiologists practicing in Victoria.[1]   Until December 2012, when they resigned from the hospital pursuant to a settlement in a case in which they alleged discrimination, *see generally Gaalla v. Citizens Med. Ctr.*, No. 6:10-cv-14 (S.D. Tex.), Relators practiced at Citizens and exercised privileges there.   According to Relators, their relationship with the hospital became strained beginning in 2007. Relators allege that at that time, Citizens, acting through Defendant Brown, began implementing bonus and fee-sharing programs for emergency room physicians working at the hospital who referred patients for cardiology treatment at Citizens, employing cardiologists at above-market salaries and providing them discounted office space, and demanding that Relators refer all their surgical patients to the hospital's exclusive cardiac surgeon, Dr. Yusuke Yahagi.   Docket Entry No. 49 at 14.   Relators allege that they refused to participate in these schemes and, as a result, Citizens subsequently retaliated against them.   *See id.*

---

[1] In accordance with the Rule 12 standard, the Court recites this background taking all well-pleaded facts in Relators' complaint as true for purposes of the motions to dismiss.

In August 2010, after several years of increasing conflict between Relators and Citizens and six months after the filing of the discrimination suit, Relators filed this *qui tam* suit under seal alleging numerous violations of the False Claims Act, 31 U.S.C. § 3729.[2]  The suit remained sealed until February 2013, when, after two and a half years and two amended complaints by Relators, the Court denied the United States's latest request to keep the case sealed so it could continue its investigation to determine if intervention was warranted.  *See* Docket Entry No. 28. The United States then provided notice that it was declining to intervene at that time.   *See* Docket Entry No. 29.

In May 2013, after the Second Amended Complaint was unsealed and served, Defendants moved to dismiss Relators' suit.  That month, the Court held a status conference at which Relators and Defendants argued the merits of the motions to dismiss, and the Court gave Relators leave to file one more amended complaint.  Apparently taking to heart the Court's warning that it would be their last chance to replead, Relators filed a 122-page Third Amended Complaint on May 31, 2013. *See* Docket Entry No. 49.

Defendants promptly moved to dismiss the Third Amended Complaint with Citizens filing its own motion to dismiss and the individual defendants filing a separate one.  *See* Docket Entry Nos. 53, 54.  The main difference between the two

---

[2] Though they allege retaliatory action by Citizens, Relators do not bring any claims under the Act's anti-retaliation provision, 31 U.S.C. § 3730(h).

motions is that Campbell and Brown assert that in addition to the objections the hospital raises, they are also entitled to a qualified immunity defense. Relators responded, *see* Docket Entry Nos. 67, 68, and the United States filed a statement of interest on some of the issues raised in the motions. *See* Docket Entry No. 65.

### B. Summary of Relators' Allegations

As discussed in more detail below, the live pleading accuses Defendants of violating the FCA in several ways. First, the bulk of Relators' complaint alleges violations predicated on Defendants' submission of Medicare and Medicaid claims rendered in violation of the anti-kickback statute (the AKS) for federal health care programs, 42 U.S.C. § 1320a-7b, and the Stark Laws (Stark), 42 U.S.C. § 1395nn. Relators contend that Citizens entered into improper financial relationships with and gave kickbacks to physicians in order to induce them to refer patients for medical treatment at the hospital. Specifically, Relators make allegations concerning over two dozen individual physicians of at least six different specialties and practice groups: (i) physicians working at the hospital's emergency room; (ii) cardiologists; (iii) hospitalists; (iv) gastroenterologists; (v) urologists working as part of a lithotripsy group; and (vi) other physicians of unstated specialties. With varying levels of detail, Relators allege that each group of physicians entered into agreements with Citizens under which they received additional compensation or other benefits in exchange for referring patients to the hospital.

4

Second, Relators allege FCA violations predicated on Defendants' submission of Medicare and Medicaid claims rendered in violation of Texas's ban on the corporate practice of medicine.  Three of the above groups of physicians— the emergency room physicians, the cardiologists, and the hospitalists—are employees of Citizens, which Relators contend is a violation Tex. Occ. Code Ann. § 165.156.  Third, Relators contend that Defendants violated the FCA "directly" by knowingly submitting Medicare and Medicaid claims for unnecessary or worthless medical services.  Fourth, Relators allege violations predicated on Defendants' false certification of compliance with one of Medicare's conditions of participation, 42 C.F.R. § 482.12(a)(6), which requires the governing body of a hospital to "[e]nsure that the criteria for selection [of medical staff] are individual character, competence, training, experience, and judgment."  *Id.*  Fifth and finally, Relators argue that Defendants are liable under 31 U.S.C. § 3729(a)(1)(C) for conspiring to violate the FCA.

## II.   LEGAL STANDARDS

### A. Standard of Review

Federal Rule of Civil Procedure 12(b)(6) allows dismissal if a plaintiff fails to state a claim upon which relief may be granted.  Fed. R. Civ. P. 12(b)(6).  In evaluating a Rule 12(b)(6) motion, the "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"  *Martin K. Eby*

*Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (quoting *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999)). The court does not look beyond the face of the pleadings to determine whether the plaintiff has stated a claim. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). To survive a motion to dismiss, a claim for relief must be "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

FCA cases are subject to additional pleading requirements under Rule 9(b). *See United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009) (applying Rule 9(b) to the FCA). The rule requires relators to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To meet this standard, the plaintiff must "at a minimum . . . set forth the who, what, when, where, and how of the alleged fraud." *United States ex rel. Steury v. Cardinal Health, Inc.* (*Steury I*), 625 F.3d 262, 266 (5th Cir. 2010) (citations and internal punctuation omitted). However, the Fifth Circuit has held that the rule is not a "straitjacket" and that a relator's complaint, "if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Grubbs*, 565 F.3d at 190. And Rule 9(b) provides that any state-of-mind requirement for a fraud claim "may be alleged generally." Fed. R. Civ. P. 9(b); *see also City of Clinton v. Pilgrim's*

6

*Pride Corp.*, 632 F.3d 148, 154 (5th Cir. 2010).

### B. Statutory Framework

Before diving into the specifics of the motions to dismiss, it is helpful to briefly review how the FCA works in combination with other laws, particularly the AKS and Stark. The FCA, initially enacted in 1863 at the request of President Lincoln to curb fraud by civilians supplying the Union Army during the Civil War, is "intended to protect the Treasury against the hungry and unscrupulous host that encompasses it on every side." *Grubbs*, 565 F.3d at 184 (quoting S. Rep. No. 99-345, at 11 (1986)). An FCA suit may be brought either by the United States or, under the statute's *qui tam* mechanism, by a private relator with original knowledge of wrongdoing. *See* 31 U.S.C. § 3730(a)–(b).

Regardless whether suit is brought by the United States or by a relator, the FCA's main substantive provisions subject to civil liability any person who "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or] (C) conspires to commit a violation of [the FCA]." 31 U.S.C. § 3729(a)(1)(A)–(C). To properly plead a violation of the FCA, the United States or a relator must plead "(1) a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that is presented to the

Government." *Steury I*, 625 F.3d at 267.

Some of the prototypical claims actionable under the FCA are those in which the claimant did not perform the service he requests compensation for or did perform the service but overcharged the government. *See, e.g.*, *United States ex rel. El-Amin v. George Wash. Univ.*, 522 F. Supp. 2d 135, 141 & n.5 (D.D.C. 2007) (citation omitted) (discussing liability for submitting claims for work not performed); *United States ex rel. Hafter v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1164 (10th Cir. 1999) (discussing overcharging as "the typical False Claims Act suit"). But the FCA's reach is not limited to these claims that are false on their face. Under some circumstances, accurate claims submitted for services actually rendered may still be considered fraudulent and give rise to FCA liability if the services were rendered in violation of other laws. *See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997); *see generally United States ex rel. Steury v. Cardinal Health, Inc.* (*Steury II*), 2013 WL 4436264, at *5-6 (5th Cir. Aug. 20, 2013) (Higginson, J., concurring) (noting the FCA's distinction between "false" and "fraudulent" claims and urging courts to reframe FCA case law by "using traditional, common-sense understandings of those terms"). When "the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies

compliance with that statute or regulation." *Thompson*, 125 F.3d at 902.    Thus, a defendant's violation of a law on which the government conditions payment may serve as a "predicate" violation that invokes FCA liability.

In the healthcare context, two laws that often serve as FCA predicates are the AKS and Stark.  The AKS provides criminal penalties for "knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual to a person for the furnishing . . . of any item or service for which payment may be made in whole or in part under a Federal health care program."   42 U.S.C. § 1320a-7b(b)(2).   Stark bars entities from submitting claims to federal health care programs if the services forming the basis of the claims were furnished pursuant to referrals from physicians with which the entities had a financial relationship.  *See* 42 U.S.C. § 1395nn(a)(1).  Because compliance with the AKS and Stark is a condition of payment for Medicare and Medicaid, claims submitted for services rendered in violation of these statutes may be "false or fraudulent" for purposes of the FCA.  *See Thompson*, 125 F.3d at 901–903; *see also United States ex rel. King v. Solvay, S.A.*, 823 F. Supp. 2d 472, 506 (S.D. Tex. 2011) (collecting cases in which AKS violations served to render claims false under the FCA).

As noted, Relators in this case allege "direct" FCA liability for Defendants' alleged submission of claims for worthless medical services, as well as FCA liability predicated on violations of the AKS, Stark, and other laws.  The Court discusses each of these allegations below.

### III.   CITIZENS MEDICAL CENTER'S MOTION TO DISMISS

The Court first turns to the hospital's motion to dismiss, *see* Docket Entry No. 53.  It raises general arguments that would defeat all or most of Relators' claims, as well as attacks on the sufficiency of the pleadings that relate to the actions of particular physicians.  To the extent these same issues apply to the individual defendants, the analysis below will also govern the disposition of their motion to dismiss, *see* Docket Entry No. 54).  After reviewing the hospital's defenses, the Court will address the separate issue that Campbell and Brown raise in their motion: whether the claims asserted against them must also clear a qualified immunity hurdle.

#### A. AKS and Stark Allegations

Concerning the AKS and Stark-based claims that predominate, Citizens makes several arguments that apply broadly to all groups of physicians, including that (i) all of the claims fail because Relators have failed to plead that Citizens certified compliance with those laws, as is required for FCA liability to attach; (ii) the AKS-based claims fail because Relators have not pleaded that the kickbacks

actually induced physicians to refer patients for treatment at the hospital; and (iii) the Stark-based claims for services rendered pursuant to Medicaid fail because Stark is not directly applicable to private Medicaid providers. In addition, Citizens argues that each of Relators' specific allegations relating to the different groups of physicians is insufficient to state a claim with particularity under Rule 9(b).

1. *General Arguments*

**a. Certification Requirement**

Citizens argues that all of the FCA allegations based on violations of the AKS and Stark must be dismissed because Relators have failed to plead with particularity that Citizens certified compliance with those laws when it submitted claims to Medicare and Medicaid.  As noted above, the general rule is that a defendant's violation of a separate law can only serve as a predicate to FCA liability when "the government has conditioned payment of a claim upon a claimant's certification of compliance with" that law, and the claimant "falsely certifies compliance with that statute or regulation." *Thompson*, 125 F.3d at 902. Citizens contends that the Relators' certification allegations are deficient like those in a recent unpublished Fifth Circuit case, *United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 2013 WL 1749328 (5th Cir. Apr. 3, 2013) (per curiam). In *Nunnally*, the court found insufficient an allegation that the defendant was "periodically either certifying in writing or impliedly certifying to the Medicare

11

program that it complied with all of Medicare's program rules, regulations, and laws applicable thereto." *Id.* at \*3 (internal brackets omitted).

But Relators' extensive allegations concerning certification are nothing like the conclusory pleading in *Nunnally*. The complaint provides extremely detailed allegations concerning how Citizens allegedly certified its compliance with the AKS and Stark. *See, e.g.*, Docket Entry No. 49 at ¶¶ 20, 59–64 & nn. 4, 24 (explaining how Citizens allegedly falsely certified a number of different forms, including CMS provider agreements, Medicare enrollment application Form CMS 855-A's, and the hospital's annual cost reports, and quoting the language of some of these forms in which Citizens expressly certified compliance with the AKS and Stark); Docket Entry No. 49-32 (providing example of a form submitted by Citizens certifying compliance with the AKS and Stark). The hospital contends in its reply that pleading the existence of annual cost reports and CMS Form 855-A's is insufficient for certification purposes because these forms are publicly available on the internet. *See* Docket Entry No. 74 at 7–8. But, as Relators correctly point out, numerous courts have held that allegations referring to just such forms are sufficient to plead certification as required for FCA liability. *See* Docket Entry No. 68 at 41 & n. 153 (citing *Thompson*, 125 F.3d at 902; *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 n.6 (5th Cir. 2004); *United States v. Health Alliance of Greater Cincinnati*, 2008 WL 5282139 (S.D. Ohio Dec. 18,

2008)).  The Third Amended Complaint's allegations concerning certification pass muster.[3]

### b.  Requirement for Pleading Inducement Under the AKS

The second general argument the hospital makes is that all of Relators' AKS-based claims are flawed because they have not pleaded that any specific referrals were actually induced by the various financial incentives that Citizens provided to the different physicians.  And such inducement would be unlikely, Citizens contends, because it is one of only two hospitals in Victoria.  *See, e.g.*, Docket Entry No. 53 at 1, 15–16, 21–22.  This argument also rests on a passage from *Nunnally*, in which the court stated that "actual inducement is an element of the AKS violation, and [relator] must provide reliable indicia that there was a kickback provided in turn for the referral of patients."  *Id.* at *3 (citation omitted). Relators and the United States argue in response that the inducement element of the AKS is an intent requirement, requiring only the allegation that Citizens intended to induce referrals by making kickbacks, rather than a causation one requiring a showing that specific referrals were actually induced as a result of the kickbacks.

---

[3] Additionally, all of Relators' AKS-predicated FCA allegations based on claims submitted after the 2010 enactment of the Patient Protection and Affordable Care Act, which amended the AKS to include the express provision that "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]," may proceed without any certification by Defendants.  42 U.S.C. § 1320a-7b(g); *see King*, 823 F. Supp. 2d at 505–07.

This issue turns on the interplay between the FCA and the AKS.  On its own, the AKS does not require actual inducement.  The statute makes it unlawful to pay kickbacks "to any person to induce such person . . . to refer an individual" for reimbursable services.  42 U.S.C. § 1320a-7b(b)(2)(A).  The AKS's plain language thus makes it unlawful for a defendant to pay a kickback with the intent to induce a referral, whether or not a particular referral results.  Case law thus consistently treats the AKS's inducement element as an intent requirement.  *See, e.g.*, *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998); *United States v. McClatchey*, 217 F.3d 823, 834-35 (10th Cir. 2000) (both treating the inducement requirement as an intent element in rejecting the position that a defendant's sole motivation in making payments must be to induce referrals).  *Nunnally*'s statement that "actual inducement is an element of the AKS violation," *see Nunnally*, 2013 WL 1749328, at *3, thus appears at odds with both the language of the AKS and precedent applying that statute.  It also turns out to be at odds with *Nunnally* itself.  In the very next line after the statement Defendants quote, the Fifth Circuit stated that pleading "reliable indicia" of actual inducement required alleging only "that [the defendant] knowingly paid remuneration to specific physicians in exchange for referrals"—the commonly accepted understanding of the AKS's inducement requirement.  *Id*.  In any event, as an unpublished opinion, *Nunnally* does not bind this Court.

14

But concluding that the AKS does not have an "actual referral" causation requirement does not end the inquiry.   Cases like *Davis* and *McClatchey* are criminal prosecutions for stand-alone AKS violations.   *Davis*, 132 F.3d at 1094; *McClatchey*, 217 F.3d at 826.   As previously discussed, the relators in this FCA case must also establish that claims rendered fraudulent by an underlying AKS violations were "presented to the Government."   31 U.S.C. § 3729(a)(1)(A)–(C); *Steury I*, 625 F.3d at 267.   To establish presentment for an AKS-based liability theory, to what extent does a relator have to tie a particular claim submitted to the government to a particular kickback?   The Court need not decide that issue, on which little case law apparently exists, at this juncture in the case.   As a matter of pleading standards, *Grubbs* establishes that Relators need not identify particular claims resulting from the kickback scheme.   *Grubbs*, 565 F.3d at 190.   As the *Grubbs* court noted, requiring a relator to plead the "exact dollar amounts, billing numbers, or dates" prior to discovery—as Citizens seem to argue is necessary to plead an AKS-predicated FCA violation—would be "significantly more than any federal pleading rule contemplates."   *Id*.   As long as Relators plead with particularity that Citizens made kickbacks with the intent of inducing referrals, and they plead "particular details of a scheme . . . paired with reliable indicia that lead to a strong inference that claims were actually submitted," the separate elements of the AKS and FCA are satisfied.   *Id*.   The Court will consider below whether

15

Relators have done that for the different sets of physicians included in the complaint.

### c.  Applicability of Stark to Medicaid Claims

Another argument Citizens makes concerns the allegations that it violated the FCA by submitting claims to Medicaid in violation of Stark.  According to Citizens, it cannot be liable under the FCA for these acts because it, as a private Medicaid provider, submits claims to Texas rather than to the United States.  It also argues that liability cannot be found because there are no regulations or guidance explaining how Stark is supposed to affect private Medicaid providers.

Although Stark originally applied only to Medicare claims, it was later expanded to apply to Medicaid claims.  *See* 42 U.S.C. § 1396b(s) (barring states from receiving federal reimbursements for Medicaid expenditures if the reimbursements would be blocked under Stark as Medicare expenditures).  Thus, the only difference between holding a defendant liable for Stark-predicated FCA violations based on Medicare claims and those based on Medicaid claims is that the former are submitted to the federal government directly, while the latter are submitted to the states, which in turn receive federal funding to help pay the claims.  The hospital's arguments on this point fail because it does not matter, for purposes of the FCA, whether a claim is submitted to an intermediary or directly to the United States.  *See* 31 U.S.C. § 3729(b)(2) (defining an FCA "claim" to include

16

requests for payments submitted "to a contractor, grantee, or other recipient, if the money . . . is to be spent or used . . . to advance a Government program or interest"); *see also United States v. Rogan*, 459 F. Supp. 2d 692, 717 (N.D. Ill. 2006) (citation omitted) ("Medicaid claims submitted to a state are also 'claims' to the federal government under the FCA.").

Moreover, even if its own Medicaid claims to Texas did not create FCA liability, Citizens could still be liable for causing Texas to submit a claim in violation of Stark.  Causing a third party to present a false claim or use a false record creates FCA liability just as if the defendant had presented or used the claim or record itself.  *See* 31 U.S.C. § 3729(a)(1)(A)–(B); *United States v. Caremark, Inc.*, 634 F.3d 808, 814–17 (5th Cir. 2011) (holding that the similarly worded language of the pre-2010 FCA allowed a defendant to be liable because "its false statements caused the state Medicaid agencies to make false statements to the Government").  A number of courts have used this rationale in allowing Stark-predicated FCA liability for claims submitted by private Medicaid providers.  *See, e.g.*, *Rogan*, 459 F. Supp. 2d at 722 (holding that Medicaid claims for services rendered in violation of the Stark Act were false claims); *United States v. Halifax Hosp. Med. Ctr.*, 2012 WL 921147, at *4 (M.D. Fla. Mar. 19, 2012) (holding sufficient to survive dismissal the Government's theory of FCA liability that "the Defendants caused the state of Florida to submit false claims to the federal

17

government for services furnished on the basis of improper referrals"). The hospital's argument fails.

### 2. *Claims Against Specific Groups of Physicians*

The Court next addresses the sufficiency under Rule 9(b) of Relators' different AKS- and Stark-predicated FCA allegations. As noted above, Relators' allegations center on six different groups of physicians that referred patients for treatment at Citizens.

### a. **ER Physicians**

The first group, a prime focus of Relators' complaint, is the group that practiced at the hospital's emergency room. Relators allege that the ER physicians, including twelve doctors identified by name, received illegal bonuses for referring ER patients to the hospital's Chest Pain Center. *See* Docket Entry No. 49 ¶¶ 23–25 & nn. 5–15. According to Relators, Citizens did this because "[t]he Chest Pain Center generates substantial revenue from nuclear stress tests performed on patients." *Id.* ¶ 24. To increase these revenues, Citizens allegedly "knowingly and willfully pays the ER Physicians illegal bonuses based on the volume, value, and revenue generated from the ER Physicians' patient referrals to [the hospital's] Chest Pain Center." *Id.* ¶ 23. Half of the Chest Pain Center's revenues, including revenues derived from Medicare and Medicaid patients, were supposedly paid to the referring ER Physicians as bonuses. *Id.*; *see also* Docket

Entry No. 49-2 (attached document purporting to be the hospital's ER physician compensation form, showing that part of the ER physicians' compensation package was for "Chest Pain Observation (50% of specific reimbursement)").

Relators allege that the ER physicians as a group received over $647,000 in illegal bonuses between September 2008 and March 2010, with four doctors identified by name receiving bonus payments ranging between $3,000 and $16,000 per quarter to between $10,000 and $20,000 for the month of August 2010. Docket Entry No. 49 ¶ 24.  They also identify two alleged shell companies that Citizens used to funnel bonus payments to the ER physicians and argue that this act of obfuscation demonstrates intent to violate the law.  *Id.* ¶ 25.  Moreover, Relators allege that the ER physicians would surreptitiously refer Relators' patients for treatment at the Chest Pain Center because Relators often refused to make such referrals themselves.  *Id.* ¶¶ 24.

Relators allege that the bonus payments "induced and incentivized the ER Physicians to further increase the number of Medicare and Medicaid patients they referred from [the hospital's] emergency room to the Chest Pain Center."  *Id.*  In exacting detail comprising eleven pages of their complaint, Relators provide 28 examples of specific Medicare or Medicaid patients that the ER physicians referred for treatment at the Chest Pain Center, often in violation of Relators' patient care instructions.  *Id.* ¶ 54.   Relators allege that the Chest Pain Center has seen a

significant increase in the number of Medicare and Medicaid patients undergoing treatment there since the bonus program was initiated, including a 12% increase in patients from 2008 to 2009.  *Id.* ¶ 23.

Citizens argues that the ER physician allegations fail to state a claim for three reasons: 1) the AKS inducement element is not specifically pleaded, 2) Relators have not pleaded an improper financial relationship or improper referrals violating Stark, and 3) the ER physicians are exempted from complying with the AKS and Stark because they fall within those statutes' exceptions for bona fide employees.  *See* Docket Entry No. 53 at 8–16.

The first argument was rejected above.  To plead FCA liability predicated on AKS violations, Relators need only allege the particular details of a scheme to offer kickbacks in order to induce referrals, coupled with reliable indicia leading to a strong inference that claims based on such referrals were actually submitted to Medicare or Medicaid.  *See Grubbs*, 565 F.3d at 190; *see also United States ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 768–69 (S.D. Tex. 2010) (citation omitted) (noting that the Rule 9(b) standard allows relators to plead "representative examples of specific fraudulent acts conducted pursuant to [a] scheme").  Relators' meticulous allegations more than satisfy this standard.

The second argument concerning how the ER physicians entered into improper financial relationships under Stark in exchange for referrals is also

rejected, as it is properly pleaded by Relators.  Stark defines a covered financial relationship as "a compensation agreement . . . between the physician . . . and the entity."  42 U.S.C. § 1395nn(a)(2)(B).  Relators' complaint alleges a pervasive scheme in which the ER physicians received bonus payments in exchange for making referrals to the hospital's Chest Pain Center, and specifically alleges amounts received by the group as a whole and by several individual physicians. Accepting the hospital's argument that the financial relationships are insufficiently pleaded because Relators have not made allegations concerning each individual physician's compensation—an argument that ignores the fact that Relators have done just that for at least four of the ER physicians, *see* Docket Entry No. 49 ¶ 24—would require this Court to hold Relators to their ultimate burden of proof at the pleading stage.

Likewise, the hospital's argument that the 28 individual referrals alleged are exempt under Stark's personal services exception, *see* 42 U.S.C. § 1395nn(h)(5); 42 C.F.R. § 411.351 (exception from liability for referrals for which the services rendered were personally performed by the same physician who made the referrals), ignores two critical facts.  On one hand, it does not cover all the allegations, because three of the 28 individual patients that the ER physicians referred to the Chest Pain Center were then treated by other physicians.  *See* Docket Entry No. 49 ¶ 54 (for patients K.H., R.C., and R.G.).    More

fundamentally, even if the referring physicians personally performed the services, it fails to account for the fact that the facility fee portion of each bill is considered a Stark referral.  *See United States ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394, 406–07 (4th Cir. 2012) (adopting the Health Care Financing Administration's interpretation that "the personal services exception does not extend to a facility fee a hospital bills for a facility component resulting from a personally performed service").   Relators have properly pleaded financial relationships and referrals giving rise to Stark liability.

The hospital's final argument concerning the ER physician allegations is that, because the ER physicians were employed by Citizens beginning in 2010, all Medicare and Medicaid claims submitted after that point fall within the AKS's and Stark's employment exceptions.  *See* Docket Entry No. 53 at 12–15.  The AKS's employment exception states that no violation of the statute will occur for "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services."   42 U.S.C. § 1320a-7b(b)(3)(B).   Stark's employment exemption applies to "[a]ny amount paid by an employer to a physician . . . who has a bona fide employment relationship with the employer for the provision of services" with several qualifications.  42 U.S.C. § 1395nn(e)(2).  Those qualifications include that the employment be for identifiable services, the amount of the remuneration paid

22

be consistent with the services' fair market value and not be determined in a manner that takes into account the volume or value of the referrals, and the remuneration be commercially reasonable. *Id.*

Relators correctly argue in response, however, that the AKS and Stark employment exemptions are affirmative defenses on which Citizens has the burden of proof. *See United States v. Robinson*, 505 F. App'x 385, 387 (5th Cir. 2013) (per curiam) (stating that the AKS's employment exception is an affirmative defense); *United States v. Vernon*, 2013 WL 3835831, at *32–33 (11th Cir. July 26, 2013) (same); *United States ex rel. Kosenske*, 554 F.3d 88, 95 (3d Cir. 2009) ("Once the plaintiff or the government has established proof of each element of a violation under the [Stark] Act, the burden shifts to the defendant to establish that the conduct was protected by an exception." (citing *Rogan*, 459 F. Supp. 2d at 716)). "[A]ffirmative defenses are generally not appropriate grounds on which to dismiss a complaint under a Rule 12(b)(6) motion," unless a successful defense is apparent from "the facts pleaded and judicially noticed." *Johnson v. Deutsche Bank Nat. Trust Co.*, 2013 WL 3810715, at *8 (N.D. Tex. July 23, 2013) (quoting *Hall v. Hodgkins*, 305 F. App'x. 224, 227-28 (5th Cir. 2008)).

The facts alleged in the complaint do not satisfy Citizens' requisite burden of proof for its affirmative defenses. Even without addressing Relators' argument that the ER physicians were not bona fide employees because the Texas law

against the corporate practice of medicine barred such employment, there are a number of issues that may prevent Citizens from successfully using the defenses. The AKS's employment exemption only excepts compensation paid to "bona fide" employees, who are defined under 26 U.S.C. § 3121(d)(2) as "individual[s] who, under the usual common law rules applicable in determining the employer-employee relationship, ha[ve] the status of an employee." 26 U.S.C. § 3121(d)(2); *see Robinson*, 505 F. App'x at 387.  Thus, whether the ER physicians count as bona fide employees under the AKS depends on Citizens meeting its burden of showing that the common law factors—which include whether Citizens had the right to control the manner and means of the physicians' work, the method of payment, and Citizens' control over the physicians' work hours—support such a conclusion. *See Robinson*, 505 F. App'x at 387–88 (analyzing these factors and finding that two individuals were not bona fide employees for purposes of the AKS).  And with respect to Stark's employment exception, the ER physicians' compensation must not vary with the volume or value of their referrals.  42 U.S.C. § 1395nn(e)(2).  But that is exactly what Relators allege occurred.  The alleged referral scheme, which must be taken as factual for purposes of the motions to dismiss, causes the ER physicians' compensation to vary with the number of referrals and thus takes Citizens right out of Stark's safe harbor.  All of the alleged FCA violations predicated on Citizens violating the AKS and Stark through its

financial arrangements with the ER physicians survive the motion to dismiss.

### b. Cardiologists

Relators also allege that Citizens operated a separate kickback scheme with a group of cardiologists. Relators identify five cardiologists, including Defendant Dr. William Campbell, Jr., that Citizens employed at above-market salaries and provided with various other financial incentives in order to induce them to refer their patients for cardiac surgery and other services at the hospital. *See* Docket Entry No. 49 ¶¶ 27–32, 46, 75–78. The list of incentives and benefits allegedly provided to the cardiologists is lengthy. According to Relators, three of the cardiologists—Defendant Dr. Campbell, as well as Drs. Krueger and Oakley—saw their salaries more than double after being employed at Citizens in 2007, even though market conditions did not justify the increases. *See id.* ¶ 76 (alleging that these three doctors' combined salary rose from $630,000 in 2006 to $1,400,000 in 2007, the first year of their employment at Citizens). Relators also allege that the five cardiologists were provided with benefits including malpractice coverage, health and dental insurance, dictation services, paid advertising, *see id.* ¶¶ 75–76, and that Citizens rented office space to them at below-market rates. *See id.* ¶ 29. As an example of the rental practices, Relators state that "Dr. Campbell entered into a lease agreement with [Citizens] on September 17, 2007, in which he rents 192 square feet of office space at $1.12 per square foot per month . . . which

includes janitorial services and telecommunication services," and that "this is well below fair market rate for that type of office space in that location." *Id.* As a result, to give just several examples of Relators' allegations, "Dr. Campbell's and his partners' referrals to [Citizens] have increased dramatically since 2007, when they entered into the discounted lease agreement with [Citizens]"; Dr. Campbell stopped referring Medicare and Medicaid patients for heart surgery at other hospitals and instead referred nearly all of them to Citizens; and Dr. Krueger admitted that he has kept as many of his patients as possible at Citizens since becoming employed there. *Id.* ¶ 30.

Citizens refers to these benefits as "commonplace." Indeed, without more, there is nothing improper about paying or receiving such benefits. But Relators allege that Citizens gave the cardiologists all these benefits in order to induce them to refer their patients for services at Citizens, particularly for cardiac surgery with the hospital's exclusive cardiac surgeon, Dr. Yahagi. *See id.* According to Relators, the cardiologists have been "extremely valuable to [Citizens] because of their patient referrals," and Citizens has consequently turned "enormous profits" from the cardiologists' Medicare and Medicaid referrals. *Id.* ¶¶ 30, 36. Additionally, Relators claim that the cardiologists' office practices have systematically lost money even while Citizens has prospered, including losses of $400,000 in 2008 and $1,000,000 in 2009, "but [Citizens] continues to employ

26

them because of the volume and value of their patient referrals." *Id.* ¶¶ 36, 81. Relators, practicing cardiologists themselves, also allege that Citizens and Defendant Brown instructed them to refer their own patients to Citizens for surgery by Dr. Yahagi, and that Citizens and Brown attempted to revoke their hospital privileges in favor of Dr. Campbell and the other cardiologists when Relators refused to do so. *See id.* ¶¶ 37–47, 83–85.

In response to these allegations, Citizens raises many of the same arguments that it brought against the ER physician allegations, including its contentions regarding actual inducement under the AKS and the AKS and Stark employment exceptions. *See* Docket Entry No. 53 at 16–17, 20–22. For the reasons already discussed, these particular arguments serve it no better in this new context. Citizens also argues that Relators' allegations are insufficient because they do not allege that the cardiologists actually made above-market income and, instead, that an expert report they rely on shows that the cardiologists' salaries are below the national median. *Id.* at 24–27. They thus argue Relators have not sufficiently alleged that the cardiologists are receiving improper remuneration as is required for AKS- and Stark-based liability.

Given the Rule 12 posture in which Relators allegations must be taken as true, the Court disagrees. Relators have made several allegations that, if true, provide a strong inference of the existence of a kickback scheme. Particularly, the

Court notes Relators' allegations that the cardiologists' income more than doubled after they joined Citizens, even while their own practices were costing Citizens between $400,000 and $1,000,000 per year in net losses. Even if the cardiologists were making less than the national median salary for their profession, the allegations that they began making substantially more money once they were employed by Citizens is sufficient to allow an inference that they were receiving improper remuneration. This inference is particularly strong given that it would make little apparent economic sense for Citizens to employ the cardiologists at a loss unless it were doing so for some ulterior motive—a motive Relators identify as a desire to to induce referrals. Relators' allegations are more than sufficient to satisfy Rule 9(b) as interpreted by *Grubbs*. The AKS- and Stark-predicated FCA allegations concerning the cardiologist group survive the motion to dismiss.

### c. Hospitalists

The third group of physicians that Relators make allegations concerning is a group of four hospitalists. A hospitalist is "a physician who specializes in seeing and treating other physicians' hospitalized patients in order to minimize the number of hospital visits by the patients' regular physicians." *Hospitalist Definition*, Merriam-Webster, http://www.merriam-webster.com/dictionary/ hospitalist (last visited Sept. 19, 2013). Relators allege that "the hospitalists and their employed physician assistants illegally refer the [Relators'] patients to

28

[Citizens] and the [Citizens] Cardiologists in exchange for employment benefits and a salary, despite the patient's preexisting relationship with the [Relators]." Docket Entry No. 49 ¶ 37.  Relators also provide two examples of situations in which the hospitalists or their assistants referred patients to the Citizens cardiologists in exchange for "employment and related benefits."  *Id.*  Finally, Relators allege that Citizens "has knowingly billed for and obtained payments from Medicare and Medicaid for medical services provided under these illegal contracts."  *Id.*  Relators also make brief references to the hospitalists throughout their complaint. *See, e.g.*, *id.* ¶¶ 102, 106.

Relators' allegations regarding the hospitalists fail to satisfy Rule 9(b)'s specific pleading requirements because they do not provide specific details explaining how the hospitalists are engaged in a scheme that violates the AKS and Stark, and thus the FCA.  Although they do allege two specific instances in which the hospitalists or their assistants made referrals in exchange for improper benefits, Relators' sparse allegations do not explain how these incidents fall into a larger scheme or plan to violate the FCA.  *Grubbs* makes clear that it is the scheme, rather than individual instances of fraudulent claims, that an FCA relator must plead with particularity.  *Grubbs*, 565 F.3d at 190.  This is why, as discussed above, Relators did not have to specifically allege the presentment of particular claims by the ER physicians and cardiologists.  "Standing alone, raw bills—even

with numbers, dates, and amounts—are not fraud without an underlying scheme to submit the bills for unperformed or unnecessary work.  It is the scheme in which particular circumstances constituting fraud may be found that make it highly likely the fraud was consummated through the presentment of false bills."  *Id*.  But though the *Grubbs* court relaxed the standard for pleading presentment of false claims by holding it sufficient for a relator to merely plead "reliable indicia" that claims were submitted, it did not relax the pleading requirements for alleging the existence of the more crucial element—the scheme.  *See id.* (requiring the pleading of "particular details of a scheme to submit false claims").

And thus the hospitalist allegations fail.  While Relators painted a detailed picture of how Citizens had created a kickback scheme with the ER physicians and cardiologists—a picture that included an explanation of how those doctors would be illegally compensated, and how Citizens would benefit from the scheme—they have not done the same with the hospitalists.  The Court is left to speculate how the hospitalists are receiving improper compensation, by what means Citizens is attempting to induce them to make referrals, or how Citizens is supposed to benefit from the referrals.  Because these conclusory allegations are insufficient to survive Rule 9(b), the Court will dismiss the AKS- and Stark-predicated FCA allegations concerning the hospitalists.

### d.  Gastroenterologists

30

The next set of physicians is the gastroenterologists.  Relators allege that Citizens is allegedly running a bonus scheme with these physicians similar to that which it is engaged in with the ER physicians.  Citizens has several gastroenterologists on staff who operate a colonoscopy screening program at the hospital, for which they and the hospital properly bill Medicare and Medicaid.  *See* Docket Entry No. 49 ¶ 109.  Relators allege, however, that Citizens also pays each of the gastroenterologists "an Additional Bonus Payment of approximately $1,000 per day . . . for each day per month that the physician participates in [the hospital's] screening program." *Id.* ¶ 110.  One of the gastroenterologists allegedly receives $4,000 per month under this program, while another receives $2,000 or $3,000 a month.  *Id.* ¶ 112.  According to Relators, there is no additional work required by or responsibilities imposed on the physicians receiving the bonus, even though it is styled as a "directorship fee" and the physicians receive the title of "director" for the day they receive the fee.  *Id.* ¶ 111.  Defendant Brown allegedly has complete discretion to award screening days to physicians, and "assigns disproportionate time to various participating physicians based on their patient referrals to [Citizens]." *Id.* ¶ 110.  Citizens allegedly runs this program for the sole purpose of "induc[ing] participating physicians to use [the hospital's] services for their procedures, which allows [Citizens] to bill and receive payment from Medicare and Medicaid, in exchange for the monthly bonus payments." *Id.* ¶ 111.

31

As with the other physician groups, Citizens contends that the gastroenterologist allegations are insufficient under Rule 9(b) because Relators do not specifically plead actual inducement or specific examples of referrals made, that the bonus payments are above fair market value, or that the amount of money paid varied based on the volume or value of referrals made. *See* Docket Entry No. 53 at 26–28. Although it is true that Relators provide less detail with respect to the gastroenterologists than they do with the ER physicians and the cardiologists, the Court nonetheless holds that these allegations state a claim. Unlike with the hospitalist allegations, Relators have pleaded the specifics of the alleged scheme: that Citizens and Brown award screening days, and therefore $1,000 daily bonus payments, to gastroenterologists based on their referrals to Citizens. Other courts have held that alleging schemes under which physicians receive work time and financial benefits (even in the absence of direct compensation) may be sufficient to plead AKS- and Stark-predicated FCA violations under Rule 9(b). *See, e.g.*, *Health Alliance*, 2008 WL 5282139, at *7 ("Plaintiff has adequately pleaded Defendants set up a system whereby Ohio Heart physicians received something of value, time in the heart station . . . in exchange for referrals. . . . Here, the government has pleaded facts showing that time in the heart station was essentially money, and further, that Defendants' system excluded cardiologists from the benefit of heart station time when their referral levels did not qualify them for such

time.").

Moreover, the case Citizens relies on to argue that Relators have failed to plead actual referrals, *United States ex rel. Dennis v. Health Mgmt. Associates, Inc.*, 2013 WL 146048 (M.D. Tenn. Jan. 14, 2013), relied on a more stringent standard for pleading presentment of false claims, a standard that the *Grubbs* court expressly rejected. *Compare id.* at *14–17 (applying the more stringent pleading standard originally promulgated by the Eleventh Circuit in *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002)), *with Grubbs*, 565 F.3d at 186–90 (discussing the *Clausen* standard in detail and ultimately rejecting it in favor of the more lenient "reliable indicia" standard). The Court thus holds that the AKS- and Stark-predicated FCA allegations concerning the gastroenterologists survive the motion to dismiss.

### e.  Urologists and the Lithotripsy Group

Relators also allege that Citizens engaged in a kickback scheme with three urologists offering lithotripsy and cystoscopy procedures. Relators plead that Citizens entered into an exclusive contract for lithotripsy services with an entity named Matagorda Lithotripsy, LLP, owned by Drs. White and Manatt. *See* Docket Entry No. 49 ¶¶ 96–97. According to Relators, in addition to the normal bills the urologists properly submit to Medicare and Medcaid, Citizens would pay Matagorda Lithotripsy $2,500 for each procedure performed, of which the entity

would then pay $1,000 to White and Manatt. *Id.* ¶ 96. Citizens allegedly also provides office space to Drs. White and Manatt, and to a third urologist, Dr. Weiner, at below-market rates. *Id.* In exchange, the urologists "refer virtually all of their patients, including their Medicare and Medicaid patients, to [Citizens]" and refuse to perform procedures at the only other hospital in Victoria, DeTar Hospital. *Id.* ¶ 97. Relators also allege that the urologists transfer patients from DeTar to Citizens by performing consultations with numerous Medicare and Medicaid patients at DeTar and then discharging those patients in order to refer them to Citizens for the actual urology procedures. *Id.* ¶ 98. As examples, they allege that Dr. Weiner met with patients R.T. and P.R. at DeTar in October 2012 and March 2013, respectively, and then discharged them and referred them to Citizens for prostate and urology surgery. *Id.*

Citizens argues that these allegations are insufficient under Rule 9(b), and once again cites *Nunnally* and *Dennis* in support of its arguments. *See* Docket Entry No. 53 at 29–32. The Court rejects the hospital's arguments. Relators' allegations are sufficient under *Grubbs* because they have specifically pleaded the existence of a scheme to violate the FCA, including details that, taken as true, allow an inference that the urologists were, in essence, poaching patients from DeTar to increase their referrals at Citizens. Moreover, for these allegations, Relators have pleaded specific examples of Medicare patients that the urologists

34

referred to Citizens, thus going beyond what Rule 9(b) requires.  The AKS- and Stark-predicated FCA allegations based on the urologist and lithotripsy group allegations survive the motion to dismiss.

### f.  Other Physicians

Finally, Relators allege that Citizens is violating the AKS and Stark through its relationships with a number of other physicians who are not members of the aforementioned practice groups: Drs. Yahagi, Leggett, Espinosa, Llompart, and Seiler.  As noted, Dr. Yahagi is the hospital's exclusive cardiac surgeon.  The other four physicians are a family practitioner, an internal medicine physician, a pulmonologist, and an OB-GYN, respectively.  *See* Docket Entry No. 49 ¶ 93. Because the allegations concerning Dr. Yahagi are much more extensive than those concerning the other four physicians, the Court addresses Dr. Yahagi first.

Dr. Yahagi is one of the central figures in Relators' complaint, and many of Relators' allegations relate to him in some way.  As already discussed, according to Relators, he was the physician to whom the cardiologists were making referrals in exchange for kickbacks.  *See id.* ¶¶ 30, 32.  He also allegedly aided Citizens's retaliation against Relators when they refused to refer their patients to him.  *Id.* ¶¶ 40.  Moreover, as noted below, Dr. Yahagi is the prime target of Relators' allegations concerning unnecessary medical services; to briefly summarize many pages of allegations, they contend that he performed numerous worthless surgeries

so that Citizens could submit false claims, and that many of his patients died or suffered severe injuries after he operated on them.  *See id.* ¶¶ 70–73.

Of immediate relevance, Relators also make detailed allegations relating to AKS- and Stark-predicated FCA violations that Citizens supposedly committed by providing kickbacks and improper financial benefits to Dr. Yahagi.  They allege that Dr. Yahagi was the exclusive cardiac surgeon at Citizens, that he was offered and made use of free transcription services provided by Citizens on at least two specific occasions, that he received discounted rent at Citizens, and that Citizens placed billboards around Victoria that advertised the services of Dr. Yahagi and the cardiologists, at no expense to Dr. Yahagi.  *See id.* ¶¶ 34, 75, 87.  Relators allege that the free transcription services and the billboard advertisements were offered in order to induce Dr. Yahagi to refer his patients to the cardiology group when pre-surgery evaluations were required.  They also plead numerous occasions in which Dr. Yahagi referred the Relators' patients to the Citizens cardiologists instead of Relators in order to increase Citizens's revenues.  A typical example of Relators' allegations concerning Dr. Yahagi's actions is as follows:

> Patient M.R. (July 2009): The Medicare patient had lung surgery by Dr. Yahagi at [Citizens] in July 2009, and died three days after surgery in the hospital.  [Relator] was not called to consult on the patient before surgery despite the patient's family's request that [Relator] be called to evaluate the patient before surgery.  Instead, Dr. Yahagi referred the patient to [Citizens] and a [Citizens] Cardiologist for pre-surgery consulting in order to increase revenue for [Citizens] and to continue to receive illegal kickbacks in return.  Medicare was

knowingly billed in or around July 2009, and paid for this false and worthless claim.

*Id.* ¶ 70. Relators' allegations concerning Dr. Yahagi are sufficient to state a claim against Citizens for AKS- and Stark-predicated FCA violations.

Relators' allegations about Drs. Leggett, Espinosa, Llompart, and Seiler, however, are insufficient to satisfy Rule 9(b) and *Grubbs*. Relators list a number of allegedly improper payments and gifts that Citizens gave these four physicians, allegedly in return for referrals. *See id.* ¶¶ 93–95. These payments included an all-expenses-paid trip to New Orleans for a "leadership conference," discounted rent and refurbished office space, free medical care for one physician's injured son, and "free computers, EKG machines, flat screen televisions, furniture, and/or fish tanks." *Id.* ¶¶ 87, 93. However, although these allegations regarding remuneration are specific, particularly when compared to those regarding the hospitalists, which did not provide such detail, they do not fully explain how the alleged scheme concerning these physicians is supposed to work. Unlike with, for example, the ER physicians or the gastroenterologists, there are no details concerning whom the physicians referred their patients to at Citizens, or for what services. And unlike with the cardiologist allegations, which specified that Citizens makes a profit from the referrals for cardiac surgery with Dr. Yahagi even though the cardiologists themselves are a net loss for the hospital, there are no allegations here specifically explaining how Citizens is supposed to benefit from the referrals. Moreover,

37

Relators do not plead either specific examples of illegal referrals or reliable indicia creating an inference that such referrals occurred, as required by *Grubbs*.  Their only allegations on this point are conclusory ones, such as that "Dr. Leggett has referred Medicare and Medicaid patients to [Citizens] since May 1, 2011."  *Id.* ¶ 93.

These allegations are insufficient under Rule 9(b).  The Court will therefore dismiss the AKS- and Stark-predicated FCA allegations concerning Drs. Leggett, Espinosa, Llompart, and Seiler.

### B. Corporate Practice of Medicine Allegations

Relators also allege FCA violations predicated on Citizens's supposed violations of Texas's ban on the corporate practice of medicine, Tex. Occ. Code Ann. § 165.156.  That statute states that a "corporation commits an offense if [it] . . . indicates that [it] is entitled to practice medicine if [it] is not licensed to do so."  *Id.*  "Under the Medical Practice Act, when a corporation comprised of lay persons employs licensed physicians to treat patients and the corporation receives the fee, the corporation is unlawfully engaged in the practice of medicine."  *Gupta v. E. Idaho Tumor Institute, Inc.*, 140 S.W.3d 747, 752 (Tex. App.—Houston [14th Dist.] 2004, pet. denied).  Relators argue that Citizens is violating the ban by employing the ER physicians, the cardiologists, and the hospitalists, and that it thus violated the FCA by falsely certifying that it was in compliance with Texas law.

38

But even assuming that Citizens is engaged in the illegal corporate practice of medicine, Relators' FCA claims on this count fail because "[t]he FCA is not a general 'enforcement statute' for federal"—or state—"statutes, regulations, and contracts." *Steury I*, 625 F.3d at 268 (quoting *Thompson*, 125 F.3d at 902). Rather, for a legal violation to be a predicate for FCA liability, the defendant's compliance with that law must be a condition or prerequisite to payment. *Id.* "The prerequisite requirement recognizes that unless the Government conditions payment on a certification of compliance, a contractor's mere request for payment does not fairly imply such certification." *Id.*

Very few cases have analyzed whether a violation of a state law corporate practice of medicine doctrine may serve as a predicate to FCA liability. The closest case is *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993 (9th Cir. 2010), in which the Ninth Circuit, adopting the *Grubbs* court's interpretation of Rule 9(b), held that an alleged violation of Arizona's common law prohibition on the corporate practice of medicine could not serve as a predicate to FCA liability because the relator failed to allege "any statute, rule, regulation, or contract that conditions payment on compliance with state law governing the corporate practice of medicine." *Id.* at 1000.

Likewise here. Relators argue that the Fifth Circuit's decision in *Riley*, 355 F.3d at 378, serves as authority establishing that FCA violations may be predicated

on the violation of the corporate practice of medicine. But *Riley* is inapposite because the underlying violation in that case was that the defendant had used unlicensed physicians and unqualified individuals to provide services while falsely certifying that all services were provided by licensed professionals. *Id.* Relators have thus failed to cite any authority supporting the proposition that FCA liability can be predicated on violations of the ban on the corporate practice of medicine. Moreover, the certification that Relators claim was an express certification of compliance with the ban was actually a generic statement that Citizens was "familiar with the laws and regulations regarding the provision of health care services, and that the services identified . . . were provided in compliance with such laws and regulations." *See* Docket Entry Nos. 49 ¶ 20 n.4; 68 at 55. Because Relators provide no support for the legal theory they advance, and because Citizens did not expressly certify compliance with that law, the Court holds that the FCA allegations predicated on violations of the ban on the corporate practice of medicine must be dismissed.[4]

## C. Unnecessary or Worthless Services Allegations

Relators make detailed allegations that, at the behest of Citizens, various physicians, in particular Dr. Yahagi, knowingly provided patient care that they

---

[4] The Court thus need not address whether Citizens was actually in violation of Texas's ban on the corporate practice of medicine. *See Gaalla v. Citizens Medical Ctr.*, 2010 WL 5387603 (Dec. 17, 2010) (Jack, J.) (holding that the corporate-practice-of-medicine statute does not apply to a county owned hospital like Citizens).

knew was unnecessary or worthless in order to increase Citizens' revenues and their own income.  *See* Docket Entry No. 49 ¶¶ 54–55, 64, 70, 72–74, 87, 91–92. Citizens argues in response that Relators' allegations serve to plead only non-actionable, subjective disagreements between physicians about the proper treatments to give their patients, and thus that they are insufficient to satisfy Rule 9(b).  The Court disagrees.  The Fifth Circuit has made clear that "claims for medically unnecessary treatment are actionable under the FCA" and that such claims will be sufficiently pleaded if the relator alleges knowing misconduct on the part of the defendants.  *Riley*, 355 F.3d at 376–78.  Relators have done just that, and in painstaking detail.  The FCA allegations based on alleged false claims for unnecessary or worthless services survive the motion to dismiss.

### D. Medicare Condition of Participation Allegations

Relators also argue that Citizens violated the FCA by conditioning physician privileges at the hospital on economic criteria such as numbers of referrals, when they were instead required by a Medicare condition of participation to "[e]nsure the criteria for selection [of medical staff] are individual character, competence, training, experience, and judgment," 42 C.F.R. § 482.12(a)(6), and that they expressly certified compliance with that condition.  *See* Docket Entry No. 49 ¶¶ 100–101.

41

Failure to comply with a mere condition of participation, rather than a condition of payment, is inadequate for FCA liability to attach.  *See United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 382–83 (5th Cir. 2003).  In response, Relators argue that the express language of the CMS-855A forms that Citizens signed indicates that payment is conditioned on compliance with these conditions of participation.  *See id.* ¶ 100 n.30 (quoting the certification Citizens made reading "I understand the payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with . . . the provider's compliance with all applicable conditions of participation in Medicare").  In essence, Relators argue that the contractual language of the forms converts the conditions of participation into conditions of payment that can invoke FCA liability.

Citizens, however, cites case law that convincingly rejects Relators' argument.  *See, e.g.*, *United States ex rel. Wall v. Vista Hospice Care, Inc.*, 778 F. Supp. 2d 709, 721 (N.D. Tex. 2011) ("[I]f merely signing [the CMS-855A] converts a condition of participation into a condition of payment, then *every* hospice provider not fully complying with all conditions of participation may be held liable under the FCA, thus undermining the distinction between conditions of payment and participation, as well as Medicare's internal administrative structure to deal with violations of conditions of participation." (emphasis in original)).  The

Court finds *Wall*'s concern that Relators' argument would convert all conditions of participation into conditions of payment to be well-placed.   Accepting Relators' argument would allow FCA liability to attach any time a condition of participation is violated (even if, as in this case, the condition is a vague guideline requiring the defendant to "ensure" that medical staff are selected by various merit-based criteria) and could drastically expand the role of the courts in policing regulations in an area traditionally governed by administrative agencies.  *Id.*  Thus, the Court will dismiss Relators' FCA allegations based on violations of Medicare's conditions of participation.

### E. Conspiracy Claim

The last allegations that Relators bring are for conspiracy to violate the FCA under 31 U.S.C. § 3729(a)(1)(C).   Incorporating the rest of their complaint, Relators state that "[Citizens], David Brown, David Brown's employer, BioCare, Inc., Dr. Campbell, Dr. Yahagi, the employed hospitalists, and the ER physicians . . . conspired to commit the misconduct set forth [in the complaint]." Docket Entry No. 49 ¶ 123.  Relators also allege that many of the different illegal acts they alleged Defendants and the various physicians committed were overt acts committed in furtherance of the conspiracy.  *Id.* ¶¶ 124–27.

In response, Citizens incorporates the arguments against the various allegations that it made in its motion to dismiss; however, its main defense against

43

the conspiracy claims is that the intracompany conspiracy doctrine defeats liability because, even taking Relators' allegations as true, all the alleged members of the conspiracy are either agents or employees of Citizens.  *See* Docket Entry No. 53 at 46.  In support of this defense, it cites Judge Jack's decision from the related case Relators filed against Citizens, *Gaalla v. Citizens Medical Center*, 6:10-cv-14, 2010 WL 5395772 (S.D. Tex. Dec. 22, 2010), *rev'd on other grounds*, 460 F. App'x 469 (5th Cir. Feb. 16, 2012).  In *Gaalla*, Judge Jack held that the Relators' Texas civil conspiracy claim against Citizens failed under the intracompany conspiracy doctrine because Brown was an agent of Citizens.  *Id.* at *11–12. Citizens argues that the Court should rule the same in this  related case that concerns the same parties.

The  Relators' allegations in this case are sufficiently distinct from the ones Judge Jack considered in *Gaalla* that the Court cannot pass judgment on the intracompany conspiracy defense at the Rule 12 stage.  Unlike in *Gaalla*, in which Relators only pleaded the existence of a conspiracy between Citizens, Brown, Dr. Campbell, and the hospital's board of directors, in this case Relators allege the existence of a more expansive conspiracy, one that includes a larger number of physicians of a number of different practice groups, as well as some that are nonparties and nonemployees, like Dr. Yahagi and BioCare, Inc.  *See id.* at *3, 11– 12.  Determining whether these individuals and entities are agents of Citizens so as

44

to invoke the intracompany conspiracy doctrine—and, if the doctrine is applicable, determining which specific conspiracy allegations it defeats—will be a fact-intensive analysis that the Court cannot properly undertake at this stage of the case, particularly given the Rule 12 standard, which requires taking all of Relators' allegations as true. The Court therefore will allow the conspiracy allegations to go forward without prejudice to Defendants raising their defense again at summary judgment.

## IV.   BROWN AND CAMPBELL'S MOTION TO DISMISS: QUALIFIED IMMUNITY

The Court next addresses Brown and Campbell's motion to dismiss which argues that as public officials they are entitled to a qualified immunity defense.   If that defense applies to FCA claims, they would have an immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  For the reasons discussed below, the Court holds that the FCA does not provide a qualified immunity defense.

### A. Fifth Circuit Precedent

There are very few cases examining whether qualified immunity is available as a defense for government officials accused of violating the FCA.  Unfortunately for Defendants, one of the few courts that has spoken on the issue is the Fifth Circuit, and it has foreclosed the use of qualified immunity:

> The defendants have not cited, nor has our research disclosed, any case recognizing qualified immunity from claims arising under [the False Claims Act's antiretaliation provision].  Moreover, qualified immunity seems particularly ill-suited in this context, given the goals of the FCA.  In *Robertson v. Bell Helicopter Textron, Inc.*, we observed that the FCA's purpose "is to discourage fraud against the government, and the whistleblower provision is intended to encourage those with knowledge of fraud to come forward."  Granting government officials the protection of qualified immunity would hardly spur reluctant employees to step forward.

*Samuel v. Holmes*, 138 F.3d 173, 178 (5th Cir. 1998) (quoting *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994)); *see also Bell v. Dean*, 2010 WL 2976752, at *2 (M.D. Ala. July 27, 2010) (following *Samuel* to hold that,"[w]hile qualified immunity is an understandable doctrine when applied to the split-second decisions of law enforcement officers in the field, it is difficult to discern what purpose it would serve to permit retaliation against whistleblowers by public employers").

Defendants contend that *Samuel*'s effect is limited only to the section of the Act at issue in that case, the anti-retaliation provision, 31 U.S.C. § 3730(h).  But they offer no coherent principle to explain why, when qualified immunity is unavailable in that context, it should instead be available in the context of 31

U.S.C. § 3729, the Act's core ban on false claims. *See Elizondo v. Univ. of Tex. at San Antonio*, No., 2005 WL 823353, at *6 (W.D. Tex. Apr. 7, 2005) (describing *Samuel* as "holding that qualified immunity is categorically denied to government officials under the False Claims Act"). If anything, for the reasons discussed below, the anti-retaliation provision is more like the statutes protecting individual rights for which the Supreme Court has recognized immunity defenses than is the ban on false claims in which a relator is enforcing the claims of a defrauded federal government. The Court thus concludes that *Samuel* forecloses an immunity defense in this case.

### B. Qualified Immunity Analysis

Nonetheless, because *Samuel* did not address the precise section of the FCA at issue in this case, and because a district court from another circuit has read an immunity defense into the FCA, *see United States ex rel. Burblaw v. Orenduff*, 400 F. Supp. 2d 1276 (D.N.M. 2005), *affirmed on other grounds* 548 F.3d 931 (10th Cir. 2008), the Court will address in the first instance the considerations that the Supreme Court has used in determining whether qualified immunity should exist as a defense to a particular claim.

### 1. Principles of Statutory Interpretation

Judicial creation of an immunity defense for a statute where it has no textual basis is an extraordinary act of statutory interpretation. *See Dep't of Hous. &*

*Urban Dev. v. Rucker*, 535 U.S. 125, 132 (2002) (following the general principle of statutory interpretation "that Congress knew exactly how to provide an 'innocent owner' defense" in holding the textual omission of the defense rendered it inapplicable).  That is especially true for a statute like the False Claims Act in which Congress included a number of complete defenses to suit—analogous to a defense of absolute immunity—in section 3730(e).  Most notably, section 3730(e)(1) provides a defense to certain suits against military personnel that dates back to the original FCA enactment in 1863. *See* An Act to Prevent and Punish Frauds upon the Government of the United States, 12 Stat. 696, 698 § 3 (1863); Dan L. Hargrove, *Soldiers of* Qui Tam *Fortune: Do Military Service Members Have Standing to File* Qui Tam *Actions Under the False Claims Act?*, 34 Pub. Cont. L.J. 45, 56 ("[T]he 1863 Act precluded only military service members from being sued.").  Section 3730(e)(2) also bars certain suits against members of Congress, the judiciary, or the executive branch.  31 U.S.C. § 3730(e)(2).  As Judge Silberman explained in rejecting qualified immunity as a defense to the Wiretapping Act, when "Congress itself provides for a defense to its own cause of action, it is hardly open to the federal court to graft common law defenses on top of those Congress creates."  *Berry*, 146 F.3d at 1013; *cf. Carl v. Angelone*, 883 F. Supp. 1433, 1437 (D. Nev. 1995) (holding qualified immunity to be unavailable in a Title VII case where Congress provided a narrow statutory defense because

"allowing qualified immunity . . . might impermissibly increase the narrow exception Congress intended when it enacted the [statutory] provisions"); *Hepting v. AT&T Corp.*, 439 F. Supp. 2d 974, 1006 (N.D. Cal. 2006) ("Because the common law 'immunity' appears to overlap considerably with the protections afforded under the certification provision, the court would in essence be nullifying the procedural requirements of that statutory provision by applying the common law 'immunity' here.").

Because recognizing extratextual immunity defenses is at odds with ordinary principles of statutory construction, the Supreme Court has done so only when two conditions are met: "[1] if the 'tradition of immunity was so firmly rooted in the common law and [2] was supported by such strong policy reasons that Congress would have specifically so provided had it wished to abolish the doctrine.'" *Wyatt v. Cole*, 504 U.S. 158, 163–64 (1992) (quoting *Owen v. City of Independence*, 445 U.S. 622, 637 (1980) (internal citation and quotation marks omitted)). The argument seeking to impose an immunity defense against FCA claims fails on both of these fronts. As discussed below, Defendants have identified no historical basis rooted in the common law for such immunity nor shown that qualified immunity was "necessary to preserve their ability to serve the public good or to ensure that talented candidates were not deterred by the threat" of FCA suits. *Wyatt*, 504 U.S. at 167.

### 2.  Tradition of Immunity Firmly Rooted in Common Law

Defendants cite no authority demonstrating that immunity existed for *qui tam* suits when the FCA was enacted in 1863.  The history *qui tam* actions casts considerable doubt on that proposition.  A *qui tam* provision, like that found within the False Claims Act, is an ancient mechanism by which a government, finding its own enforcement actions inadequate, incentivizes private parties with original knowledge of wrongdoing to enforce public law.  *See* Note, *The History and Development of Qui Tam*, 1972 Wash. U. L.Q. 81, 86 (describing the emergence of *qui tam* "informer" statutes in England in the fourteenth century and thereafter as a means of enforcing criminal laws at a time when enforcement by public authorities was limited).  *Qui tam* statutes were widely used in early English law, eventually becoming prevalent enough that they became the subject of a complaint often heard in modern times: that they encouraged frivolous litigation.  *See Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 775–76 (2000) (noting acts by the English Parliament in the sixteenth and seventeenth centuries repealing obsolete *qui tam* informer statutes in order to eliminate abusive litigation); *see also The History and Development of Qui Tam*, *supra*, at 88–90 (detailing the reforms but noting that "in the seventeenth century the *qui tam* concept had wide acceptance in England").

As Justice Scalia noted in writing for the Court in *Stevens*, *qui tam* statutes were also common in early American law, both before and after the framing of the Constitution, and the first Congress passed a number of statutes enforceable through the *qui tam* mechanism. *Stevens*, 529 U.S. at 776. In the earliest years of the Republic, the Supreme Court noted that "[a]lmost every fine or forfeiture under a penal statute may be recovered by an action of debt [*i.e.*, a *qui tam*] as well as by information [*i.e.*, a government prosecution]." *Adams v. Wood*, 6 U.S. 336, 341 (1805). Many of these early *qui tam* statutes not only could be asserted against public officials, but were aimed directly at such officials. One allowed informers to sue customs officials who failed to publish "a fair table of the rates of fees, and duties demandable by law." *See* J. Randy Beck*, The False Claims Act and the English Eradication of Qui Tam Legislation*, 78 N.C. L. Rev. 539, 553 n.54 (2000) (citing Act of July 31, 1789, ch. 5, § 29, 1 Stat. 29, 44-45 (repealed 1790)). Another "punished fraud or neglect of duty by marshals participating in the first census." *Id.* (citing Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. 101, 102 (obsolete); Act of July 5, 1790, ch. 25, 1 Stat. 129 (obsolete)). Still others authorized *qui tam* suits to be brought against Indian agents violating Indian trading laws and against marshals engaged in illegal activities. *See* Jerry L. Mashaw*, Recovering American Administrative Law: Federalist Foundations* 1787-1801, 115 Yale L.J. 1256, 1318 n.210 (2006) (citing An Act for Establishing Trading Houses with the Indian

51

Tribes, ch. 13, § 3, 1 Stat. 452, 452-53 (1796); An Act Providing for the Enumeration of the Inhabitants of the United States, ch. 2, § 3, 1 Stat. 101, 102 (1790)).  Yet for the analogous common-law claims that could be used to recover from wayward public officials in this period, "[o]fficial immunity was nonexistent. The officers only defense was that they were carrying out their statutory responsibilities."[5]  *Id.* at 1321; *see also id.* at 1334 ("office-holding carried no special immunity from suit").  In fact, because of the prospect that such lawsuits would lead to the imposition of fines against public officials, bonds or sureties, sometimes of substantial amounts, "were often required before administrators were eligible to take up their positions."  *Id.* at 1317.

Although many of the early *qui tam* statutes had long expired, it was on this historical background of enforcement of public law by *qui tam* relators that, in 1863, Congress enacted the False Claims Act to stem fraud by contractors supplying the Union Army during the Civil War.  *See Stevens*, 529 U.S. at 768. Defendants point to no source, and this Court is aware of none, showing that the

---

[5] Courts have recognized this type of immunity for officials subject to FCA suits.  If the allegations against a public official do not demonstrate any personal gain arising from the FCA violations, then the suits are considered to be brought against the individual in his or her official capacity, which amounts to a suit against the government employer itself.  *See, e.g.*, *Alexander v. Gilmore*, 202 F. Supp. 2d 478, 482 (E.D. Va. 2002) (holding that the allegations do not suggest the defendants "were acting in  anything other than their official capacities" in submitting a grant for their government employer because there were no allegations they "converted [grant funds] to their personal use") (citing cases)).  In this case, Relators allege that both Brown and Campbell personally benefited from the alleged schemes.  Docket Entry No. 49 ¶ 123 n.34 (alleging that the scheme benefitted Brown personally as well as his private employer, BioCare, Inc.); *id.* ¶ 125 (detailing alleged benefits Campbell received, which include those discussed above with respect to the "Cardiologists").

common law recognized an immunity defense for *qui tam* defendants in 1863.

Defendants, citing *Orenduff*, argue that qualified immunity is available because Congress failed to expressly abrogate the defense when it amended the Act in 1986. *See Orenduff*, 400 F. Supp. 2d at 1280. But given that no cases in the 120-year history of the FCA prior to 1986 had recognized an immunity defense, this Court does not see how Congress's silence in amending the Act can be construed as adopting one. That is especially true because the background against which Congress was legislating in 1986 was one in which FCA cases had been brought against public officials without so much as a whisper of an immunity defense. *See Smith v. United States*, 287 F.2d 299, 304 (5th Cir. 1961) (affirming FCA judgment against Executive Director of the Beaumont Housing Authority).

*Orenduff* relied on Congress's presumed knowledge in 1986 of "government officials' general entitlement to qualified immunity," which stemmed from the Supreme Court cases recognizing such a defense in section 1983 civil rights actions. *Orenduff*, 400 F. Supp. 2d at 1280 (citing *Harlow*, 457 U.S. at 807). But the significance to be afforded *Harlow* in discerning Congress's intent in enacting the 1986 amendments to the FCA is limited because of the starkly different nature of *qui tam* suits and the *Bivens* suit at issue in *Harlow*. Qualified immunity usually arises in *Bivens* suits or suits brought under 42 U.S.C. § 1983 to remedy violations of an individual's constitutional rights, and, as noted, is derived from the

53

traditional immunity of "good faith and probable cause" available to law enforcement officials at common law.  *Pierson*, 386 U.S. at 556–57; *see Berry v. Funk*, 146 F.3d 1003, 1013 (D.C. Cir. 1998) (stating that "[q]ualified immunity is typically invoked in two types of cases: *Bivens* actions—constitutional torts— brought against federal officers and claims brought against state officers under 42 U.S.C. § 1983").  Some courts have also held that the defense may be raised in comparable suits brought to remedy violations of an individual's statutory rights, even if the cause of action is a novel, congressionally-created one with no analogue at common law.  *See, e.g.*, *McGregor v. La. State Univ. Bd. of Supervisors*, 3 F.3d 850, 862 (5th Cir. 1993) (qualified immunity available as a defense to Rehabilitation Act claims); *Cronen v. Tex. Dep't of Human Servs.*, 977 F.2d 934, 938–40 (5th Cir. 1992) (qualified immunity available as a defense to Food Stamp Act claims); *Tapley v. Collins*, 211 F.3d 1210, 1215, n.9 (11th Cir. 2000) (listing other cases recognizing qualified immunity defense to federal statues).  The common theme is that qualified immunity will be available when the plaintiff is suing to remedy a government official's violation of the plaintiff's individual rights for which a common law defense would have existed.  The qualified immunity standard reflects the defense's typical application to these cases asserting individual rights: the defense is available for officials "insofar as their conduct does not violate clearly established statutory or constitutional *rights* of which a

reasonable person would have known." *Harlow*, 457 U.S. at 818 (italics added).

The FCA is different. The *qui tam* provision does not give a relator an individual statutory right or, like section 1983, provide a means by which an aggrieved party may seek redress for wrongs done to his individual constitutional rights. In fact, False Claims Act relators do not even have Article III standing on their own, and in their suits they assert the standing assigned to them by the United States. *See Stevens*, 529 U.S. at 773 (concluding as such and stating that "[a] *qui tam* relator has suffered no such invasion [of a legally protected right]—indeed, the 'right' he seeks to vindicate does not even fully materialize until the litigation is completed and the relator prevails"). Instead, the False Claims Act, like the early English informer statutes, is an enforcement statute, one that "imposes damages that are essentially punitive in nature." *Id.* at 784; *see also Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 130 (2003) (confirming that the treble damages provision of the False Claims Act gives the statute a punitive component). Put another way, it just makes little sense that Congress would have intended to include an immunity defense, albeit a qualified one, for a government official accused of stealing from the government, especially when the defrauded government could be his employer.[6]

---

[6] This case involves officials of a local government entity, but if the statute provides a qualified immunity defense, presumably that defense would also be available to federal employees who are sued under the FCA.

The point is not that committing fraud against the federal government is a more serious offense than violating an individual's constitutional rights, but that the common law recognized immunity for actions similar to the latter situation but there is no indication of a common law immunity defense for the former. *Compare Pierson v. Ray*, 386 U.S. 547, 556–57 (1967) (deriving the forerunner of today's defense of qualified immunity for law enforcement officers sued for false arrest under section 1983, because a defense of "good faith and probable case" would have been available to them at common law), *with Wyatt*, 504 U.S. at 160, 164, 168–69 (holding, in a section 1983 suit against private defendants accused of wrongly utilizing a state garnishment statute, that qualified immunity was unavailable because those parties would not have had immunity at common law from the analogous torts of malicious prosecution and abuse of process).   The Court is therefore unable to conclude that the common law recognized an immunity defense for public officials accused of defrauding the government when the FCA was enacted in 1863 or when it was amended in 1986.

### 3. Policy Justifications for Qualified Immunity

It is unclear whether the Supreme Court still considers "policy concerns involved in suing government officials" relevant in determining whether a statute includes a qualified immunity defense.   *Wyatt*, 505 U.S. at 166 (O'Connor, J.). Justice Kennedy's *Wyatt* concurrence, which as the narrowest grounds for rejecting

the immunity defense is likely controlling, *see Marks v. U.S.*, 430 U.S. 188, 193

(1977) ("When a fragmented Court decides a case and no single rationale

explaining the result enjoys the assent of five Justices, 'the holding of the Court

may be viewed as that position taken by those Members who concurred in the

judgments on the narrowest grounds.'") (quoting *Gregg v. Georgia*, 428 U.S. 153,

169 n.15 (1976) (opinion of Stewart, Powell, & Stevens, JJ.)), takes the view that

"immunity doctrine is rooted in historical analogy, based on the existence of

common-law rules . . . rather than in 'freewheeling policy choices.'" *Wyatt*, 505

U.S. at 170 (Kennedy, J., concurring) (quoting *Malley v. Briggs*, 475 U.S. 335, 342

(1986)).

It remains the case, however, that Supreme Court cases recognizing an

immunity defense do rely in part on policy justifications. *See, e.g., Imbler v.

Pachtman*, 424 U.S. 409, 424-27 (1976) (considering consequences such as

constraints in decision-making of prosecutors and the functioning and fairness of

the criminal justice system); *Butz v. Economou*, 438 U.S. 478, 506-07 (1978)

(evaluating "the need to protect officials who are required to exercise their

discretion and the related public interest in encouraging the vigorous exercise of

official authority"); *Harlow*, 457 U.S. at 819 (citing "the public interest in

deterrence of unlawful conduct and in compensation of victims"); *Mitchell v.

Forsyth*, 472 U.S. 511, 526 (1985) (noting as important considerations, "the

general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service") (internal quotations omitted) (quoting *Harlow*, 457 U.S. at 816). This Court therefore will consider whether such policy concerns support qualified immunity in FCA cases. *See also Samuel*, 138 F.3d at 178 (considering policy in rejecting immunity defense for FCA retaliation claims).

The following policy rationale was cited by the one court that has recognized an FCA immunity defense: "if there is a difference between protecting individual rights and protecting the government's money, officials should be encouraged more strongly to protect individual rights.  Presumably, then, immunity should be available less easily when statutes protecting individual rights are involved, and the fact that the FCA protects the government's money rather than individual rights actually militates in favor of applying qualified immunity not against it."  *Orenduff*, 400 F. Supp. 2d at 1281.  In addition to ignoring the importance of identifying a historical basis for an immunity defense, this analysis considers the importance of the plaintiff's claim without addressing the side of the equation where the Supreme Court has focused its policy considerations: whether the lawsuits are "disruptive of effective government."  *Harlow,* 457 U.S. at 817 ("In short, the qualified immunity recognized in *Harlow* acts to safeguard government, and thereby to protect the public at large, not to benefit its agents.").

58

Those concerns include "distraction of officials from their governmental duties, inhibition of discretionary authority, and deterrence of able people from public service." *Mitchell*, 472 U.S. at 526. None of those concerns are strongly implicated when it comes to the FCA.

With respect to the "problem of time and energy distraction," *Clinton v. Jones*, 520 U.S. 681, 720 (Breyer, J., concurring) (calling this factor "a critically important consideration militating in favor of a grant of immunity") (citing cases), the paucity of FCA cases addressing an immunity defense indicates that the *qui tam*s against public officials are not common enough to implicate such concerns. *Cf. Mitchell*, 472 U.S. at 511 (comparing the high likelihood of suit against actors in the judicial process like judges, prosecutors, and witnesses absent absolute immunity with the less likely prospect of "vexatious litigation" against executive officials making national security decisions); *Imbler*, 424 U.S. at 423. And to the extent the Supreme Court has been motivated by not just the number of potential claims against public officials but also the prospect of frivolous ones, Rule 9 provides a screening function for FCA cases that does not exist for the paradigmatic section 1983 or *Bivens* constitutional claim in which qualified immunity can serve that role. *See Leatherman v. Tarrant County*, 507 U.S. 163, 164 (1993) (rejecting a heightened pleading requirement for section 1983 case alleging unlawful search).

59

Nor is the absence of an immunity defense to FCA claims likely to inhibit the decisionmaking of public officials.  Unlike the "split-second decisions of law enforcement officers in the field" that may result in violations of constitutional rights that do not have a *scienter* requirement, FCA liability only attaches if a defendant "knowingly presents . . . a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A);   *see Bell*, 2010 WL 2976752, at *2 (contrasting the "understandable" role qualified immunity plays in the law enforcement context with its lack of justification in the FCA context).  The "knowingly" requirement builds into the FCA much of the "breathing room to make reasonable but mistaken judgments about open legal questions," *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011), that a qualified immunity defense provides.   As the cases Defendants cite in their response to the United States's statement of interest make clear, the *scienter* requirement—which, at the very least, requires a defendant to recklessly disregard the truth or falsity of the claim presented, *see* 31 U.S.C. § 3729(b)(1)— serves to eliminate the prospect of liability in cases where the legality of the defendant's actions is open to debate.  *See United States ex rel. Siewick v. Jamieson Science & Engineering*, 214 F.3d 1372, 1378 (D.C. Cir. 2000) (holding as such where there was "only legal argumentation and possibility" and not clear guidance on what the law was); *see also United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 684 (5th Cir. 2003) (en banc) (Jones, J., concurring) ("Where there

are legitimate grounds for disagreement over the scope of a contractual or regulatory provision, and the claimant's actions are in good faith, the claimant cannot be said to have knowingly presented a false claim.") (citation omitted). Therefore, qualified immunity, which "protects 'all but the plainly incompetent or those who knowingly violate the law,'" *al-Kidd*, 131 S. Ct. at 2085 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)), has little role to play in False Claim Act cases, and it is not likely Congress intended it to apply another thin layer on top of the "knowingly" requirement plaintiffs already must establish.

Because there is not a time-consuming flood of FCA suits against public officials and the fear of such litigation is not likely to inhibit their ability to make tough judgment calls given the FCA's *scienter* requirement, it is doubtful that rejecting an immunity defense for a statute that is over 150 years old will deter qualified people from public service. But this inquiry need not be speculative. *Samuels* was decided more than fifteen years ago, and there is no indication that it has distracted or deterred public officials in the Fifth Circuit.

An examination of the policy rationales that have justified immunity defenses in other areas thus leads to the same conclusion as precedent and history: the FCA does not include a qualified immunity defense.

In light of this ruling that they are not entitled to a qualified immunity defense, the claims directed at Brown and Campbell are resolved in the same

manner as the allegations against Citizens.

## V.   CONCLUSION

Most of Relators' allegations survive the motions to dismiss, and the Court therefore **GRANTS IN PART** and **DENIES IN PART** the motions to dismiss (Docket Entry Nos. 53, 54) as discussed above.  Relators will face a more difficult challenge later in this case for those claims that survive: they must come forward with evidence to show that the hospital's claims were false or fraudulent.

To summarize the post-Rule 12 posture of this case, the following allegations survive the motions to dismiss and shall proceed:

- All of Relators' AKS- and Stark-predicated FCA allegations concerning the ER physicians, the cardiologists, the gastroenterologists, the urologists and the lithotripsy group, and Dr. Yahagi;

- All of Relators' allegations that Defendants violated the FCA directly by providing unnecessary or worthless medical services; and

- All of Relators' allegations that Defendants conspired to violate the FCA.

`The following allegations are **DISMISSED WITH PREJUDICE**:

- All of Relators' AKS- and Stark-predicated FCA allegations concerning the hospitalists and Drs. Leggett, Espinosa, Llompart, and Seiler;

- All of Relators' FCA allegations predicated on violations on Texas's ban on the corporate practice of medicine, Tex. Occ. Code Ann. § 165.156; and

- All of Relators' FCA allegations predicated on violations of the Medicare condition of participation contained in 42 C.F.R. § 482.12(a)(6).

Additionally, because the Court holds that qualified immunity is not available as a defense for Brown and Dr. Campbell, Defendants' motion to stay discovery (Docket Entry No. 61) is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

**SIGNED** this 20th day of September, 2013.

_____
Gregg Costa
United States District Judge